## Page 1

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:23-CV-22276-BB

PATRICK MULLER, an Individual, and
MOUNA BOUZID, an Individual,
    Plaintiffs,
v.

ITEB ZAIBET a/k/a "Swagg Man", an Individual,
LOLITA C. REBULARD, an individual, LUXURY
PROPERTIES, INC., a Delaware corporation,
BEACH PROPERTIES RENTAL, INC., a
Delaware corporation, LUXURY PROPERTIES TRUST
u/a/d/ March 2, 2018, AAA PLUS
FINANCIAL GROUP, INC., a Florida corporation,
YVETTE TENORD, an Individual, JOHNNY
PREVILUS, an individual, RES INVESTMENT
INTER, INC., a Florida corporation, INFINITE
RES INVESTMENT, LLC, a Nevada limited
liability company, MIAMI REALTY, CORP., a
Florida corporation, and GUZMAN305 TRUST, a
Florida trust,
    Defendants.
_____/

DATE:   April 12, 2024
TIME:   2:21 p.m. - 4:40 p.m.
PLACE:  Via remote video Zoom

VIDEOCONFERENCE DEPOSITION OF MOUNA BOUZID

Kimberly Hacker
United Reporting, Inc.
Litigation Building
633 South Andrews Avenue, Suite 202
Fort Lauderdale, Florida 33301
(954) 525-2221

## Page 2

APPEARANCE FOR THE PLAINTIFFS:
    TAYLOR, DAY, GRIMM & BOYD
    50 North Laura Street, Suite 3500
    Jacksonville, Florida 32202
    BY: JOHN D. OSGATHORPE, ESQUIRE

APPEARANCE FOR THE DEFENDANTS:
    CONRAD & SCHERER, LLP
    633 South Federal Highway, Suite 800
    Fort Lauderdale, Florida 33301
    BY: JASON R. ADAMSKY, ESQUIRE and
    STEVEN H. OSBER, ESQUIRE and
    CLAYTON PENGEL/OBSERVING

APPEARANCE FOR THE DEFENDANT/LUXURY PROPERTY TRUST:
    REINER & REINER, P.A.
    9100 South Dadeland Boulevard, Suite 901
    Miami, Florida 33156
    BY: DAVE P. REINER, ESQUIRE and
    ERIC REINER, OBSERVING

ALSO PRESENT:
    SCOTT HOMLER, INTERPRETER
    Translation In Motion

## Page 3

INDEX

WITNESS                                              PAGE
Mouna Bouzid
Direct Examination by Mr. Adamsky                    5


EXHIBIT
DEFENDANT'S   DESCRIPTION                            PAGE
1 *           Luxury Property document               44


(Exhibit in possession of Counsel.)
*(Exhibit has been previously marked in Patrick Muller's deposition taken on April 12, 2024.)

## Page 4

1       COURT REPORTER: Are we all ready to go ahead?
2   I'll go ahead and get our interpreter sworn in and
3   then our witness.
4       Mr. Interpreter, do I have your consent to
5   swear you in via remote video zoom this afternoon?
6       INTERPRETER: Yes.
7       COURT REPORTER: Very good.
8       Sir, do you swear or affirm that the testimony
9   you're about to translate is a correct translation
10  from English to French and French to English?
11      INTERPRETER: Yes.
12      COURT REPORTER: Madam, please raise your
13  right hand.
14      Do I have your consent to swear you in via
15  remote video Zoom this afternoon?
16      WITNESS: Yes.
17      COURT REPORTER: Do you swear or affirm that
18  the testimony you're about to give this afternoon
19  via remote video Zoom will be the truth, the whole
20  truth, and nothing but the truth?
21      WITNESS: I swear under the name of God that I
22  will provide testimony that is the complete truth.
23      COURT REPORTER: Thank you. And we're all set
24  to go.
25

Page 5

1    DIRECT EXAMINATION
2  BY MR. ADAMSKY:
3    Q. Good afternoon, Ms. Muller.
4        Can you hear me okay?
5    A. Yes.
6    Q. Should I address you as Ms. Bouzid or
7  Ms. Muller?
8    A. Ms. Muller.
9    Q. I know you were present at the deposition of
10 your husband this morning, and I may go through a few of
11 the ground rules again, so I'll try to be as brief as
12 possible.
13       Is there anyone else in that room with you
14 right now?
15   A. Yes, Mr. Muller is here, that's all.
16   Q. If I could have Mr. Muller please be on the
17 camera during the deposition or leave the room, if you
18 prefer.
19       MR. ADAMSKY: I'm answering you that I am
20 here.
21   Q. Ms. Muller, have you ever given a deposition
22 before?
23   A. It is the first time that I am in court.
24   Q. I'm going to be asking questions, and then the
25 interpreter is going to be giving a translation to you.

Page 6

1    A. Okay.
2    Q. I understand you may know some English, but I
3  would ask that you base your answers upon the
4  translation given by the interpreter and not what you
5  understand from me saying in English.
6    A. I didn't understand your question.
7        Does that mean I'm supposed to speak in
8  English or what?
9    Q. When you listen to the question, listen to the
10 interpreter saying it in French rather than trying to
11 understand me saying it in English.
12   A. Okay.
13   Q. If you need a question rephrased or repeated,
14 please let me know. Otherwise, I'll assume you
15 understood the question.
16   A. Okay.
17   Q. Mr. Muller cannot assist you in any way in
18 this deposition, so please, please be mindful of that.
19   A. Okay, no problem.
20   Q. Aside from any conversations you may have had
21 with your attorney, did you do anything to prepare for
22 this deposition today?
23   A. No, I didn't prepare.
24   Q. Ms. Muller, so that we have it for the record,
25 can you please state and spell your full name?

Page 7

1    A. My name is Mouna Bouzid Muller. It is spelled
2  M-O-U-N-A. My family name, B-O-U-Z-I-D and Muller,
3  M-U-L-L-E-R.
4    Q. You currently live with your husband in
5  Tunisia?
6    A. I am Tunisian, yes.
7    Q. Are you from Tunisia originally?
8    A. Yes.
9    Q. Have you lived anywhere outside of Tunisia?
10   A. I was born in Tunisia. I've lived in Tunisia,
11 and then after that I have spent time in both France and
12 Tunisia.
13   Q. What is your date of birth?
14   A. Okay, so I was born in 1973, August 4th. I'm
15 50 years old.
16   Q. And I apologize, I forgot to ask Mr. Muller
17 his date of birth during his deposition.
18       What is his date of birth?
19   A. He was born on October 5, 1955.
20   Q. Ms. Muller, are you currently employed?
21   A. I am an associate with Mr. Muller in this
22 company.
23   Q. You're an employee of Nimetex?
24   A. Nimetex Group.
25   Q. How long have you been with Nimetex Group?

Page 8

1    A. I don't remember. 23 maybe -- or, excuse me,
2  2003 maybe. So I guess it would be 20 years.
3    Q. Okay. How long have you been married to
4  Mr. Muller?
5    A. That's my private life. I can't answer those
6  sorts of questions. My husband and I have two
7  daughters, I can tell you that.
8    Q. I understand, ma'am. I'm not in any way
9  asking these questions to embarrass you. These are just
10 standard questions that I have to ask for the case.
11   A. I can tell you that I have a 14-year-old
12 daughter and a twelve-year-old daughter.
13       MR. MULLER: Give him the date. Give him the
14 date.
15       MR. ADAMSKY: Hold on.
16       Mr. Muller, again, this is only your wife's
17 deposition. You had a chance to speak this
18 morning. This is separate now. This is your
19 wife's deposition, so you cannot give any input.
20 You cannot speak.
21       MR. MULLER: I'm right here, so I am
22 answering. I'm moving slightly to the side in
23 order not to respond.
24       MR. OSGATHORPE: Mr. Muller, again, it's just
25 going to make it quicker if you don't respond.

Page 9

1  Ms. Muller is -- Jason is not intending to
2  inquire into deep personal issues. And if he gets
3  something completely off track, he and I will
4  address that.
5  But as to when you two were married, and,
6  again, if there's some reason that's particularly
7  sensitive to you, I'm sure Jason and I can work out
8  where that will be stated off the record.
9  MR. MULLER: Okay.
10  MR. ADAMSKY: I can assure you that I am not
11  trying to be here any longer than is necessary, and
12  as long as we all follow the rules of this
13  deposition, we'll get out of here as quickly as
14  possible.
15  BY MR. ADAMSKY:
16  Q. The question we left off at, Ms. Muller, was I
17  just asked how long you had been married to your
18  husband?
19  A. So again, I repeat, this is a question about
20  my private life that I don't want to answer. However,
21  we were married on 29 December 2007. And I would ask
22  you not to ask so many questions about my private --
23  this is our private life.
24  Q. And I assure you I'm not here to pry into your
25  private life. I'm asking background questions. And

Page 10

1  then I need to ask questions that involve this case. So
2  none of these questions are being asked to embarrass you
3  or to get personal information.
4  Ms. Miller, I'm going to refer to one of the
5  parties in this case as Iteb Zaibet, also known as
6  Swagg Man. So if I refer to one or the other
7  interchangeably, that's who I'm referring to.
8  A. So you mean Iteb, okay.
9  Q. When did you first meet Iteb?
10  INTERPRETER: Interpreter notes that
11  Ms. Muller is quite difficult to hear. I'm not
12  sure what the issue is.
13  A. So the day that he got out from prison, the
14  next day he came to this factory here to meet with my
15  husband and I. That is the exact same answer that my
16  husband gave earlier.
17  Q. Were you involved in helping Iteb get out of
18  prison?
19  A. Yes, I saved -- yes, I got him out of prison,
20  yes.
21  Q. And how did you do that?
22  A. Based on assistance from -- or advice from
23  attorneys.
24  Q. Did you contribute money towards his bail?
25  How did you help get him out of jail?

Page 11

1  A. I paid the bail to get him out of prison.
2  Q. Do you know why he was in prison?
3  A. Yes.
4  Q. What was your understanding of why he was in
5  prison?
6  A. So do you want my opinion or do you want what
7  the lawyers have said?
8  The reason he was in prison was for fraud and
9  for money laundering. But according to the attorneys,
10  they said he was the victim, that he was innocent, and I
11  believed them.
12  Q. So what was the reason you contributed money
13  to get him out of prison?
14  A. So it is a long story. I don't want to go
15  into the details.
16  INTERPRETER: Interpreter needs to clarify.
17  A. Okay. So it was to save his life. And ever
18  since then, I've had nothing but problems. But I don't
19  really want to go into any more details about that
20  because it hurts too much. I don't want to see or know
21  anything from him anymore. It just hurts too much.
22  Q. What do you mean, it was to save his life?
23  A. Well, somebody who's been convicted and sent
24  to prison and who has all of these problems, and you pay
25  their bill to get them out, I mean, that's saving their

Page 12

1  life, isn't it?
2  Q. You did this as a favor for him?
3  A. No, no, not a favor.
4  Q. What was communicated to you about how he
5  ended up in prison that led you to want to bring him
6  out?
7  Can you give more detail?
8  INTERPRETER: Interpreter notes that it's hard
9  to hear her.
10  A. So at first, I didn't think that I would ever
11  be in a situation where I would want to help this
12  person.
13  Q. Who told you that? How did you learn that
14  Iteb was in prison?
15  A. On TV.
16  Q. Did someone reach out to you personally?
17  A. Yes. After that, his attorney contacted me,
18  yes, because we have friends in common.
19  Q. So Iteb's attorney reached out to you through
20  mutual friends to ask for help getting him out of jail?
21  A. Okay, so -- well, it wasn't exactly like that.
22  I mean, it wasn't like I was exactly getting him out of
23  prison directly. But his lawyer created this image of
24  him as somebody who was innocent, an honest person,
25  somebody who was successful in life and who had a lot of

Page 13

advantages, somebody that was honest and who wanted to help Tunisia, particularly to help the poor.
And so I was very sensitive to that presentation of his story.
INTERPRETER: Interpreter needs to ask for one clarification.
A. So it was his first attorney, Mehdi Louzi, who provided that information.
COURT REPORTER: Can I have the spelling, please?
A. First name, M-E-H-D-I. The last name, L-O-U-Z-I.
COURT REPORTER: Thank you.
Q. So how did he get connected to you? How did your name come up?
A. Are you talking about Mehdi or are you talking about Iteb? I didn't quite understand.
Q. I am talking about how did Iteb get connected to you?
How did your name come up for his lawyers to reach out to you?
A. So it was through his wife, Lorita, and they asked me for help.
Q. I understand that, but how did they know to ask you for help?

Page 14

A. What do you mean exactly? I didn't understand. Mehdi Louzi didn't just ask me, Mehdi asked several people.
Q. I'm sorry, what is that name you're saying?
A. Mehdi Louzi.
Q. Who is Mehdi Louzi?
A. The name of a Tunisian lawyer, his first lawyer.
Q. Okay. How did Iteb's wife -- Iteb's wife is Lolita Rebulard?
A. Yes.
Q. Sometimes I guess I've heard of her referred to as Lorita.
A. Lolita, Lolita, is her name, not Lorita.
Q. How did Lolita know you?
A. Through Mehdi, so it was through Mehdi Louzi that I was introduced to her. And this was during the pandemic, the time with COVID. And he told me that she was somebody who was suffering, that she was alone because her husband was in prison, and she didn't have a job and she had nothing to eat, she was living with her parents and her husband was in prison. So it was to help her to get a job.
Q. How do you know Mehdi Louzi; is that a friend of yours?

Page 15

A. Through a friend that we both had -- a friend whose children were in the same school as mine in the French school in Sousse.
Q. Are you or your husband well known in Tunisia?
A. Yes, sir. Nimetex Group. So, yes, we're very well known. Our reputation is very well known in the country of Tunisia. The name Muller is very well known. I want you to know who we are, who I am exactly.
Can I explain that to you?
Q. Yes, please.
A. So I'll just talk about the pandemic period. We are people who have a big heart. We are very humane, and we work with our hearts. We're very sensitive to the problems of others, especially my husband.
And, again, particularly during the pandemic, we bought so many ventilators. We spent so much money or gave so much money for health operations in Tunisia, to help Tunisia with respect to the pandemic. And we bought so many ventilators. I've got the proof here. I can show you.
So I have a letter here thanking me. And this is a letter that comes from the government of Tunisia to thank me for all of the work that we did with respect to schools and so on during the pandemic.
I made 100,000 masks for Tunisia during the

Page 16

pandemic. We made 100,000 masks for distribution in Tunisia. I hope you got the exact number, 100,000. And that's to give you an idea of who it is that I am. And I've been like that my whole life.
So this is just to give you an idea of my reputation and the degree to which I am a person motivated by human interests and helping those who are in need. And never in my whole life did I ever think I'd end up in court, and it's a shame or a humiliation for me to be here.
Q. Aside from the mutual friend, do you think part of the reason that Iteb reached out to you is because of your reputation?
A. Of course. So, I mean, I don't want to talk about myself too much, but I can tell you simply that I am a woman who's worked hard. I started from nothing, and I'm not ashamed to say that. And I built my fortune. My husband and I built our fortune in a way that was clean and in a way that was honest.
Q. Aside from Iteb, have you or your husband ever helped anybody else get out of jail?
A. No. And I would never do that again.
Q. Did you do any research or investigation as to why Iteb was put in jail?
A. Well, I know all Tunisia. I know the image.

Page 17

1  And I saw him on TV, and it's because there were a lot
2  of political issues. If you want to come to Tunisia and
3  invest and you're young and you want to help, we have a
4  lot of political problems. But I would say that he had
5  a good image.
6      Q. What I'm asking about specifically is aside
7  from his image, did you inquire about the charges
8  against him?
9      A. No, because his lawyer -- in fact, he had
10 three lawyers who all declared his innocence. So I
11 didn't investigate any further, no.
12     Q. Was getting Iteb out of prison -- did that
13 have anything to do with wanting to do business with
14 him?
15     A. Well, the plans to begin doing business with
16 him were, I guess, addressed initially while he was
17 still in prison, and they were discussed with his
18 attorney and with Lolita.
19     Q. So part of the reason you wanted to help him
20 out of prison is because you were interested in doing
21 business with him?
22     A. No. In fact, no.
23     Q. Did you make any arrangements to do business
24 with him while he was still in prison?
25     A. So it wasn't directly with me. It was through

Page 18

1  his attorney and Lolita, the attorney, who would go and
2  see him every week in jail and would talk about these
3  things. And the idea was that there were two brands --
4      INTERPRETER: The interpreter is going to need
5  to clarify.
6      A. Two U.S. brands.
7      INTERPRETER: So they're clothing brands, and
8  the interpreter needs to clarify further.
9      A. So there were two brands that he wanted to
10 produce in the U.S., but there was nobody there to do
11 that. And he tried to do a pilot of these brands or a
12 test run of these brands, but they didn't work out well
13 in Tunisia.
14     Q. Okay, so he knew you had a textile operation,
15 and that's why he wanted to do business with you?
16     A. Maybe. So, yeah, the truth is -- well, I
17 learned the truth of his motivations later. But the
18 idea was that he would plant this dream in my head
19 about -- or that he had this dream of working --
20     Well, he planted this dream of working with
21 the U.S. market. I work with the French market on high
22 end goods, and I don't want to list the names of the
23 clients in France because they're high end.
24     But the attorney was explaining that there
25 were lots of opportunities to be pursued in the U.S.

Page 19

1  market.
2      Q. Did you eventually go into business with Iteb
3  on these clothing brands?
4      A. No, we never engaged in these projects. These
5  were just discussions. These were just sort of ideas,
6  dreams.
7      Q. For these clothing projects that you
8  discussed, did he ever ask for any money or any
9  investment?
10     A. In textile you mean?
11     Q. Yes.
12     A. So in terms of textiles, there were
13 discussions with Lolita about producing masks, as my
14 husband testified earlier, and this was during the
15 pandemic, and we were making masks.
16     And so the attorney was asking me if I could
17 help find work for her because she was living in France
18 with her family. And so the idea was for her to
19 identify clients in France, and in exchange for that,
20 provide her with a percentage. And I have all of the
21 proof of that.
22     Q. Okay. So you mentioned that you never --
23 these discussions about textile projects never led to
24 anything.
25     A. Yes, that's exactly right, nothing. So that

Page 20

1  was the first trap, yes.
2      Q. Okay. So what you're saying is that -- strike
3  that.
4      Prior to this real estate investment issue in
5  Miami, did you or your husband ever enter into a
6  business arrangement with Iteb or his wife?
7      A. No, just words.
8      Q. Prior to the Miami real estate situation, did
9  Iteb Zaibet ever ask for money from you?
10     A. Do you mean before the real estate deal?
11     Q. Correct.
12     A. So I'm not sure how I can explain all of this
13 in detail or how to explain all of this.
14     You know, he's somebody who will project a
15 false image of something and have you try to believe it.
16     Q. I understand.
17     The question was did he ever ask for money
18 prior to the Miami real estate deal?
19     A. When he was in prison or after prison?
20     Q. After prison.
21     A. Well, as my husband said earlier, he would
22 come and ask about things like investing in a luxury
23 car, like a Ferrari or a luxury watch. But I said,
24 well, these are things that I don't know anything about,
25 so it's not worth it to me.

Page 21

1  Q. But these -- to clarify, these were investment
2  opportunities, not him asking to borrow money
3  personally?
4  A. I don't understand. So just, I want to
5  explain to you, the attorney here. My husband called
6  these people fraudsters before, Lolita and Iteb, but I
7  think the real word is thieves, they're criminals.
8     I want you to understand that, Mr. Attorney
9  Adamsky. I also want to let you know that while I've
10 known him, Iteb, I never called him Iteb. I called him
11 Ryan. I just want you to know that as well.
12    INTERPRETER: The interpreter needs to
13 clarify.
14 A. Ryan Sanchez, so we called him Ryan Sanchez,
15 Ryan.
16 Q. Did you know that this was not his real name?
17 A. After we did, yes.
18 Q. So this whole time before the Miami deal, you
19 thought his name was Ryan Sanchez?
20 A. Well, the explanation that he gave to
21 everybody is that his mother was Brazilian and his
22 father was Tunisian, and he was ashamed of the name
23 Iteb, and that's why he changed it to Ryan. So that's
24 the story that everybody knew.
25 Q. So you knew his name was Iteb, but Ryan was

Page 22

1  the name -- Ryan Sanchez was the name that he preferred?
2  A. Yes.
3  Q. In these discussions where you were talking
4  about these business ventures, who was dealing with
5  Iteb?
6     Was that you or was that your husband?
7  A. Well, sometimes it was me, sometimes it was
8  Patrick with Lolita, et cetera.
9  Q. You were either dealing with --
10 A. There is something important that I want to
11 tell you, something very important.
12    So I just want to say that when you hear
13 Lolita's voice on the telephone, she sounds so sweet,
14 she sounds so nice, she's so nice. You would have no
15 doubt about how nice she is. She's always saying please
16 and thank you, very polite. You'd have no doubt about
17 who she is. But there's a whole different real image
18 behind her.
19 Q. So again, you were --
20    It was both you and your husband dealing with
21 Iteb and Lolita in talking about these business
22 ventures?
23 A. Yes.
24 Q. How did the topic of investment in Miami come
25 up?

Page 23

1  A. Okay, so it's quite simple. As I mentioned, I
2  have two daughters, and I always had this idea of
3  investing in real estate because, you know, ours is a
4  private company, and real estate is a way to have
5  something stable, something reassuring. It's a way of
6  having stable revenue.
7     So my idea was to buy two apartments for two
8  girls and to rent them out as a way of having regular
9  income in case something were to happen to us or if I
10 were to pass away early, they would have that stable
11 revenue.
12    And then especially, I mean, I never thought
13 that he would be such a bad person. And I always
14 believe that if you do good, then good will come back to
15 you, and if you do bad, then you'll be met with bad.
16 But I never imagined ever that doing good could result
17 in so much bad in this case.
18    So when Lolita was sick with Corona, I sent a
19 doctor to her, I brought meals to her. I thought, well,
20 there's no way you can leave this poor woman alone, her
21 husband is in prison. And there were so many people
22 dying from Coronavirus. So I felt like I was helping
23 save her life, and I did this for her.
24    And when you do something like that for
25 someone, it's just impossible that they could try to

Page 24

1  hurt you like that. And I helped him get out of prison,
2  so it was just unthinkable that they could do something
3  so despicable to us after all of the help that I
4  provided them.
5  Q. Ms. Muller, I understand there's a lot that
6  you have on your mind about this case, but I'm trying to
7  speed things along and get us out of here as quick as
8  possible. So if you could just focus on the question
9  I'm asking, and we'll go along, and at the end you can
10 explain these thoughts.
11 A. Okay.
12 Q. Thank you.
13    INTERPRETER: Interpreter notes. We've been
14 going for nearly an hour and the interpreter needs
15 a break.
16    MR. ADAMSKY: No problem. We'll take three
17 minutes.
18    INTERPRETER: Five?
19    MR. ADAMSKY: Sure.
20    (A brief recess was taken at 3:21 p.m.)
21    (The proceedings resumed at 3:28 p.m.)
22 BY MR. ADAMSKY:
23 Q. Madam court reporter, can you read off the
24 last question, please?
25    (The requested portion was read.)

Page 25

MR. ADAMSKY: Can you read the one before it that there's another question?

COURT REPORTER: Sure, no problem. Let me just switch screens.

(The requested portion was read.)

BY MR. ADAMSKY:

Q. Ms. Muller, you mentioned that you had a general goal of investing in real estate so that your daughter's future could be provided for.

A. Yes.

Q. So was it you or your husband who first came up with an idea to Iteb to invest in real estate?

A. Both of us.

Q. And what did you say to Iteb or Lolita about it?

A. Well, I said it was my dream to do lots of investment in real estate for rental and for regular income. So that's what it was.

Q. And what did Iteb or Lolita say in response to that?

A. So, you know, the strength of Iteb and Lolita is to present this particular image of what they do. And they were saying that in the U.S., for people who don't pay their taxes, their house or their apartment is seized and then it's sold off at half price. So that's

Page 26

the first thing.

So they were talking about lots of opportunities there in the US. How you could, for example, buy an apartment for $500,000 and then turn around and sell it for a million because the government would take off such a percentage when they're reselling these properties.

And then he would show me these sites and he would show me all of the things that they had done. He showed me how they had bought and sold these different properties and how it was so astounding to see, see all of that. And it was especially higher priced properties where you would earn the most money. So he would show me these luxury apartments that would be resold for even more.

Q. Before Iteb -- when I say Iteb, I'm referring to either Iteb or Lolita.

Before he talked about these us properties, did you or your husband mention to them a possibility of investing in France?

A. So, yeah, he showed me real estate in France, and we looked at the prices and compared those prices to prices in the United States according to how much square footage, footage there was, how much you could earn by buying and then renting out a property in France, versus

Page 27

how much you could in the United States. And in the United States, it was just so much more.

And the thing about Lolita is that she was connecting me with Johnny. Johnny was helping her while Iteb was in prison. And so she showed me Johnny, who was showing off his house in the United States. Here's my apartment, here's the view.

And so it was really magnificent in the United States. I don't know anything about the United States, but she's showing me Johnny, who's showing off these different properties. Here's his house in the United States, all of that.

Q. Johnny who?

A. Johnny the accountant from that agency, AAA or whatever it is -- Rebolous (phonetic) I don't remember the name exactly -- the accountant.

Q. So Lolita was showing you that Johnny owned property in the United States and that he had a business there?

A. Well, that he was managing the properties that Lolita and Ryan owned in the United States. I mean, that they were involved together, and he was helping them a lot -- helping Lolita and Ryan in the United States with their properties that they had.

Q. There is this stuff that Johnny is telling you

Page 28

or Lolita is telling you about Johnny?

A. So it was Lolita explaining these things. I didn't know Johnny. I had never met him.

Q. Did you ever talk to him?

A. Well, one day when he showed me the house, I said hello, that's it. It was on a WhatsApp video.

Q. What was shown to you?

A. So it was that same day that we were in the car, Lolita, Patrick and me were coming back from Tunis, the 13th of January. It was the same person on the phone.

He showed the photo on that WhatsApp telephone call. And they were speaking English, then they were speaking French and they were talking, just the two of them together.

Q. So this was after that whole transaction had been done?

MR. MULLER: (Inaudible response.)

INTERPRETER: The interpreter is confused.

A. So I was made aware of Johnny through Lolita at first. Then Iteb got out of prison, and he was talking about him as well.

So then one day, it was in September, after he got out of prison, he showed me on the phone, Johnny, and we were talking about real estate.

Page 29

1  INTERPRETER: The interpreter needs to
2  clarify.
3  A. So he was showing -- Iteb was showing me the
4  house that Johnny was managing in the United States. He
5  showed that to me on the telephone, the website on the
6  telephone.
7  Q. Okay, so Iteb showed you a house that he was
8  encouraging you to invest in?
9  A. So I just want to make sure you understand,
10 there was a video, but then there's also photos. So he
11 was showing me photos on the phone.
12 Q. Okay, I understand that.
13    What did Iteb or Lolita tell you about what
14 was required from you or your husband in order to
15 participate in this investment?
16 A. Well, it was their area of specialty. They
17 had a real estate agency in the United States. And what
18 they did was to buy and resell luxury properties as a
19 way to make money, but then they also mentioned that
20 because of all of the wonderful things you've done for
21 us, this will be our way of repaying you. And through
22 this investment, we'll be able to help you earn money
23 through real estate in the United States better than in
24 France.
25 Q. So Iteb or Lolita said you need to give a

Page 30

1  certain amount of money to invest in this?
2  A. Yeah, something like that.
3  Q. How much did he tell you you needed to invest?
4  A. Exactly what my husband said.
5  Q. Well, I'm asking you.
6  A. Well, you know, anything to do with money and
7  how much, it's Patrick who's the one in charge of
8  everything financial.
9  Q. So do you know - do you personally know how
10 much you were asked to contribute toward this
11 investment?
12 A. $1,500,000.
13 Q. Was this done -- was this proposed as one
14 transaction? Or you said it was a one part deal?
15 A. No, four. Four times.
16 Q. Was it -- did he present it as 1.5 million
17 broken up into four times? Or did he keep progressively
18 asking for more?
19 A. No, he was asking for a certain amount of
20 money and then came back and asked for more and asked
21 for more.
22 Q. Was it him asking for more money or were you
23 saying I want to contribute more, I want to have a
24 bigger piece of this investment?
25 A. I'm not sure I understood your question.

Page 31

1  Q. Were his requests -- did he keep coming back
2  to you for more money? Or did you at any point say, I
3  want to contribute more to have a bigger piece of this
4  investment?
5  INTERPRETER: The interpreter does not
6  understand the answer.
7  A. No, in terms of money, he was always
8  discussing that with Patrick, not with me.
9  Q. So these instructions to give you on how and
10 how much to invest, that was done through Patrick and
11 not you?
12 A. So, I mean, sometimes he would talk to both of
13 us, sometimes he would just talk to Patrick.
14    You know, you have to understand that he's
15 somebody who doesn't say things just one time. He'll
16 repeat it and repeat it and repeat it to try to convince
17 you. I mean, it's a habit with him. He works on your
18 mind, and he insists a lot.
19    And if he doesn't convince you one way, he'll
20 come up with another way to try to convince you and to
21 get you to understand the way he's trying to get you
22 through his different explanations.
23 Q. Who actually wired the money? Was that you or
24 your husband?
25 A. It was Patrick at that time.

Page 32

1  Q. So did you see -- did you receive or see any
2  of the instructions as to how to wire the money or how
3  much?
4  A. No, I didn't do the transfers. Patrick was
5  the one who did them.
6  Q. Were you or Patrick involved at all in
7  handling any other part of this deal aside from
8  contributing money?
9  A. I don't understand. What do you mean,
10 involved?
11 Q. Did you deal with any other part of this aside
12 from sending money?
13 A. Sorry, I just don't understand.
14    What do you mean?
15 Q. With Swagg Man -- was Iteb and Lolita, were
16 they handling this transaction? Or were you involved in
17 dealing with brokers or real estate agents?
18 A. It was Iteb and Lolita because it was their
19 company. They're the two or the associates of this
20 company. So it was the two of them that did it.
21    Can I ask you a question, please?
22 Q. If you need clarification, I'm happy to
23 clarify, but I'm not here to answer questions.
24 A. Yeah, it's to clarify something, in fact.
25 Q. Okay, go ahead.

Page 37

1  why you feel it is appropriate to be disrespectful
2  during this proceeding.
3      The next time that there is an interruption,
4  Mr. Muller, by you, this deposition is over.
5      Jason has a job to do. He's just asking
6  questions. He wasn't involved in the transaction.
7  He had nothing to do with your money. We are
8  representing our clients to the best of our
9  ability, which allows us to find out your
10 positions.
11     Again, you sat through our client's
12 depositions despite the fact that both Mr. -- both
13 Johnny and Yvette were present in the deposition,
14 and they conducted themselves with the absolute
15 most respect for the proceedings. Do not test me
16 on this.
17     Are you ready to proceed, Ms. Muller?
18 A. May I ask --
19     MR. OSBER: If you anything other than yes or
20 no, this deposition is over with.
21 A. Say yes or no to what?
22     MR. OSBER: Whether she's ready to proceed?
23 A. Yes, I'm ready to continue with the
24 deposition.
25     But can I talk to you, yes or no?

Page 38

1      MR. OSBER: No.
2      Jason, continue.
3      MR. ADAMSKY: Madam Court reporter, can you
4  please read the last question?
5      COURT REPORTER: Let me switch screens, I'll
6  be right back.
7      (The requested portion was read.)
8      MR. ADAMSKY: Thank you.
9  BY MR. ADAMSKY:
10 Q. Ms. Muller, is it fair to say that Iteb and
11 Lolita handled the entire transaction aside from the
12 money that you contributed?
13 A. We are talking about real estate, right?
14 Q. Yes, we're talking about this real estate
15 transaction.
16     INTERPRETER: Interpreters to clarify.
17 A. So what I said was Iteb, Lolita, Johnny stole
18 our money. And I'd like to say that lawyers, based on
19 my understanding, are there to protect their clients.
20     And I know that you're trying to protect your
21 clients, but please, I'm begging you, don't protect
22 thieves and don't protect people who harm other people.
23     Listen, if you think about somebody who's
24 killed somebody, afterwards they're not bothered by the
25 fact that they did that. But what these people have

Page 39

1  done is to kill us again and again and again. It's not
2  just us, but it's our family and it's our children. And
3  now the lawyer is yelling at us and harassing us,
4  harassing my children. My children can't sleep at
5  night. So I just wanted to say thank you for all of
6  that.
7  Q. I'll move to strike as nonresponsive. Ma'am,
8  I'm going to ask the question again.
9      Did you or your husband handle any part of
10 this real estate transaction aside from sending
11 money at Iteb's request?
12 A. My husband and I have experienced a great
13 injustice, and we are waiting for somebody to show us a
14 degree of humanity and justice.
15 Q. Again, a move to strike as nonresponsive.
16     Ma'am, are you refusing to answer my question?
17 A. I answered the question. I didn't understand
18 or I didn't answer. I don't know. I answered
19 everything.
20 Q. Ma'am, the question is not relating to how you
21 feel about this lawsuit.
22     The question is in this transaction did you or
23 your husband handle any part of this real estate deal
24 aside from sending money?
25 A. My husband sent the money to buy an apartment,

Page 40

1  and they took our money. I answered the question. It's
2  simple.
3  Q. Aside from sending the money, did you or your
4  husband deal with real estate brokers? Did you ever
5  look at the property? Did you ever talk to the escrow
6  agency? Were you involved in any of that?
7  A. I didn't understand the question. I answered
8  that question, didn't I?
9      We sent the money to make the purchase, and
10 they took our money and that's it.
11 Q. Did you do anything beyond sending the money?
12 A. What do you mean, anything? What do you mean?
13     Can you give me some examples?
14 Q. I'll ask again as I asked in my previous
15 question.
16     Did you speak with any real estate agents?
17 A. No, I didn't speak to any real estate agents.
18 Q. Did you speak personally with an escrow agent?
19 A. No.
20 Q. Did you go and look at the property yourself?
21 A. On the Zillow, the Internet site.
22 Q. You didn't go look at the property in person,
23 correct?
24 A. No, we didn't go to Miami, no.
25 Q. You let Iteb and Lolita handle all of that,

Page 41

1  correct?
2      A. So they're not the only ones. And there are
3  people who do this kind of transaction and who buy real
4  estate remotely like that. I bought an apartment three
5  months ago in Paris in the same way.
6      Q. Did you personally ever speak with anyone from
7  AAA?
8      A. No.
9      Q. Did you personally ever have any
10 correspondence or conversations with Johnny Previlus?
11     A. No.
12     Q. Did you personally have any conversations or
13 correspondence with Yvette Tenord?
14     A. No.
15     Q. Did you personally have any correspondence or
16 communications or conversations with anyone from a
17 company called Res Investments?
18     A. I don't know Res Investments.
19        Who is Res Investments?
20     Q. Is your answer no?
21     A. No.
22     Q. Did you ever have any personal correspondence,
23 conversations, or discussions with anybody from Infinite
24 Res?
25     A. I don't know.

Page 42

1        INTERPRETER: The interpreter needs to
2  clarify.
3      A. I don't know the name that you gave me. I
4  don't know the name of that entity.
5      Q. So if you don't know the name of the entity,
6  it's fair to say that you don't remember or you didn't
7  have any conversations with anybody from that entity?
8      A. What organization?
9        MR. ADAMSKY: Madam Court Reporter, can you
10 please read back the question?
11       (The requested portion was read.)
12     A. I answered, right?
13     Q. Is your answer no?
14     A. My answer was no.
15     Q. Did you ever receive any instructions or
16 requests to wire money from anybody aside from Iteb or
17 Lolita in connection with this Miami real estate
18 transaction?
19     A. No.
20     Q. I'm going to put something on my screen here.
21 Ms. Muller, I'll represent to you that this has been
22 marked as Exhibit A or Exhibit 1 to your husband's
23 deposition.
24        Do you see what's shown on my screen?
25     A. Yes, I recognize this document, but what was

Page 43

1  the relationship between this document and the question
2  that was asked of me?
3      Q. I'm asking if you've ever seen this document
4  before?
5      A. Yes, it's a document that was sent by Iteb to
6  Patrick.
7      Q. This document was sent by Iteb to Patrick
8  after you had already wired the approximately 1.5
9  million to the United States?
10     A. Yes.
11     Q. Did you or your husband take any action as per
12 any instructions given by this document?
13     A. I don't understand.
14        What are you asking me?
15     Q. In other words, do you know the purpose of why
16 Iteb forwarded this document to you?
17        INTERPRETER: Interpreter didn't understand.
18     A. So, yes, I understand why Iteb sent this
19 document to my husband, but it's a falsified document.
20 It's not a correct document.
21     Q. How do you know this was a falsified document?
22     A. Well, I'm not there to show you what the
23 errors are, but everybody knows them.
24     Q. Ma'am, are you saying that there are laws in
25 the way or that appear in the face of this document that

Page 44

1  show that it's not authentic?
2      A. So I'm not -- I don't understand. So for you,
3  the attorney, that is a correct document?
4      Q. Ma'am, is that a no? I'm not answering
5  questions.
6      A. There are things that I can't answer either.
7  Those will be up to the court to decide. I'm not going
8  to weigh in on that.
9        MR. ADAMSKY: Madam Court Reporter, if we can
10 mark that as Exhibit A to this deposition as well.
11       (The Luxury Property document was previously
12 marked as Defendant's Exhibit Number 1 for
13 Identification.)
14     Q. Ms. Muller, were you or your husband ever
15 involved in any sort of bitcoin investment with Iteb or
16 his wife?
17     A. No.
18     Q. So no transactions involving bitcoin?
19     A. No.
20        What is the relationship between these real
21 estate investments and your question about bitcoin?
22        What's the relationship?
23     Q. Again, I'm not answering those questions.
24        Aside from this real estate transaction, have
25 you or your husband ever been involved in other

Page 45

1 investments in the United States?
2   A. No.
3   Q. Have you ever been involved in any other
4 lawsuit aside from this one?
5   A. Are you talking about which one, Iteb, Lolita,
6 Johnny? I didn't understand.
7   Q. Other lawsuits?
8   A. Me?
9   Q. Yes.
10   A. I think, Mr. Attorney, you have not been
11 listening to the things that I've been saying ever since
12 the beginning.
13   Q. I will move to strike that as nonresponsive.
14     Can you answer the question, ma'am?
15   A. So, yes, I can answer the question. The
16 question is that I am somebody who is innocent and
17 somebody who has nothing in her past. We are people who
18 have a good reputation in France and in Tunisia. And
19 we're having to deal with this group of people who
20 represent some sort of organized gang who've already
21 been imprisoned, who falsified papers, and there's no
22 way that you can compare us to them.
23     I'm 50 years old, and here I am in the courts
24 to seek the truth and defend myself. It is as if I'm
25 the guilty one. Nevertheless, I still trust the court

Page 46

1 system.
2   Q. Again, I'll move to strike as not responsive.
3     Ma'am, do you understand that I'm also asking
4 if you have ever sued anybody?
5   A. Do you mean in the U.S. and France, Tunisia?
6   Q. Anywhere.
7   A. It's the first time in my life that I am in
8 court as a litigant against somebody like Iteb and
9 Lolita.
10   Q. I need to take two minutes. I'm almost done.
11 I just need to look through my notes.
12     MR. OSBER: Why don't we take five?
13     (A brief recess was taken at 4:29 p.m.)
14     (The proceedings resumed at 4:35 p.m.)
15 BY MR. ADAMSKY:
16   Q. Ms. Muller, I only have two more questions for
17 you. And, again, I want to be very clear that these are
18 questions that I ask literally everybody, no matter who
19 they are or what the lawsuit is about.
20     Have you ever been convicted of a crime?
21     Can you hear me? Do you have your audio on?
22   A. Yes, I answered.
23   Q. I didn't hear.
24   A. I said no. I am a clean and honest woman.
25   Q. You mentioned before that there were certain

Page 47

1 things that you wish that I wouldn't ask about and I
2 will represent to you that during this deposition that
3 I've done everything in my power to be as respectful as
4 possible and the least intrusive that I could make these
5 questions.
6     Are you referring to anything in particular
7 when you mentioned certain areas that you did not want
8 me to go into?
9   A. Just about my private life -- I don't want to
10 necessarily have to address a lot of questions about
11 that because, as I said, I'm somebody with a good
12 reputation, and I don't want anyone to attempt to
13 destroy it. And the issue is that Iteb continues to
14 tell lies about us.
15     MR. ADAMSKY: I have no further questions. I
16 thank you for your time.
17     WITNESS: Thank you very much.
18     COURT REPORTER: Does anyone else have
19 questions?
20     MR. OSBER: No, ma'am.
21     MR. OSGATHORPE: I have no questions. We will
22 order, and we will read.
23     (The proceedings concluded at 4:40 p.m.)

Page 48

CERTIFICATE OF OATH

STATE OF FLORIDA,
COUNTY OF BROWARD
  I, Kimberly Hacker, Notary Public, State of
Florida, certify that Mouna Bouzid personally appeared
before me via remote video Zoom on the 12th of
April, 2024, and was duly sworn by me.
  Signed this 12th day of April, 2024.

              Kimberly Hacker
              Notary Public, State of Florida
              My Commission No. HH 313518
              Expires: September 24, 2026