Page 1

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:23-CV-22276-BB

PATRICK MULLER, an individual, and
MOUNA BOUZID, an individual,
    Plaintiffs,
v.

ITEB ZAIBET a/k/a "Swagg Man", an individual,
LOLITA C. REBULARD, an individual, LUXURY
PROPERTIES, INC., a Delaware corporation,
BEACH PROPERTIES RENTAL, INC., a
Delaware corporation, LUXURY PROPERTIES TRUST
u/a/d/ March 2, 2018, AAA PLUS
FINANCIAL GROUP, INC., a Florida corporation,
YVETTE TENORD, an individual, JOHNNY
PREVILUS, an individual, RES INVESTMENT
INTER, INC., a Florida corporation, INFINITE
RES INVESTMENT, LLC, a Nevada limited
liability company, MIAMI REALTY, CORP., a
Florida corporation, and GUZMAN305 TRUST, a
Florida trust,
    Defendants.
_____/

DATE:  April 12, 2024
TIME:  10:40 a.m. - 1:24 p.m.
PLACE:  Via remote video Zoom

VIDEOCONFERENCE DEPOSITION OF PATRICK MULLER

Kimberly Hacker
United Reporting, Inc.
Litigation Building
633 South Andrews Avenue, Suite 202
Fort Lauderdale, Florida 33301
(954) 525-2221

Page 2

APPEARANCE FOR THE PLAINTIFFS:
  TAYLOR, DAY, GRIMM & BOYD
  50 North Laura Street, Suite 3500
  Jacksonville, Florida 32202
  BY: JOHN D. OSGATHORPE, ESQUIRE

APPEARANCE FOR THE DEFENDANTS:
  CONRAD & SCHERER, LLP
  633 South Federal Highway, Suite 800
  Fort Lauderdale, Florida 33301
  BY: JASON R. ADAMSKY, ESQUIRE and
  STEVEN H. OSBER, ESQUIRE and
  CLAYTON PENGEL/OBSERVING

APPEARANCE FOR THE DEFENDANT/LUXURY PROPERTY TRUST:
  REINER & REINER, P.A.
  9100 South Dadeland Boulevard, Suite 901
  Miami, Florida 33156
  BY: DAVE P. REINER, ESQUIRE and
  ERIC REINER, OBSERVING
ALSO PRESENT:
  SCOTT HOMLER, INTERPRETER
  Translation In Motion

Page 3

INDEX

WITNESS                  PAGE
Patrick Muller
Direct Examination by Mr. Adamsky    6

EXHIBIT
DEFENDANT'S  DESCRIPTION            PAGE
1       Luxury Property document    41

(Exhibit in possession of Counsel.)

Page 4

1    COURT REPORTER: MR. Homler, do I have your
2  consent to swear you in via remote video Zoom this
3  morning?
4    INTERPRETER: Yes.
5    COURT REPORTER: Very good. If you could
6  please raise your right hand.
7    Do you swear or affirm that the testimony
8  you're about to translate this morning via remote
9  video Zoom is the correct translation from English
10  to French and French to English?
11    INTERPRETER: I swear.
12    COURT REPORTER: If you could have Mr. Muller
13  raise his hand. Actually, before we do that, I
14  haven't seen any form of photo ID from him, so if
15  you could request that. And I'll need the number
16  on that ID, the photo ID, and the expiration date,
17  please.
18    INTERPRETER: As we're waiting, could you give
19  the interpreter just a brief explanation of what
20  the topic is today.
21    MR. ADAMSKY: As what this case is regarding?
22    INTERPRETER: Yes.
23    MR. ADAMSKY: These are the depositions of the
24  plaintiffs and a claim regarding the transfer of
25  money and a claim of unjust enrichment.

Page 5

1  WITNESS: Okay, thank you. So you wanted my
2  ID card?
3  COURT REPORTER: Yes. Is this a state ID
4  card; is that what that is, Mr. Homler?
5  WITNESS: No, it's a French ID card.
6  COURT REPORTER: Very good. Can I have the
7  number if there's a number on there and the
8  expiration date, please?
9  WITNESS: It is V2DVX7720. It says on the
10  front 2032. So it expires in 2032.
11  COURT REPORTER: Very good. All right. I am
12  trying to read it. Thank you, Mr. Homler and
13  Mr. Muller.
14  I'm seeing in the chat someone is requesting
15  to know who else is in the room. Maybe counsel
16  wants to address that.
17  UNKNOWN SPEAKER: It's me. There are three of
18  us in the room.
19  MR. ADAMSKY: Who else is in the room?
20  WITNESS: Oh, an assistant, a secretary.
21  MR. ADAMSKY: Are we on the record?
22  COURT REPORTER: I'm gonna go ahead and swear
23  in the Mullers. I just want to get their ID.
24  Mr. Interpreter, if you could please ask
25  Mr. Muller if I have his consent to swear him in

Page 6

1  via remote video Zoom?
2  WITNESS: Yes, of course.
3  COURT REPORTER: Very good. Please raise your
4  right hand.
5  Do you swear or affirm that the testimony
6  you're going to give this morning via remote video
7  Zoom will be the truth, whole truth and nothing but
8  the truth?
9  WITNESS: I swear.
10  COURT REPORTER: Thank you. All right, we're
11  all set.
12  DIRECT EXAMINATION
13  BY MR. ADAMSKY:
14  Q. Good morning, Mr. Muller.
15  Can you hear me okay?
16  A. Yes, I can hear you, hello.
17  Q. All right, before we begin, we were talking
18  before we got on the record regarding whether or not
19  anyone else is in the room with you.
20  A. Yes.
21  Q. And you mentioned you -- I see that you're --
22  there's another person on the screen. I assume that
23  that's your wife?
24  INTERPRETER: Interpreter just instructed
25  Mr. Muller to please wait for the end of

Page 7

1  translation before beginning to speak.
2  A. Yes, this is Mrs. Muller next to me.
3  Q. Is that Ms. Mouna Bouzid?
4  A. Here's her ID card.
5  Q. We'll get to that in a second. I just want
6  you to let me know who's in the room.
7  A. Yes, it is she.
8  Q. Okay, but before we go any further, we have a
9  translator here today who's taking what I say and
10  translating it into French and then taking what you say
11  and translating it into English.
12  So we need to wait for the interpreter to
13  perform that translation before responding.
14  A. Yes.
15  Q. You may understand some English, but I ask
16  that your testimony be based on the translation that is
17  given by the interpreter, rather than listening to my
18  question.
19  A. I don't understand.
20  Q. So when you're listening to me talk, you may
21  understand some of what I'm saying. But I ask that when
22  you're answering a question, you don't base it off of
23  what you may understand that I'm saying, that you base
24  it off the translation that the interpreter gives you.
25  A. Okay.

Page 8

1  Q. Now, aside from your wife, Ms. Bouzid, who --
2  or Ms. Muller, as we're referring to her, who else is in
3  the room?
4  What is their name and what's their relation
5  to you?
6  A. My secretary. I already answered that
7  question.
8  Q. This is your deposition. Nobody can help
9  provide answers or give you any assistance. So I would
10  ask that the secretary either come into the view of the
11  camera or if she could leave the room for the duration
12  of the deposition.
13  A. Yeah, if that's any kind of an issue, she can
14  leave, no problem.
15  Q. All right. I would ask that she leave the
16  room just for your deposition.
17  A. She's gone.
18  Q. Thank you.
19  So let me introduce myself. My name is Jason
20  Adamsky. I'm an attorney for some of the
21  defendants in this matter, Johnny Previlus,
22  Yvette Tenord, AAA Plus --
23  INTERPRETER: The interpreter is going to ask
24  you to slow down, please, Counsel, when you're
25  listing these names. Johnny Previlus --

Page 9

1  Q. Yvette Tenord, AAA Plus, Res Investment Inter
2  and Infinite Res.
3      Mr. Muller, have you ever given a deposition
4  before?
5  A. Never.
6  Q. Okay, I want to give you some ground rules
7  before we get started to make the process a little more
8  smooth.
9      So this is a question-and-answer session
10 regarding the issues in this lawsuit. If you need to
11 take a break for any reason, we can; but if there's a
12 question pending, I would only ask that you answer the
13 question first. If you need a question rephrased or
14 repeated for any reason, feel free to ask me at any time
15 and I'll be happy to do so. If you answer a question, I
16 will assume that you understood it.
17     Everything is being taken down by a court
18 reporter, so all your answers obviously have to be
19 verbal and, obviously, for the interpreter as well.
20     Do you understand, sir?
21 A. Yes.
22 Q. Thank you. Mr. Muller, did you do anything to
23 prepare for this deposition? And I don't want to hear
24 about any communications you've had with your attorneys.
25 A. I didn't prepare anything at all. I'm just

Page 10

1  going to answer your questions spontaneously. I didn't
2  prepare anything in advance because I don't have
3  anything to hide.
4  Q. Okay. Mr. Muller, could you please state and
5  spell your full name for the record?
6  A. My last name is Muller, M-U-L-L-E-R. My first
7  name is Patrick, P-A-T-R-I-C-K.
8  Q. Have you ever been known by any other name?
9  A. No.
10 Q. Where are you currently giving this deposition
11 from, like where are you located right now?
12 A. In my company office in Tunisia.
13 Q. What is the address there?
14 A. The address? The exact address is
15 Neopark(phonetic). Monasir is the name of the city.
16 Q. That's the full address of where you're
17 located right now?
18 A. There's the number. I don't have the
19 number -- 5036.
20 Q. Mr. Muller and Ms. Muller, I want to make
21 clear again that only Mr. Muller can give answers right
22 now. Ms. Bouzid, you'll have a chance to speak at your
23 deposition, which will follow this. But you can't help,
24 you can't give answers, you can't give any input.
25     Mr. Muller, what is your current home address?

Page 11

1  A. Skanes in Monastir.
2      COURT REPORTER: I'm sorry to interrupt.
3  Mr. Interpreter, could you please spell that for
4  me? I'm not really sure on that.
5      INTERPRETER: Okay, so the address is spelled
6  as follows Skanes, S-K-A-N-E-S. And the name of
7  the city Monastir, M-O-N-A-S-T-I-R. And the
8  address is the number 5000.
9      COURT REPORTER: Thank you.
10 A. It's on my ID card. The address is indicated
11 on the ID card.
12     Can you see it?
13 BY MR. ADAMSKY:
14 Q. I can't see it. And we won't go off of that.
15 I just need to -- we don't need to go off of the ID
16 card.
17 A. So here's my address on the card. I can scan
18 it.
19     Can you see it?
20 Q. I can't see it, and the Zoom doesn't allow
21 for --
22 A. It's a French ID card.
23 Q. I understand that, sir. The address you gave,
24 that's in France?
25 A. No, it's a Tunisian address. I'm residing in

Page 12

1  Tunisia, but it's French. It's French.
2  Q. Okay. All right. This address that you have
3  just given and the one that's reflected on your ID card,
4  how long have you lived at that address?
5  A. Five, six years maybe -- five, six years. But
6  I'm a resident of Tunisia for more than 20 years.
7  Q. When you say -- so you've lived in Tunisia for
8  the past 20 years, and you have maintained a residence
9  there?
10 A. Yes.
11 Q. Where did you live prior to that?
12 A. Do you mean in Tunisia or where?
13 Q. When you said you lived in Tunisia for the
14 past 20 years, did you live outside of Tunisia prior to
15 that?
16 A. In France, in my home country. So I have
17 always been a resident of France.
18 Q. Mr. Muller, do you have a current occupation?
19 A. Me? Yes. I'm the head of a company.
20 Q. What's that company called?
21 A. Nimetex Group, N-I-M-E-T-E-X Group.
22 Q. What does Nimetex Group do?
23 A. Textiles.
24 Q. How long have you been the head of Nimetex
25 Group?

Page 13

1  A. I'm an owner. I own the company.
2  Q. This is a company that you founded?
3  A. No. I had associates before, but now I'm all
4  on my own.
5  Q. How long have you been affiliated with Nimetex
6  Group?
7  A. What do you mean, affiliated?
8  Q. How long have you been involved with them,
9  employed by them?
10  A. Employed? I own the company. Since 2005 I've
11  been the owner.
12  Q. Okay. In the last ten years, have you been
13  employed by or involved with any other company or
14  organization for work for your career?
15  A. No.
16  Q. What is your highest level of education?
17  A. I don't understand your question.
18  Q. What is -- do you have and college, do you
19  have any high school, do you have a degree? What is the
20  highest level of education?
21  A. I don't understand your question. So I'm 68
22  years old. I was born in 1955.
23      So after I got my baccalaureate, that was
24  in -- that was 50 years ago that I got my baccalaureate.
25  Q. I said, a bachelor's degree.

Page 14

1      Does that sound like what a baccalaureate is?
2  A. No, I did studies after that.
3      INTERPRETER: Interpreter would note that the
4  French and American educational systems are quite
5  different. So the question might not necessarily
6  resonate particularly well. But that's just a side
7  note from the interpreter.
8  Q. Okay, I understand. We'll move on and we'll
9  address that later.
10      Mr. Muller, have you ever resided in the
11  United States?
12  A. Never.
13  Q. Have you ever been to the United States?
14  A. I just traveled there.
15  Q. How often do you travel to in the United
16  States?
17  A. I have been to the United States one time, one
18  time to Miami.
19  Q. How did you like Miami?
20  A. Do I have to answer that?
21  Q. It's not super important, no, you don't.
22  A. So Miami, Florida, is really not the United
23  States, sorry. So there's some really nice
24  neighborhoods in Miami, nice neighborhoods.
25  Q. When did you travel to Miami?

Page 15

1  A. Miami? In December 2022.
2  Q. And what was that in relation to? Was that
3  for business or pleasure?
4      INTERPRETER: The interpreter didn't
5  understand the response.
6  A. So is this a question coming from them?
7      So it was to meet with a client.
8      Are you the Mayor of Miami? Is that why
9  you're asking this question? It's not normal, it's not
10  normal, please, the questions you're asking me.
11  Q. Sir, this case involves property in Miami and
12  some things that happened in Miami. So don't be
13  concerned with why I'm asking the questions. You're in
14  a deposition, and you're required to answer these
15  questions.
16  A. I'll answer your questions directly.
17  Q. Okay. Mr. Muller, one of the parties in this
18  lawsuit is someone named Iteb Zaibet, who is also
19  referred to as "Swagg Man". So as I ask these
20  questions, I'm referring to -- when I say Swagg Man, I'm
21  referring to Mr. Iteb Zaibet.
22  A. Yeah, you can call him Iteb. That's his name.
23  Q. When did you first become familiar with
24  Iteb Zaibet?
25      INTERPRETER: Interpreter needs you to

Page 16

1  clarify "become familiar with" what do you mean
2  exactly?
3  Q. When did you first learn of who Swagg Man was?
4  A. You mean when I heard about him?
5  Q. You became acquainted with Swagg Man at one
6  point in time, correct?
7  A. You mean when I met him?
8  Q. Yes. When did you first meet Swagg Man?
9  A. I met him beginning of July 2021. So he got
10  out of prison at the end of June 2021, and I met him in
11  beginning of July 2021.
12  Q. When you say you met him, that's the first
13  time you met him in person, in 2021?
14  A. Yes, that's right.
15  Q. You had spoken to him before you met him in
16  person?
17  A. Never. For the simple reason that he was in
18  prison before that. He had been incarcerated.
19  Q. Do you know why he was in prison?
20  A. Not at all.
21  Q. But you knew he had been in prison at the time
22  you first met him in July of 2021?
23  A. Yes, because I had heard about Iteb before
24  that.
25  Q. What were the circumstances of you meeting

Page 17

1  with Iteb? Why did you meet with him?
2      A. Because he wanted to see us.
3      Q. Did he or someone on his behalf reach out to
4  you and ask to meet?
5      A. I met his wife, Lorita(sic).
6      Q. And what did you -- what was the subject of
7  that meeting?
8      A. Just to meet him, that's all.
9      Q. You met him just to meet him. There's no
10 reason in particular?
11     A. So he's the one that wanted to meet me, not
12 me. It was Iteb that wanted to meet me.
13     Q. But he never -- he or Lorita never explained
14 why he wanted to meet you.
15     A. I didn't understand.
16     Q. What was your understanding as to why Iteb
17 Zaibet wanted to meet with you?
18     A. Just to get to know me, that's all.
19     Q. When you first met with Iteb, who was involved
20 in that meeting?
21     A. So it was me and him and my wife and lawyers.
22     Q. And you have no understanding of what the
23 reason was that he wanted to meet with you?
24     A. I know why he wanted to meet me, but I'm
25 answering your question. I'm answering the question

Page 18

1  asked by the attorney.
2      Q. Mr. Muller, do you know what the purpose of
3  Iteb's request to meet with you was? Did he want to
4  invest with you? Did he -- was he a fan of you
5  personally? Did he like your business? Did he want to
6  be a business partner? Can you tell me why he wanted to
7  meet with you?
8      A. All of those things at the same time? He
9  wanted to do business. He wanted to do textile business
10 with this brand.
11     Q. He approached you because he knew you were
12 involved in a textile industry and he wanted to be a
13 part of that?
14     A. To develop products for the US.
15     Q. How did you come to learn that this is why he
16 wanted to meet with you?
17     A. It was through his wife and through the lawyer
18 before he got out of prison.
19     Q. So he -- his representatives, his wife and his
20 lawyer while he was in prison told you that he wanted to
21 meet with you to get involved in your textile business?
22
23     A. Not directly after.
24        Can I ask you a question, Mr. Adamsky?
25     Q. Of course.

Page 19

1      A. So who are you representing? Are you
2  representing Iteb and Lorita or Yvette and Tenord?
3      Q. As I mentioned, I'm the attorney for Johnny
4  Previlus, Yvette Tenord, AAA, Res Investment and
5  Infinite Res.
6      A. So why are we talking about Iteb?
7      Q. Sir, I'm not here to answer questions. If you
8  could please just answer the questions that I'm asking,
9  we'll get through this a lot more smoothly.
10     A. Okay.
11     Q. Mr. Muller, were you involved in any way in
12 helping Iteb get out of prison before you met him?
13     A. No, no. I was contacted by his lawyer, but I
14 didn't have any power. I was too busy in any case to
15 help him get out of jail.
16     Q. You didn't contribute anything to help pay for
17 his lawyer fees or bail money or anything like that?
18     A. That's another question. My wife paid the
19 bail to get him out of jail.
20     Q. Why did your wife pay his bail?
21     A. You can ask her that question later, right?
22     Q. Well, I'm asking you if you know the answer.
23     A. Yes, of course I know the answer, of course.
24     Q. So if you know the answer -- I'm asking you if
25 you know the answer, sir.

Page 20

1      A. So she talked to his three lawyers and to
2  Lorita, and they asked her to pay the bail and that she
3  would get reimbursed three months later.
4      Q. Did you ask your wife why she was bailing him
5  out of jail?
6      A. I knew why. I mean, she told me why. So I
7  gave her my agreement to do that.
8         INTERPRETER: The interpreter notes that
9  Ms. Muller said I can answer the question. I can
10 answer the question.
11        MR. ADAMSKY: Ms. Muller --
12        If you could address Ms. Muller, please,
13 Mr. Translator.
14        Ms. Muller, this is Patrick's deposition. So
15 he is the only one who is allowed to answer
16 questions right now. If you have things that you
17 would like to explain, we'll get to that in your
18 deposition this afternoon.
19        MS. BOUZID: I just said that to save time.
20 There's nobody who knows this story better than I
21 do.
22        MR. ADAMSKY: I understand.
23 John, can you help me out here? I can't have
24 both of them testifying here.
25        MR. OSGATHORPE: Ms. Bouzid, with the

Page 25

1  it gets translated. We're not under oath. She
2  made a comment on the record, and I want it
3  translated.
4      So, Mr. Interpreter, please translate it.
5      MR. OSGATHORPE: Let me clarify.
6      She made a comment. She is not under oath.
7      MR. OSBER: I agree with you.
8      MR. OSGATHORPE: She was responding to your
9  instructions about the process of the deposition,
10 which was a yes or no question. She clearly said
11 much more than that.
12     MR. OSBER: Yes, Mr. Interpreter, can you
13 please translate what she said?
14     MS. BOUZID: So this is the first time I've
15 ever been in this situation. And I feel like it's
16 an injustice. And I don't feel well about this,
17 this situation.
18     I feel like there's an injustice in this
19 justice system. So I'm sorry if I am reacting or
20 if I am answering questions directly, but I want
21 this to be direct.
22     And I'm not doing this because of any kind of
23 lack of respect. I just want you to know that this
24 is hard.
25     INTERPRETER: The interpreter now notes that

Page 26

1  as more time passes between statements, it's harder
2  for the interpreter to recall a consecutive mode of
3  interpretation. What the interpreter would like to
4  have done at this point is to try to summarize the
5  conversation between counsel, Mr. Osgathorpe and
6  Mr. Osber.
7      MR. OSBER: I think that Mr. Osgathorpe's
8  conversation and my conversation were good.
9      I'm sure that the translator or the court
10 reporter was able to take that down, so we're good.
11     And I just want to address one thing in
12 response to Ms. Muller. I understand that this is
13 a process that you are not familiar with, but it's
14 a process that we're involved in right now that has
15 rules.
16     So all I'm asking you to do is to understand
17 that there are rules, and I'm trying to explain
18 them to you in my very best way. I mean absolutely
19 no disrespect with what I'm telling you.
20     And I understand that there is a significant
21 time difference between where we are and where you
22 are. So I would like to get this finished for you
23 before the sun comes up where you are.
24     So, again, I just ask for your patience and
25 your understanding so that we can get through this

Page 27

1  process, okay?
2      MS. BOUZID: Okay, sorry, sorry.
3      MR. OSBER: Does anybody need to take a break?
4      INTERPRETER: The interpreter could use two
5  minutes.
6      MR. OSBER: Absolutely, you have earned it.
7  Please let the Mullers know that we're taking a
8  two-minute break.
9      (A brief recess was taken at 11:40 a.m.)
10     (The proceedings resumed at 11:48 a.m.)
11 BY MR. ADAMSKY:
12     Q.  Mr. Muller, as a result of this meeting that
13 you had with Iteb, did you or your company get involved
14 in a joint venture -- in a business venture with Iteb?
15     A.  No, there was a project.
16     Q.  What was the project?
17     A.  So it was a project to develop clothing,
18 jeans, t-shirts, caps.
19     Q.  So did he -- would it be accurate to say that
20 he hired your company to produce these items for him?
21     A.  So we did. We developed these. And we
22 started with masks because, you know, it was COVID. So
23 we started with masks that bore the logo, and this went
24 through Lorita.
25     Q.  In this project, as you called it, were you

Page 28

1  personally dealing with Iteb handling that project?
2      A.  No.
3      Q.  Who was involved as the point of contact with
4  Iteb?
5      A.  Lorita and Ms. Muller.
6      Q.  Were you involved at all with that or you were
7  just running the company?
8      A.  I wasn't personally involved, no. Because
9  Ms. Muller is co-owner of the company.
10     Q.  After that meeting in July 2021, did you ever
11 meet with Iteb after that -- you personally?
12     A.  Yes, of course. Several times in fact.
13     Q.  What was the subject of these meetings?
14     A.  Well, we were trying to develop projects. He
15 had ideas that we were trying.
16     Q.  Were these ideas that he was bringing to you
17 for other projects?
18     A.  Yeah. Yes.
19     Q.  What kind of other projects were these?
20     A.  Nothing in particular. But they had to do
21 with textiles, because he had had other textile projects
22 that he had done here in Tunisia -- that he had done
23 already here in Tunisia.
24     Q.  Other than these textile projects in these
25 meetings that you had with him, did he ever ask for

Page 29

1  money or for an investment or anything like that -- to
2  borrow money, for example?
3      A.  Well, ask for money, no, but it was all about
4  doing business in any area, all areas.  So it was about
5  developing luxury products, luxury cars.  And then in
6  the end of -- at the end of 2021, the topic of real
7  estate investment came up because my wife and I were
8  interested in doing real estate investment in Paris in
9  November 2020 for one.
10     Q.  What was the investment?  You mentioned
11 something about cars?  Was that something -- was that
12 another project?  Was that like a dealership or
13 something like that?
14     A.  No, it was about buying old luxury cars and
15 then reselling them in Tunisia.  But I didn't follow up
16 with that particular project.  So that was the issue.
17     Q.  So at the end of 2021, that was the first time
18 that Iteb brought up the subject of a real estate
19 investment?
20     A.  No, I'm the one that talked about real estate
21 because my wife and I -- we had capital that we wanted
22 to invest in real estate in Paris.  So then he said,
23 well, I know the real estate market.  I know real estate
24 agents in Paris.
25     Q.  All right, so you in other words -- and when I

Page 30

1  say you, I'm referring to you specifically and not
2  necessarily you and Ms. Muller.  You approached him
3  originally about the subject of investing in a real
4  estate deal?
5      A.  In Paris.  So I said, well, I don't know real
6  estate at all, but we wanted to invest in maybe real
7  estate in Paris.  And he said, well, I know all these
8  things, I know these real estate investments and I know
9  all these sites and addresses.  I can.  So he knew those
10 things.
11         So it was in October 2021, and I was trying to
12 finalize this project in Paris.  And he said, well, if
13 you've got real estate that you want to invest in, then
14 you should be investing in Miami.  So that's how the
15 Miami investment came up.
16     Q.  Did you ever invest with Iteb Zaibet on any of
17 these things that he proposed in Paris?
18     A.  No, we let Paris go, and we were going towards
19 Miami.
20     Q.  Now, when Iteb brought up the topic of
21 investing in real estate in Miami, what did he tell you?
22         Did he say, hey, I know of somebody, or did he
23 just say it was a good idea to invest in Miami?
24     A.  So when we were talking about real estate, he
25 said, well, you know, that's my specialization, that's

Page 31

1  my job, and Miami is practically my home.  So you have
2  this money that you want to invest?  I had capital that
3  I was going to invest in Paris, and so it got redirected
4  to these investments in Miami.
5      Q.  When Iteb first brought up this topic about
6  investing in Miami, did he present to you a particular
7  property to invest in?
8      A.  Several, but I didn't know Miami.  I didn't
9  know Miami at all.
10     Q.  Okay.  Did you do any research into the
11 properties that he presented you with?
12         Did you do any legwork on your own to learn
13 about those properties?
14     A.  No, not at all.  Not at all.  So, no, it's
15 because I was going to invest this money in Paris.  But
16 he said, no, you need to send the money quickly to
17 Miami.  The money had to go quickly.
18     Q.  Was it through an agency?
19     A.  No, not an agency.  No, not a notary, but it
20 was something in order to be able to guarantee it, in
21 order to be able to lock down that property.
22     Q.  So this investment involving Miami, you were
23 trusting Swagg Man or Iteb Zaibet to handle this
24 according to his knowledge of Miami real estate?
25     A.  He had contacts in the US and in Miami.  He

Page 32

1  was talking about Johnny, Johnny Previlus, and Nelson.
2  Nelson was a contact.  Nelson was a contact of his wife,
3  Lorita.
4          Yeah, we had sort of this environment of trust
5  that we had built up, and it was an investment that had
6  to be made quickly.
7      Q.  So you trusted Swagg Man to handle the
8  logistics of this investment?  In other words, he would
9  handle the financial side of things in all the
10 transaction details?
11     A.  No.  So I trusted his wife, Lorita.  And Iteb
12 had attorneys here.  He had -- so there was a whole team
13 here that was encouraging this investment.
14     Q.  But your point of contact was Iteb Zaibet for
15 this investment, correct?
16     A.  Yes, yes, and Lorita, who is here.  And
17 Lorita, she was the one here.
18         And let me repeat, and his lawyers.
19     Q.  What I'm asking is Iteb and Lorita were the
20 ones dealing with that team that you described, correct?
21     A.  Johnny, too.  Johnny was a contact, too, yes.
22 So I did four transfers.
23         So the attorney is not asking me the question
24 why four transfers?
25     Q.  Sir, we'll get to that, I promise.  We'll just

Case 1:23-cv-22276-JB   Document 156-2   Entered on FLSD Docket 08/06/2024   Page 8 of 11

9 (Pages 33 to 36)

## Page 33

1  go in order.
2      A.  Okay, Okay.
3      Q.  To clarify, Iteb had a team, but this was his
4  team that he was dealing with, correct, not you?
5      A.  Yes, yes, of course.
6      Q.  And you trusted him based on your previous
7  business dealings, that he would take care of this on
8  his own and handle everything?
9      A.  No, but with all of the team.  Not Iteb, just
10 on his own, but it was all the team, Johnny, Yvette,
11 Nelson and Lorita.
12     Q.  Let me ask this way.  You trusted Iteb to
13 manage his team that you described to facilitate this
14 real estate investment?
15     A.  Yes.
16     Q.  What was the -- what was your involvement as
17 far as what Iteb was asking you to do to participate in
18 this investment?
19     A.  Well, it was a document that said, okay, I had
20 to make this immediate transfer in order not to miss out
21 on a really good deal.
22     Q.  Is it fair to say that your involvement in
23 this -- and we will refer to as a project -- was to make
24 a transfer of money?
25     A.  No.  So it was 100 percent a real estate

## Page 34

1  investment in order to invest and obtain this building.
2  And it was marked on the money transfers, real estate
3  investment from my French bank.
4      Q.  What did it -- what information did
5  Iteb Zaibet give to you as far as how this transfer was
6  to be made?
7      A.  So he sent me an order explaining how to do
8  it, and it was through the company of Johnny and Yvette.
9      Q.  When you say he sent you an order, was this a
10 wire transfer instruction?
11     A.  Yeah, it was to make a transfer to the account
12 of AAA Plus.
13     Q.  Did he tell you anything about why the
14 transfer was to be made that way?
15     A.  Yes, it was in order to put the money and the
16 account at the real estate agency that he had with
17 Johnny so that they could buy this real estate property
18 right away.  And he sent me a contract to sign, and that
19 had to be done right away as well.
20     Q.  What was the amount of the investment that he
21 needed from you?
22     A.  Well, first it was a $500,000 Euro amount.
23         May I continue?
24     Q.  Go ahead.
25     A.  So I sent that first transfer of $500,000 in

## Page 35

1  November 2021.
2         Some ten days later, approximately, he said
3  it'd be better to invest more in order to take advantage
4  of a really great opportunity, something like $900,000
5  or $950,000.  So I sent a second transfer of $500,000.
6      Q.  Were there any other transfers that were sent
7  as a part of that?
8      A.  There were four.
9         So there were the two $500,000 Euro transfers,
10 and then there were two more for $250,000 each, for a
11 total of $1.5 million.
12     Q.  When you were instructed to make these
13 transfers, each time there was a transfer made, was
14 there something presented to you?
15         INTERPRETER:  I'm sorry, the interpreter would
16 ask you to repeat your question, please,
17 Mr. Adamsky.
18     Q.  For each of these four transfers, every time
19 you were asked to make a transfer, did he present you
20 with any kind of paperwork?
21     A.  So he sent me photos.  There was the marina,
22 Miami Beach, Cocoa Beach.  Then there was Zillow, which
23 is a real estate site.
24         COURT REPORTER:  Can I have the spelling?
25     A.  Z-I-L-L-O-W.

## Page 36

1         COURT REPORTER:  Thank you.
2      Q.  Is this for the purchase of multiple
3  properties or all as a part of one property?
4         INTERPRETER:  The interpreter would ask
5  counsel to remind the witness to allow the
6  interpretation to be completed before he begins to
7  respond.
8      Q.  So my last question --
9         Mr. Muller, before we continue, I just want to
10 remind you to allow the interpreter to finish his
11 translation, and then you can answer the question and
12 allow him to listen and translate back into English for
13 me.
14     A.  Okay.
15     Q.  So your understanding -- was it your
16 understanding, based on these instructions that were
17 given to you by Iteb, that you were investing in a
18 series of properties?
19     A.  Yes.  At first it was just one, and then it
20 turned into two.
21     Q.  The sum, all of those four wires, those were
22 all relating to the first property?
23     A.  It was for purchase of several real estate
24 properties.
25     Q.  All right.  I'm going to put something on my

United Reporting, Inc.
(954) 525-2221

Page 37

1  screen.
2       Can you see what's shown on my screen?
3       A. Yes.
4       Q. Do you recognize what I'm showing you on my
5  screen?
6       A. Yes, but do you know when I got this document?
7  When I got it -- do you know the date I received this
8  document?
9       Q. What is the date that you received the
10 document?
11      A. After the fourth transfer. After the fourth
12 wire. Because I was mad, I was mad.
13      Q. Okay.
14      A. May I speak?
15      Q. You may.
16      A. So after the fourth transfer was made, he came
17 back and asked me for a 4.5% tax, which is required in
18 Florida on the amount of an investment. So it was
19 Johnny that said -- that told me that.
20      Q. This was something that was communicated to
21 you by Iteb?
22      A. It was from Johnny and Iteb over the phone.
23 We were having a telephone call on the 13th of January
24 of 2022.
25      Q. This phone call that you're describing, that

Page 38

1  was relating just to this tax that was involved by
2  something that is imposed by Florida?
3       A. Yeah. Johnny said that this 4.5 percent
4  needed to be paid in order to release the property
5  because of this requirement.
6       Q. So this was just to explain how Florida taxes
7  work with regard to wire transfers and properties?
8          INTERPRETER: So the interpreter has asked for
9       a pause here.
10      A. So, yeah, the idea here was to liberate the
11 capital that was invested in order to be able to
12 purchase the property.
13         So I was getting impatient. It was two months
14 now, and I was wanting this property to be purchased,
15 and I never got a contract. And they were saying, well,
16 the money's blocked, the money's blocked. So I was
17 getting impatient by that. This is what they were
18 telling me.
19      Q. Okay, so you became impatient, and is that
20 where this document came from? You mentioned this came
21 after the original wires were made?
22      A. But this is a false document. This document
23 that says Florida Luxury Realty, this is a false
24 document that came after.
25      Q. And this was -- this was provided to you by

Page 39

1  Iteb?
2       A. Yes.
3       Q. Aside from that conversation you described,
4  did you at any point deal with anyone other than Iteb
5  Zaibet in this series of transactions?
6       A. Do you mean in the United States?
7       Q. Anyone.
8       A. No one in the U.S. We contacted Johnny. We
9  contacted Johnny and his lawyers in the United States
10 and Miami.
11      Q. Do you remember the name of his lawyers?
12      A. And they responded, well, we don't know
13 Mr. Muller. So I don't have the name of the lawyer.
14         INTERPRETER: I'm sorry, this is the
15      interpreter. The sound from the Mullers is not the
16      great -- the greatest. So that's why I have to
17      keep asking for a repetition.
18      A. We called Johnny, we called Yvette, we sent an
19 official communication to AAA Plus, and we never got any
20 response. And they did send a response saying that we
21 have no business dealings whatsoever with the Mullers.
22      Q. Who sent that response?
23      A. The lawyers -- our lawyers in Miami contacted
24 Johnny and Yvette, and they sent a letter. And in the
25 response it said, we don't know who the Mullers are, we

Page 40

1  don't know them.
2       Q. When is the last time that you communicated
3  with Iteb regarding this transaction?
4       A. January 2022. It was sometime in the month of
5  January 2022. I don't have the dates. The end of
6  January 2022, more or less.
7       Q. Okay. Was that by phone, by text, by e-mail?
8       A. Not by e-mail. It was through WhatsApp either
9  a phone call or a text through WhatsApp.
10      Q. Each time that you made a wire transfer,
11 before those wire transfers were made, the only person
12 that you dealt with who told you to make those wire
13 transfers was Iteb Zaibet, is that correct?
14      A. Yes. And Lorita, his wife.
15      Q. And then what followed this document that was
16 provided, that was also provided solely by Iteb and or
17 Lorita, correct?
18         INTERPRETER: Interpreter did not understand
19      the first part of your question.
20      Q. After those wire transfers, this document
21 we're looking at on my screen, this was also sent to you
22 by either Iteb or Lorita, correct?
23      A. This is Iteb who sent me this document through
24 WhatsApp. I was expecting not this document. Rather, I
25 was expecting a contract -- a contract, not this

Page 41

1  document.
2  Q. The Zoom cut out for a second. I apologize,
3  Mr. Interpreter.
4  Can you repeat that?
5  A. I wasn't expecting this document. I was
6  expecting a contract, not this document.
7  MR. ADAMSKY: Okay. Madam Court Reporter, if
8  you could mark this as defense Exhibit 1, please.
9  (The Luxury Property document was marked as
10 Defendant's Exhibit Number 1 for Identification.)
11 COURT REPORTER: Got it. Thank you.
12 Q. Now, aside from this conversation regarding
13 the general explanation of taxes, was there any other
14 contact that you ever had with -- in terms of a
15 conversation with Mr. Previlus?
16 A. No. My attorney, yes. Me? No.
17 Q. When you say your attorney, are you talking
18 about how your attorney tried to contact Mr. Previlus?
19 A. He spoke with him by phone. He said, I don't
20 know who the Mullers are. I don't know the Mullers.
21 Q. Did you have any other -- aside from what we
22 have discussed, did you have any contact with anybody
23 from AAA Investment or -- I'm sorry, AAA Plus?
24 A. No, it was Yvette -- what's her name?
25 Yvette Tenord and Johnny. And that's it, that's it.

Page 42

1  Q. What are your referring to with regard to
2  Yvette Tenord?
3  A. I'm talking about the fact that she was
4  manager at AAA Plus. She's the one that got the money.
5  She's the one that received the transfers.
6  Q. So she was just someone working in AAA Plus?
7  A. She was the head of the company. She was
8  managing the company.
9  Q. So she was just someone who --
10 A. May I speak, sir?
11 Q. Go ahead.
12 A. Sir, you're asking about that 1.5 million Euro
13 and where those 1.5 million Euros are coming from,
14 right? Is that not what you're asking?
15 Q. No, sir. What I'm asking is in this
16 transaction involving the 1.5 million, did you deal with
17 anybody else?
18 Was there any other involvement from AAA aside
19 from what we just mentioned in terms of how the money
20 was to be deposited?
21 A. Well, there's Yvette and Johnny. So Yvette is
22 the person who's running that company. And then there's
23 Johnny, and then there's Nelson, too. So it's a whole
24 organization.
25 MS. BOUZID: Nelson, of course.

Page 43

1  MR. ADAMSKY: Ms. Muller, please, if we can
2  just have Patrick answer these questions. We're
3  going to get to your deposition shortly.
4  MS. BOUZID: Okay.
5  Q. Who is -- who is Nelson?
6  A. He was the one in charge of real estate. I
7  don't know him, but I heard about him for a long time.
8  Q. So Nelson's a real estate agent?
9  A. I think. I don't know. I believe so.
10 Q. Do you know what Nelson's last name is?
11 A. No, I don't. We can find it. We can find it.
12 Q. When you say that you can find it, that's
13 information that you have?
14 A. I think so. I think we have that, yes.
15 Q. Do you know who Nelson worked for?
16 A. I think he worked with all of them -- with
17 Johnny, Yvette and Iteb and Lorita. I think they all
18 worked together.
19 Q. What I'm asking is do you know if Nelson
20 worked for a company and what company he worked for?
21 A. No, I don't know. I don't. I don't know. I
22 don't know.
23 I thought at first that Nelson worked with
24 Johnny and Yvette for this luxury company -- Luxury
25 Company, Inc. I thought at first, I believed that he

Page 44

1  worked with them at that company.
2  Q. Did you ever speak with Nelson?
3  A. No. But Iteb and Lorita spoke about Nelson a
4  lot. So he was their agent. They worked together. Oh,
5  I don't know.
6  Q. Are you familiar with -- strike that.
7  Aside from anything you've learned from your
8  attorneys, are you familiar with the company Res
9  Investment Inter?
10 A. No, I don't think so, no. I don't think so.
11 That name means nothing to me.
12 Q. Now, aside from anything you learned in this
13 lawsuit or from your attorneys, do you know anything
14 about a company called Infinite Res?
15 A. No, I don't believe so.
16 Wait, so did you say lawsuit? Lawsuit? This
17 isn't a lawsuit. This isn't a lawsuit. This isn't a
18 lawsuit; this is all just fraud. This is my money.
19 It's my money.
20 Q. Sir, what I'm asking is from your own personal
21 knowledge, aside from what has happened in this lawsuit
22 and what you've learned from your attorney, have you
23 heard of either -- of any of these companies?
24 A. Which ones are you talking about?
25 Q. Infinite Res and Res Investment Inter?

Page 45

1  A. I don't know. I don't know what they are. I
2 have no idea. I don't think so. I don't. These names
3 mean nothing to me. I don't think so. I don't know.
4     MS. BOUZID: (Inaudible response.)
5     Q. What kinds of companies are these? What are
6 these companies?
7     If I can go on the record for this --
8 Ms. Muller, please. I noticed that you spoke something
9 to your husband. I again want to remind you that we're
10 going to do your deposition this afternoon, shortly, and
11 if you have anything to say, you'll have a chance to say
12 it. But right now we're only talking to your husband,
13 Mr. Muller, and you cannot give him any input on what
14 he's saying.
15     A. She didn't answer. I asked my wife a
16 question. I asked her just if she knew those companies.
17 I was asking her the question.
18     Q. Hold on, hold on. Sir, you cannot communicate
19 or have any input or speak at all with your wife during
20 your deposition.
21     A. Sorry, I'm just not used to this. First time
22 in my life -- I'm an honest worker. I'm an honest
23 worker, that's it. I don't know the justice system.
24 This is the first time in my life. I'm 68 years old.
25 This is the first time in my life at 68 years old I'm in

Page 46

1 court in front of a judge.
2     MS. BOUZID: (Inaudible response.)
3     A. It's not a problem for him to ask me
4 questions. They're fraudsters.
5     Where are those fraudsters?
6     MR. OSGATHORPE: Mr. Muller, just please
7 answer the questions that Mr. Adamsky is asking you
8 without referring -- without assistance from your
9 wife. He just wants to know your recollection,
10 okay, so just yours, okay?
11     A. All right, sorry.
12 BY MR. ADAMSKY:
13     Q. Mr. Muller, I want to ask you -- again, this
14 is just a question directed at you.
15     A. Yes.
16     Q. Do you know if your wife was involved in any
17 part of this dealing?
18     A. What aspects are you talking about? What do
19 you mean?
20     Q. Was your wife involved in communicating with
21 Iteb?
22     A. We both were. We both had communications with
23 Iteb. She did, I did. And then there was Lorita.
24 There were four of us. So Lorita was the fourth person
25 involved in all this business. So they came here, both

Page 47

1 of them, and we talked business here.
2     Q. So when you -- when you had these, these
3 communications with Iteb, for example, when he gave you
4 instructions to do the wires and he showed you the
5 properties, your wife was involved in those discussions
6 as well?
7     A. Yes, of course. It's her money, it's my
8 money, it's our money, both of us.
9     MR. ADAMSKY: If we could just take two
10 minutes.
11     INTERPRETER: This interpreter is going to ask
12 for a five-minute break.
13     (A brief recess was taken at 12:50 p.m.)
14     (The proceedings resumed at 1:02 p.m.)
15 BY MR. ADAMSKY:
16     Q. All right. Mr. Muller, I just have a couple
17 more brief questions.
18     Mr. Muller, you said you spoke to Mr. Previlus
19 and Iteb in January of 2022?
20     A. Yes, the 13th. Sorry, but it wasn't directly.
21 We were in the car, there were four of us, and we
22 overheard conversations between Iteb and Johnny.
23     MR. ADAMSKY: Interpreter, can you repeat
24 that? The Zoom audio cut out.
25     A. There were four of us in the car, and it

Page 48

1 wasn't directly, but we overheard conversations between
2 Johnny and Iteb. The four of us were in the car.
3     Q. Who is in the car?
4     A. Lorita, Iteb, Mouna and me. It was about
5 taxes. So we started by all speaking in French, and
6 then the two of them were speaking in English.
7     Q. So you were not speaking with Johnny directly.
8 You're referring to a conversation that was between Iteb
9 and Johnny?
10     A. Yes, we heard, because it was on speakerphone
11 in the car.
12     Q. And this conversation involving the taxes, it
13 was only Iteb and Johnny speaking?
14     A. Yes, and Iteb and Johnny were asking us for
15 that 4.5 percent in taxes, saying that our capital was
16 blocked at the United States, and we had to pay those
17 taxes in order to unblock it.
18     Q. Johnny was saying this to Iteb?
19     A. The two of them were speaking to one another.
20     Q. But you were not speaking to Johnny, correct?
21     A. That's right.
22     Q. And Johnny was not addressing you, correct?
23     A. So they were talking, the two of them, about
24 us. Because I was asking for the contract -- I was
25 asking for the contract. And they said, well, these