**Page 1**

IN UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:  23-cv-22276-BLOOM/Otazo-Reyes

PATRICK MULLER, an individual,
and MOUNA BOUZI, an individual,

        Plaintiffs,

vs.

ITEB ZAIBET a/k/a
"Swagg Man", an individual,
LOLITA C. REBULARD, an
individual; LUXURY PROPERTIES, INC.,
a Delaware corporation;
BEACH PROPERTIES BEACH, INC., a Delaware
corporation; LUXURY PROPERTIES
TRUST u/a/d March 2, 2018;
AAA PLUS FINANCIAL GROUP, INC.,
a Florida corporation;
YVETTE TENORD, an individual;
JOHNNY PREVILUS, an individual;
RES INVESTMENT INTER, INC., a
Florida corporation; INFINITE
RES INVESTMENT, LLC, a Nevada
limited liability company,
NEW MIAMI REALTY, CORP., a
Florida corporation; and
GUZMAN305 TRUST, a Florida trust,

        Defendants.
_____/

VIDEOCONFERENCE DEPOSITION OF
JOHNNY PREVILUS

Friday, March 29, 2004
12:20 PM - 2:30 PM

Georgia Winegeart & Associates
(904) 355-1500
www.georgiawinegeart.com

Stenographically Reported By:
Cynthia Silverberg, Court Reporter

*GEORGIA WINEGEART & ASSOCIATES*

---

**Page 2**

2

1                 APPEARANCES:

2

3    On behalf of Plaintiffs:
       TAYLOR, DAY, GRIMM & BOYD
4      50 North Laura Street, Suite 3500
       Jacksonville, FL 32202
5      (904) 356-3224
       BY:  KENNETH A. TOMCHIN, ESQUIRE  (via Zoom)
6    AND:  TAYLOR MCMAHON, ESQUIRE  (via Zoom)
       ktomchin@taylordaylaw.com
7      jdo@taylordaylaw.com
       tmcmahon@taylordaylaw.com
8      amelton@taylordaylaw.com
       lad@taylordaylaw.com
9      hmaxwell@taylordaylaw.com

10

11

12   On behalf of Defendants Johnny Previlus, Yvette Tenord,
       AAA Plus Financial Group, Inc., Res Investment Inter,
13   Inc., Infinite Res Investment, LLC
       CONRAD & SHERER, LLP
14     633 South Federal Highway, Suite 800
       Fort Lauderdale, Florida 33316
15     (954) 462-5500
       BY:  STEVEN H. OSBER, ESQUIRE (via Zoom)
16   And: JASON ADAMSKY, ESQUIRE (via Zoom)
       sosber@conradsherer.com
17     jadamsky@conradsherer.com
       athomas@conradsherer.com

18

19

20                        *  *  *  *  *

21
22
23
24
25
                 *GEORGIA WINEGEART & ASSOCIATES*

---

**Page 3**

1                  I N D E X
                               Page

2

3    TESTIMONY OF:  JOHNNY PREVILUS

4       Direct Examination by Mr. Tomchin        4

5    CERTIFICATE OF OATH                    72

6    CERTIFICATE OF REPORTER                73

7    ERRATA SHEET                        74

8                     *  *  *  *  *

9

10               (No Exhibits)

11

12                  *  *  *  *  *

13
14
15
16
17
18
19
20
21
22
23
24
25
              *GEORGIA WINEGEART & ASSOCIATES*

---

**Page 4**

1                 JOHNNY PREVILUS,

2    having been produced on behalf of the Plaintiffs herein,

3    was examined and testified as follows:

4                DIRECT EXAMINATION

12:19  5   BY MR. TOMCHIN:

6        Q.  Please state your name for the record.

7        A.  What is it?

8        Q.  Please state your name for the record.

9        A.  My name is Johnny Previlus.

12:19 10     Q.  And it's P-r-e-v-i-l-u-s; is that correct?

11       A.  Yes.  Correct.

12       Q.  Have you been known by any other names?

13       A.  No.

14       Q.  Preliminarily, have you ever been convicted of

12:19 15   a crime before?

16       A.  No.

17       Q.  And I didn't ask your wife that.  I'm sure the

18   answer is no, but she never has either; is that correct?

19       A.  Correct.

12:19 20     Q.  Great.  Where do you currently live?

21       A.  I currently live in Texas.

22       Q.  Where in Texas?

23       A.  It's Magnolia, Texas.

24       Q.  Where is that close to?

12:20 25     A.  It's in, I would say, in the Houston area.

              *GEORGIA WINEGEART & ASSOCIATES*

**9**

1  recall.

2      Q.  What job did you have when you left DeVry?

3      A.  I was -- first worked for a company as an

4  administrative assistant and also I did transfer to work

12:26  5  for a mortgage lending -- lender as a post closer.  And

6  since then, I've been pretty much in -- more like in the

7  financing, yes.

8      Q.  Administrative?

9      A.  Assistant.

12:26  10      Q.  What company did you work for then; do you

11  remember the name?

12      A.  I don't recall because I was hired by an

13  agency.  And then -- but I don't really recall.

14      Q.  How about the lender, the first mortgage

12:26  15  lender you worked for?

16      A.  The first mortgage lender was NSL and I didn't

17  -- they have been out of business for probably over 15

18  years or 10 years.

19      Q.  After that -- and you did post closing work?

12:27  20      A.  Yes, I did post closing.

21      Q.  And then after NSL, who did you work for?

22      A.  I work for several other companies.  I don't

23  -- I can go look for them, but I don't recall because

24  it's been a while since I become self-employed by

12:27  25  myself.

*GEORGIA WINEGEART & ASSOCIATES*

**10**

1      Q.  When did you first become self-employed?

2      A.  Well, I opened AAA Plus.  That was back in

3  2015.  But I was working for a company, I believe Gold

4  Star Mortgage at the time, while I opened my company.

12:28  5  And then I have been -- physically I was in between.  I

6  was self-employed and also that too but I become fully

7  self-employed.  That was two years ago.  I started my

8  own company.  So I always own the company and also work

9  as an -- I work as a self-employed and also work as a

12:28  10  waiter meaning received W-2.

11      Q.  Okay.  And so in 2015, you started AAA,

12  correct?

13      A.  Yes.  That's what I recall.

14      Q.  And did you also start it with your wife?

12:29  15      A.  Yes.  She was in the corporation.  What happen

16  is in some time.

17          MR. OSBER:  Hold on.  Your sound is going out.

18  BY MR. TOMCHIN:

19      Q.  Say that again.

12:29  20      A.  She was in the corporation, but she was not --

21  she always -- basically she was not willing -- so the

22  business was solely operated by me only but, yes, she

23  was in it.

24      Q.  Did you have any employees at AAA?

12:29  25      A.  Yes.  I -- most of the employees, more likely,

*GEORGIA WINEGEART & ASSOCIATES*

**11**

1  used to contract because they used to receive a 1099.

2      Q.  And what did they do for you?

3      A.  They used to -- either they do taxes during

4  the tax season and -- but that was it.  So basically for

12:30  5  the rest of the year.  So I remained in the office for

6  other services and so forth.

7      Q.  Where else did you work when you started AAA

8  through, say, 2015, '16, '17, where else did you work?

9      A.  I work for a lender, Full Star Mortgage.  And

12:30  10  then also -- I forgot -- and American Bancshares.  That

11  was the last company I worked for as a loan officer.

12  And then I used to work for -- I forgot the name.  That

13  was another company I was working in between, but I

14  forgot the name.

12:31  15      Q.  Is AAA still in existence?

16      A.  Well, it still exists.  But since the --

17  unfortunately after the lawsuit and that's really in --

18  so I don't really operate, so really make money out of

19  the company, because since the lawsuit, that's my first

12:31  20  time I ever been in, so it really bothers me.  So my

21  work ethic become very diminished because of that issue,

22  because I never been in anything like that.  And then

23  suddenly -- and claim that you're dealing with a fraud

24  and scamming and things like that, so it's really not

12:31  25  (inaudible).  It's really funny.

*GEORGIA WINEGEART & ASSOCIATES*

**12**

1      Q.  And tell me a little bit more about that.

2  There was an administrative complaint; is that correct?

3      A.  Yes.  It is, I think, administrative, yes,

4  again stating that I was involved in a real estate

12:32  5  transaction, which I'm not a listed broker.  And at AAA

6  Plus, we do not provide real estate services.

7      Q.  How did that end; what did the administrative

8  result -- what was the administrative result?

9          MR. OSBER:  Hold on just one second because I

12:32  10  don't know if the Bar investigation, whether

11  an investigation like that is confidential.  So can

12  you ask him that question?  Because I don't want to

13  ask questions.

14          MR. TOMCHIN:  You want me to ask whether or

12:32  15  not it's confidential?

16          MR. OSBER:  Yeah.

17  BY MR. TOMCHIN:

18      Q.  Do you know if that administrative

19  investigation was confidential, one way or the other?

12:32  20      A.  I don't know.  I cannot answer that.

21      Q.  Has there been a final resolution -- I'll ask

22  that -- yes or no?

23      A.  We got the resolution, correct, and we got the

24  Plaintiffs beef in a complaint against me in a criminal

12:33  25  real estate transaction, which I did find out I did not

*GEORGIA WINEGEART & ASSOCIATES*

**13**

1 -- was not in any real estate transaction because I'm
2 not a listed broker. So the complaint was dismissed in
3 that sense because I had nothing to do with real estate
4 because I never been a real estate broker or employed by
12:33 5 a real estate agent.
6 Q. Was there any other findings other than the
7 dismissal as to the real estate issue?
8 A. Well, there is no finding, and I believe
9 that's the reason why we are here today and basically
12:33 10 for me to express myself and for --
11 MR. OSBER: Mr. Previlus, Mr. Previlus.
12 THE WITNESS: Yes.
13 MR. OSBER: I'm going to have the court
14 reporter read the question back again and I want
12:34 15 you to answer the question, as does Mr. Tomchin.
16 Answer the question that's being asked of you.
17 Cindy, could you read the question back,
18 please?
19 (The question was read back.)
12:34 20 BY MR. TOMCHIN:
21 Q. Do you understand my question? You said that
22 the real estate part was dismissed. Was there any other
23 findings by the administrative board concerning your
24 license or anything else --
12:34 25 A. No, no, no, no.

*GEORGIA WINEGEART & ASSOCIATES*

**14**

1 Q. Where currently does AAA keep its business
2 records?
3 A. It's at the office in Miami. And I still have
4 the office, but I still keep AAA Plus exists, but I
12:35 5 don't have any transactions going on at that moment.
6 MR. OSBER: Let's try this one more time.
7 Cindy, can you read back the question?
8 (The question was read back.)
9 THE WITNESS: In the office in Miami.
12:35 10 MR. OSBER: Say it again.
11 BY MR. TOMCHIN:
12 Q. At the office in Miami, correct?
13 A. Yes.
14 Q. Approximately -- well, tell me what AAA did.
12:35 15 That's a very broad question and might have a very broad
16 answer, but what did AAA do?
17 A. What I did, taxes and also we provide, if
18 somebody needs an LLC, we do that, and begin to complete
19 documents, online documents. So we do it online for a
12:36 20 fee. And then also -- we also -- we also provide a
21 notary service. And also we provide prints and fax and
22 things like that. But the client services is the client
23 services taxes, but we do other services in order to
24 keep us open during the year.
12:36 25 Q. And I understood the taxes, the notary and

*GEORGIA WINEGEART & ASSOCIATES*

**15**

1 copying. What was the second thing? I couldn't
2 understand your answer to the second issue.
3 A. The second thing, if somebody needs to open an
4 LLC or a corporation on Sunbiz, so we would set up small
12:37 5 business and things like that. This is something out of
6 my scope. So I do that and then we charge a fee for
7 that.
8 Q. Approximately how many tax returns would you
9 say AAA has done over the years for customers?
12:37 10 A. Probably 150.
11 Q. And do you get hard copies of folks' documents
12 when you do their tax return, or is it electronic or
13 both?
14 A. Yeah. I do have a file and because this is
12:37 15 the norm, to keep the documents at least for two years
16 and a record.
17 Q. What bank accounts did AAA use in the 2021/
18 2022 years?
19 A. I used the Wells Fargo account.
12:38 20 Q. Any other accounts that you can think of?
21 A. Well, I use the Wells Fargo account. This is
22 the account for AAA Plus, and I had my personal business
23 and my personal account.
24 Q. At Wells Fargo as well?
12:38 25 A. Yeah. That was at Wells Fargo. And also I

*GEORGIA WINEGEART & ASSOCIATES*

**16**

1 had a personal account and we -- that was under that
2 account where I received the deposit money. I was using
3 it more like my savings, We Financial. It's a credit
4 union.
12:39 5 Q. I received from you and your company some We
6 Financial records.
7 A. Yes.
8 Q. I don't think I ever received any Wells Fargo
9 banking records. Do you still have Wells Fargo banking
12:39 10 records for AAA?
11 A. Yes, actually I do, and I do have records and
12 -- which from the -- all the records of the transaction.
13 Q. So you still have that handy right now in your
14 possession, it sounds like.
12:39 15 A. Yes, I do.
16 Q. And the closing on the Port St. Lucie
17 property, do you have those documents as well?
18 A. I should be able to begin an email and things
19 like that to have them.
12:40 20 Q. Great. What email account did you use at AAA?
21 A. It's AAA Plus and it's a gmail account.
22 Q. Do you still have it?
23 A. Yes, I still have my gmail account.
24 Q. Did you have any other email accounts in the
12:40 25 2021/22 period?

*GEORGIA WINEGEART & ASSOCIATES*

**17**

1    A.    That's the primary email I was using for AAA.

2  And the other email was when I used to work for the

3  company.  So once I'm out of the company, so I no longer

4  have access.  And then mostly all the communication was

12:40  5  related to finance, but not related to AAA Plus.

6    Q.    When was the last time you were over at AAA in

7  Miami?

8    A.    Last month.

9    Q.    And are you going in the near future?

12:41  10    A.    Yeah, I should, because I -- even though I'm

11  in taxes, I work at home.  And because I'm here not only

12  trying to establish a business here, but also -- but I

13  still have my office in Florida and it's my job to go

14  there.

12:41  15    Q.    When's the next trip planned?

16    A.    I don't -- probably next month or it can be

17  sooner.  It depends.  If I have some clients, we do Zoom

18  appointment, we do Zoom interview or things like that.

19  But some of them want to meet with me face to face so I

12:42  20  make that trip to them.

21    Q.    But right now you don't have a plan like next

22  week; you don't have a plane ticket or anything of that

23  nature to go back?

24    A.    I do have a -- actually, I have an appointment

12:42  25  I'm supposed to go this week.  But what happened, the

**18**

1  appointment that I had, then something come up and I'm

2  not sure.  If I contacted the position, I will go.  But

3  I don't know if I will go because the appointment, for

4  whatever reason, was canceled.

12:42  5    Q.    Has it been rescheduled for next week?

6    A.    I don't know.  Like I said, after the meeting,

7  after the deposition, so that's when I would know.  So I

8  have to talk because I don't have to travel for an

9  unsuccessful meeting, but because if I can do the Zoom

12:43  10  or over the phone, so it's not necessary for me to

11  travel.

12    Q.    Tell me about when you first met Iteb and his

13  -- and/or his wife.

14    A.    Oh, that was back in maybe 2017, '18, if I

12:43  15  recall.

16    Q.    Where did you meet them?

17    A.    Yes.  Actually that was somebody -- I didn't

18  recall the company and asked for -- he was looking at

19  first for a loan, but -- and they -- he was referred

12:43  20  because he needed to talk to somebody that speak French,

21  and I do have a French background.  So I was able to

22  communicate with them in French.

23    Unfortunately, I did not do any loan

24  transaction for them because he was not qualified.  So I

12:44  25  told him I can't help.  And then after that, he wanted

**19**

1  other services, such as he told me he wanted to open a

2  corporation and this and that, which we did that at AAA

3  Plus.  And I did not do the corporation for him.

4  Basically, I did a third party so I could get paid for

12:44  5  the service.

6    Q.    What corporation was set up by that third

7  party, if you know?

8    A.    It's a company, I believe, in Jacksonville.

9  It's a registered agent, and it was through their

12:44  10  website and then you input it there and then you

11  complete the LLC form.

12    Q.    What's the name of his company, do you know,

13  that was set up?

14    A.    The name of the company is some Luxury

12:45  15  something.  I don't really recall, but it was set up as

16  a real estate investment, something like that.

17    Q.    Was it one of the Defendants that have been

18  sued, Luxury Properties, or do you know?

19    A.    Yes.  Pretty much that is the company.

12:45  20    Q.    And you helped set that up; is that correct?

21    A.    I helped and, yes, through a third party.  I

22  was using a third party to set it up.  And then I get --

23  and I charge him now the third party fee and my fee.

24    Q.    Who was the third party?

12:45  25    A.    It's a company up in Jacksonville.  I don't

**20**

1  recall because that was since -- after 2021, after all

2  that come down, so I told him I no longer provide

3  services for him.  So I -- I can find the name because I

4  should have a record of the information, but I don't

12:46  5  recall at this moment.

6    Q.    All right.  Approximately how many phone calls

7  have you had with Iteb?

8    A.    Well, now I met Iteb and Lolita twice.  He

9  used to come to my office when I was -- I did file one

12:46  10  tax return for him.  But at the time he went to -- and I

11  never heard from him.  I did finally ask.  And at that

12  time Lolita did not have copies of this for what's --

13  when he filed together with his wife Lolita.  And since

14  then --

12:47  15    MR. OSBER:  Mr. Previlus, guess what I'm going

16  to have done for you?  I'm going to have Cindy read

17  back the question for you.  Let's try again.

18    (The question was read back.)

19    THE WITNESS:  Well, I cannot recall because we

12:47  20  talked a lot.  And when he was here, he called me

21  on the phone.  And when he was away, so he called

22  on What's App.  So I cannot recall that many calls.

23  BY MR. TOMCHIN:

24    Q.    When was the last time you talked to Iteb?

12:48  25    A.    Probably a month ago.

**21**

1   Q.   What did you all talk about?
2   A.   Well, I had the handbag and the gloves and
3   that was in my possession.  I mean, I purchased it for
4   him about maybe last -- in 2021.  He keep asking me when
12:48 5   can -- what do you want me to do with the gloves and
6   something expensive, but I still have that on my
7   possession.  He keep calling and asking for it.  So I
8   told him I'm not even in Broward.  I don't know and I
9   don't even know if I have it because it probably in my
12:48 10   stuff at the same time.
11   Q.   Do you have some of Iteb's property in your
12   possession now?
13   A.   The gloves.
14   Q.   The gloves?
12:49 15   A.   The gloves, yeah, Louis Vuitton, something
16   like that.
17   Q.   Louis Vuitton?
18   A.   Yes.  I'm not up to this type of things.
19   Q.   Did you buy a Louis Vuitton glove for Iteb?
12:49 20   A.   Yeah.  That was the guide.  That was it.  And
21   he purchased it.  And then he make me pay for it.  And
22   since then, I never had a chance -- I never have a
23   chance to give it to him.  So it's still in my
24   possession.  That was probably two years, three years
12:49 25   ago.

**22**

1   Q.   Was that money out of your AAA account?
2   A.   That was out of the AAA account.  That was
3   probably for 7 or 10,000.  I don't remember.
4   Q.   And do you believe it was monies that came
12:50 5   from Mr. Muller?
6   A.   No.  That money was actually from -- it was
7   the first transaction.  He sold a property in the Keys,
8   and I believe the community was called Coco Plum.  But
9   that was not from the Muller money.  That was with a
12:50 10   previous transaction.
11   Q.   Do you remember the timing, the date that
12   transaction occurred?
13   A.   I can find it because it's on the AAA account.
14   Q.   Do you believe now that -- let me ask you
12:50 15   this.  Did Mr. Muller send to AAA wires?
16   A.   Well, I received probably four wires or five
17   wires from Patrick Muller, but that was communication
18   between Iteb -- to Iteb.  So, yes, I do receive the
19   wires.
12:51 20   Q.   And did you ever talk to Mr. Muller?
21   A.   Yes, and I will give you the details.
22   Q.   I'll get to that.
23   A.   Yes.  I never talked to Mr. Muller.  I heard
24   about him through Iteb, but I never talked to him
12:51 25   personally by phone or email.

*M_JC*

**23**

1   Q.   Right.  And after all you've been through up
2   to today's date, do you believe Mr. Muller lent money to
3   Iteb, or did Iteb steal money from Mr. Muller?  Do you
4   have a belief and opinion now, one way or the other?
12:51 5   MR. OSBER:  Hold on one second.  Object to the
6   form of the question.  And to the extent it causes
7   him to give any sort of answer that pertains to
8   information that he received from his attorney I
9   would instruct him not to answer because it was
12:51 10   attorney/client communication and work product.  So
11   based upon those grounds, I think, in an abundance
12   of caution, what his beliefs are are irrelevant
13   regardless.  But if it's based upon information
14   that he has that we gave him, it's privileged.  So
12:52 15   he's not going to answer that question.
16   MR. TOMCHIN:  Wait.
17   BY MR. TOMCHIN:
18   Q.   Have you done any independent investigation
19   other than what your attorney has talked about with you
12:52 20   about where the monies came from, things of that nature?
21   A.   No.
22   Q.   Have you ever read any articles about Swagg
23   Man, Iteb?
24   A.   Well, that's recently.  And, yes.  So not the
12:52 25   new ones.  Basically Google when all of this come up.

**24**

1   But before then, I did not.
2   Q.   And I asked you for your opinion today, not
3   two years ago, not three years ago, but today.  And do
4   you have an independent opinion as to whether or not
12:53 5   Mr. Muller had had his funds stolen by Iteb, or not?
6   A.   I don't -- I cannot answer that.
7   Q.   But you do have Iteb's property in your
8   possession today, correct?
9   A.   Possession?
12:53 10   Q.   Yes.
11   A.   I do have the glove.  Yeah, I do have the
12   glove, a set of gloves.  That was way before -- that was
13   purchased way before -- before Muller's money, before
14   the wires from Patrick.
12:53 15   Q.   And we'll go through Muller wires in a few
16   minutes.  So the gloves that you have were purchased
17   before Mr. Muller sent AAA any money, it sounds like.
18   A.   That is correct.
19   Q.   Do you have anything else of Iteb's?
12:53 20   A.   No.  That's it.  That's the only thing.
21   Q.   Did you and Iteb talk about this lawsuit at
22   all since you've been sued?
23   A.   Well, I did ask him what is going on because
24   -- and we basically quit after.  That I wasn't aware of
12:54 25   any issue.  He told me about Patrick Muller and he even

*CS
M
C
IOT*

**25**

```
 1   told me because he was like his father.  He was in a
 2   jail and he actually paid his lawyers' fees and also
 3   support him.  And then I have work with Patrick, to wire
 4   money to his account, and the account I believe he lent
12:54  5   it to the listing company that he owned, Luxury Property
 6   something.  So Patrick sent him money in 2020 to that
 7   account.
 8       Q.   To that account, or AAA?
 9       A.   No, not AAA.  Patrick sent money to Iteb's
12:55 10   account.  I believe it's a Bank of America account.
11   It's not the first time he sent money, I believe.  And
12   if you allow me -- and I believe one thing -- one of the
13   reasons that when it came to my account and I believe in
14   late 2020 and Iteb was released from jail because -- and
12:55 15   then he told me -- he find out that this account was
16   closed and probably for not -- for non activity or for
17   whatever reason.  And then he -- so he sold his property
18   to someone in Coco Plum.  And then he owes me about
19   $10,000 while he was in -- actuated.  So, therefore, I
12:56 20   used to pay to his corporation and Lolita, the wife used
21   to call me -- it's unclear exactly that.  I can't -- so
22   he says the only way that I can pay you, I sold the
23   property, but it cost me about the $80,000.  So I need
24   -- and I can pay you the $10,000, but I cannot receive
12:56 25   the money because I have a couple of things to pay.  If
```

*GEORGIA WINEGEART & ASSOCIATES*

**27**

```
 1   closed.  And that's the reason why he asked me to -- so
 2   he couldn't pay me.  So he send that in order for me --
 3   to allow us to receive the money and the $10,000.
 4       Q.   Have you ever seen any part of that account in
12:58  5   which my clients, Mr. Muller and his wife, sent money to
 6   Iteb, to the Bank of America account?
 7       A.   Yeah.  That was part of the transaction.
 8       Q.   Did you see the actual bank account to
 9   disclose the amount that went into Iteb's Bank of
12:59 10   America account?
11       A.   I don't remember.  Probably --
12       Q.   Or was it just what Iteb told you?
13       A.   Not really because that was the wire and all
14   the details were on the wire.
12:59 15       Q.   And do you still have a copy of that wire?
16       A.   Well, and your clients should have a copy as
17   well.
18       Q.   Yeah.  But do you have a copy of that wire?
19       A.   I would discuss that with my lawyer.
12:59 20       Q.   You'll discuss it with your lawyer?
21       A.   No.  I said I will provide that to my lawyer.
22       Q.   Okay.  All right.  If you would.  How much was
23   that wire for, do you think?
24       A.   Probably 20,000 or something.  I don't recall.
12:59 25       Q.   Okay.  And I got some records from you.  Maybe
```

*GEORGIA WINEGEART & ASSOCIATES*

**26**

```
 1   you can resend the money -- and sent me 3,000 -- and
 2   then you can pay this stuff for me.  This is how all
 3   this -- everything begun.
 4       And then I provide him the account and then
12:56  5   the money came.  That was like $88,000.  And then I
 6   trade the 10,000 and then pay you whatever I need to pay
 7   you with the rest.
 8       COURT REPORTER:  The audio is so bad.  I'm
 9   having trouble.
10       (Off-the-record discussion held.)
11   BY MR. TOMCHIN:
12       Q.   Have you ever --
13       MR. OSBER:  Let's start all over again,
14   please.  Hold on.  Cindy, are you ready?
12:57 15       COURT REPORTER:  I'm good.  Thank you.
16       MR. OSBER:  Johnny, wait a second.  Johnny,
17   wait just a second.
18       Mr. Tomchin, go ahead.
19   BY MR. TOMCHIN:
12:57 20       Q.   Let me ask the question.  Have you ever seen
21   the Bank of America account of Iteb?
22       A.   No.  I never received this whole statement,
23   but I believe I do have a -- I did have a -- when he
24   told me to send the money to me, he did send me.  And,
12:58 25   unfortunately, the account showed the account was
```

*GEORGIA WINEGEART & ASSOCIATES*

**28**

```
 1   I got that one.
 2       A.   But that record does not --
 3       MR. OSBER:  Wait for the question.  Johnny,
 4   wait for a question.  You don't talk until there's
13:00  5   a question.
 6       THE WITNESS:  Okay.
 7       MR. TOMCHIN:  Taylor, let's pull up the bank
 8   account for Wells Fargo.  Make it larger, if you
 9   would, Taylor.  Take out that left side.
10   BY MR. TOMCHIN:
11       Q.   Can you see that, Mr. Previlus?
12       A.   Yes, yes.
13       Q.   Is that the AAA business checking account with
14   Wells Fargo?
13:00 15       A.   Correct.
16       MR. TOMCHIN:  Let's come down just a little
17   bit.  Right there.
18   BY MR. TOMCHIN:
19       Q.   What was the starting balance on December 1st,
13:01 20   approximately?
21       A.   December 1st?
22       Q.   Yeah.  It says beginning balance on December
23   1st.  Does it not say 2,000 --
24       A.   Yes.
13:01 25       MR. OSBER:  Johnny, when Mr. Tomchin is
```

*GEORGIA WINEGEART & ASSOCIATES*

**29**

1  talking, you don't talk.
2      THE WITNESS:  Okay.
3      MR. OSBER:  What's going to happen is Cindy's
4  fingers are going to catch on fire and we're going
5  to be in trouble.
6      MR. TOMCHIN:  And she's in Jacksonville.  She
7  might shoot me.  Go ahead and read that number, if
8  you would.
9      THE WITNESS:  The number is 27 --
10  2,790-and-something.  I cannot see clearly.
11  BY MR. TOMCHIN:
12      Q.   But it's a little over $2,700?
13      A.   Correct.
14      Q.   That's December 1st 2021, I believe, correct?
15      A.   Correct.
16      Q.   Now was there -- strike that.  So at that
17  time, it started with 2,700.  The next deposits for that
18  month were almost 1.4 million, wasn't it?
19      A.   Yes.
20      MR. TOMCHIN:  Come on down, Taylor.
21  BY MR. TOMCHIN:
22      Q.   Does it show, December 3rd, a large deposit
23  from Mr. Muller?
24      A.   Yes.  That was a deposit from Mr. Muller for
25  Iteb.

*GEORGIA WINEGEART & ASSOCIATES*

**30**

1      Q.   And you never talked to Mr. Muller about that,
2  correct?
3      A.   Never.
4      Q.   And you had nothing in writing from
5  Mr. Muller; is that correct?
6      A.   Correct.
7      Q.   Did you have anything in writing from Iteb
8  about this money?
9      A.   Well, we had communication.
10      Q.   Let me ask -- I'll get that -- but did you
11  have anything in writing about why that money was being
12  sent to AAA?
13      A.   No.
14      Q.   Now tell me about the conversation you had
15  with Iteb about monies going to be sent by Mr. Muller to
16  AAA.
17      A.   He told me, Mr. Muller -- at first he did not
18  tell me the money is coming from Mr. Muller.  He told me
19  he will send some money to my account and he has my
20  account number from the previous transaction.
21      And then later he on he asked me, because it's
22  an international wire, I will need a suite number in
23  order to send the wire to your account.  And I went and
24  get the suite number to him.
25      And then he told me my -- the monies is

*GEORGIA WINEGEART & ASSOCIATES*

**31**

1  actually coming from my business partner, as you know,
2  and my relationship with Patrick Muller.  So he -- there
3  were several things going on between them.  But he
4  never -- yes.
5      Q.   Good, good.  What was Iteb in jail for, if you
6  know?
7      A.   Well, I do not know.  I don't know.
8      Q.   Did you ever ask him?
9      A.   Well, all he told me -- because -- all he told
10  me, he says that was an accusation and -- but,
11  nonetheless, I was never really focused to check in on
12  that until after and the lawsuit, we checked again.
13      Q.   Did you go check to see what he was in jail
14  for?
15      A.   Well, after the accusation, I do a little bit
16  of research on that.
17      Q.   What did you find out?
18      A.   Well, I found out he was accused of -- and we
19  got money.  I don't really recall, but it was -- and we
20  got some money.
21      Q.   Fraud, theft of others money, is that what you
22  found out?
23      A.   Yeah, sort of.  Yeah, but not really -- yes.
24      Q.   How long was he in jail for, if you know?
25      A.   I do not know because the last time I spoke

*GEORGIA WINEGEART & ASSOCIATES*

**32**

1  with him before he left the country, he was in Los
2  Angeles.  He used to live in Miami.  And then after
3  that, I never heard from him, and then -- until one day,
4  I received a call from Lolita, his wife.  And then so I
5  believe he was in jail for probably a couple of years.
6  I don't know.
7      Q.   After all the research that you've done, do
8  you believe that Iteb has told you the truth on
9  everything he discussed with you concerning Mr. Muller?
10      MR. OSBER:  Objection to form.
11      THE WITNESS:  I cannot answer that question
12  because Mr. Muller and Iteb, they actually were
13  friends.  And also it is proven that he send money
14  to his accounts.  Basically they have a
15  relationship.
16  BY MR. TOMCHIN:
17      Q.   Have you ever talked to Mr. Muller?
18      A.   No.
19      Q.   So do you admit Mr. Muller sent Iteb money
20  through AAA, correct?
21      A.   I'm not saying -- so if I admit that
22  Mr. Muller send money, can you answer that?
23      Q.   Like the $557,000, you admit now that came
24  from Mr. Muller, my client, right?
25      A.   Yes.

*GEORGIA WINEGEART & ASSOCIATES*

---

**33**

1    MR. OSBER:  Object to the form.
2  BY MR. TOMCHIN:
3    Q.  Let's go on.  On December 7th --
4    MR. TOMCHIN:  Can you make it a little bit
5  bigger, Taylor, just a little?  I'm not sure --
6  there you go.
7  BY MR. TOMCHIN:
8    Q.  -- it says purchase authorized corporate
9  filings, $325.  Do you see that?
10   A.  Yes.
11   Q.  What's that for?
12   A.  That probably was to renew the corporation.
13 They sometime probably pay me in cash money and I
14 probably use the account to do it, or something like
15 that.
16   Q.  Let's go back.  The account started with
17 2,700.  And then there was $557,000 put in by my client,
18 Mr. Muller, correct?
19   A.  Well, the money came from your client, but
20 that was for Iteb.
21   Q.  That's what he told you, right, Iteb?
22   A.  That's what he told me.  This is when I was
23 the lead and this is what I was informed.
24   Q.  Right.  Now the $325 that came out of the
25 account, whose corporate filings are you paying there?

*GEORGIA WINEGEART & ASSOCIATES*

---

**34**

1    A.  Like I said, I don't recall, probably because
2  that account -- this is what I -- I do transaction
3  related to the business and things like that and I
4  accept from clients, I don't use to pay myself a check.
5  So basically I used the account, whatever money that's
6  in, to pay my other expenses as well.
7    Q.  So would it be fair to say this $325 was an
8  expense of AAA or you individually?
9    A.  Yeah.  That's probably, like I said, some
10 clients come to me and pay me cash.  And then I use the
11 account, either they sell me or things like that.  So I
12 use that account to pay -- or I probably use it to pay
13 something.
14   Q.  And if you got cash, you always deposited it
15 in your bank account so you wouldn't defraud the IRS,
16 correct?
17   A.  Yeah.  If I have cash.  Like I said, I don't
18 recall what was the transaction for.
19   Q.  But it wasn't for Mr. Muller; it was for
20 either you or one of your clients, this $325?
21   A.  That's probably for me, yes.
22   Q.  The next one, the purchase authorized Cash
23 App, Johnny, $1,500, what is that?
24   A.  Oh, I thought was -- transferred that to the
25 Cash App.  Like I used to have a Cash App account, and

*GEORGIA WINEGEART & ASSOCIATES*

---

**35**

1  sometime I use it if I need to pay for something, not to
2  use my debit cards.  So that's probably the reason why I
3  transferred that.  And I believe at that time I was
4  paying some other little FPL and things like that, but I
5  probably used the Cash App to pay for it.
6    Q.  Again, not for Mr. Muller, but for your
7  personal use, correct?
8    A.  Well, Mr. Muller was not in the picture.  The
9  money come from Mr. Muller, but the money was to be used
10 for Iteb.  I never spoke to Mr. Muller in terms that he
11 send me money to provide service to him.
12       Like I said, like I already explained earlier,
13 Iteb told me his account was closed after I believe
14 Mr. Muller sent him money or something like that.  So
15 now he told me he will send some money.  So I find out
16 the money come from Mr. Muller the day after when he
17 already have the account.
18       So, therefore, I never -- and he told me -- I
19 said, Why the money come from Mr. Muller?  And he told
20 me and Mr. Muller is his business partner, so they have
21 business going on together, so he is actually transfer
22 the money.
23   Q.  Let's go back to the $1,500.  That is a Cash
24 App.  Explain what Cash App is.
25   A.  Well, it's cash -- I have a Cash App account

*GEORGIA WINEGEART & ASSOCIATES*

---

**36**

1  where it's like a -- what is that called?  It's called
2  -- actually, it's ATM card, but you use it as needed,
3  and it is not like your bank card or you credit card
4  because it does not have too much information if you use
5  it on online and that's reimbursed.  So it's like a --
6  but it's not an actual account; it is an actual like a
7  debit, debit account.
8    Q.  So that $1,500 went to your Cash App account,
9  correct?
10   A.  Yes.  Correct.
11   Q.  Next is a hundred thousand dollars that went
12 to Professional Bank, Windmill Title.  Do you know what
13 that was for?
14   A.  That was Iteb directed me to wire that money.
15   Q.  And that was for -- go ahead.
16   A.  That hundred thousand dollars was a wire that
17 was directed by Iteb in the past.
18   Q.  For a piece of property in Miami, or do you
19 know?
20   A.  I believe it's a piece of property in Miami,
21 but I did not -- I was not part of the transaction.  So
22 I did not -- I do not know.
23   Q.  The next one is $37,581.89.  What's that for?
24   A.  Well, that was Iteb asked me to wire that
25 money to a company.  And so that's when I told him that

*GEORGIA WINEGEART & ASSOCIATES*

---

## Page 37

1 -- yeah, so that was Iteb's transaction.
2     Q.   Any idea what that company is and does?
3     A.   Well, what he told me, he told me that was a
4 something he purchased and he needs to pay for it. And
5 so all I had to do was send the money and then he will
6 ship whatever it was.
7     Q.   Okay. How about the next thousand dollars for
8 J-King Best Cleaning Services, what's that?
9     A.   That was my -- that was in -- all the later
10 transactions where I discussed it with Iteb and he told
11 me at that time, and I told him that I need probably
12 $6,000, and he told me that's okay, I can use it. That
13 was my transaction.
14     Q.   And that's for your cleaning service, correct?
15     A.   Correct. Yes. It was from Iteb for me to
16 spend the money.
17     Q.   And the same with the next one, you sent it to
18 your wife for her checking account, a thousand dollars?
19     A.   I did not send it to her because we have the
20 account together. I don't know. I probably transferred
21 the money and use it, but that was not specifically I
22 sent it to her.
23     Q.   How about the purchase authorized for
24 $3,001.75, what was that for?
25     A.   Which one?

## Page 38

1     Q.   $3,001.75 purchase authorized on 12/7.
2     A.   I believe that was part of the money that I
3 asked Iteb and then he told me. So that was part of the
4 money because I didn't disclose that with (inaudible).
5 And he said -- he told me to take that money.
6     Q.   And that's for a car payment; is that what
7 that's for?
8     A.   Yeah. That was a car payment, I believe.
9     Q.   For you?
10     A.   That is correct.
11     Q.   And the second one is for you as well, the
12 2,529.75, correct?
13     A.   Yeah. So basically that money -- if you
14 scroll down because you're going to see less than a
15 thousand -- that was not literally given to me. It was
16 like pretty much an advance. And then with the $10,000,
17 that was deposited to the account in order to cover
18 those expense. But we can go on.
19     Q.   And I'll keep going. The next one was a wire
20 transfer fee and there was $140,000 wired to Miami
21 Realty Company, another --
22     A.   That is correct. That was another escrow
23 department.
24     MR. OSBER: Johnny, wait for Mr. Tomchin to
25 stop talking before you do.

## Page 39

1     THE WITNESS: Sorry.
2     MR. OSBER: Do you remember that wire I
3 attached to your leg?
4     MR. TOMCHIN: It's not working very well.
5     MR. OSBER: I'm going to turn it on in a
6 minute.
7     MR. TOMCHIN: Keep pushing it.
8 BY MR. TOMCHIN:
9     Q.   Then the $850 to Wells Fargo Business, another
10 one for you, right?
11     A.   The $650?
12     Q.   Yeah. Is it 650? Whatever that number is. I
13 think it's 650. You're right.
14     A.   Yeah, 650. Yes.
15     Q.   For you?
16     A.   Yes.
17     Q.   For you?
18     A.   Yes.
19     Q.   And another transfer of 554,000 by Mr. Muller
20 to your account, correct?
21     A.   Yes. That was correct.
22     Q.   Then a recurring transfer of $25, 12/15,
23 what's that?
24     A.   Recurring transfer? That's probably -- the
25 $25?

## Page 40

1     Q.   Yeah. It says recurring transfer, AAA.
2     A.   I don't really recall that.
3     Q.   Was that --
4     A.   Yes.
5     Q.   $3,000 again for J-King Best Cleaning
6 Services?
7     A.   Yeah. That was my transaction. And like I
8 said, you will see below where I had deposited the
9 money.
10     Q.   What is J-King Best Cleaning Services?
11     A.   It's a cleaning service and -- yeah, it's a
12 cleaning service.
13     Q.   Do you own part of that company, or do you use
14 them to clean certain things?
15     A.   That was my company, but it is no longer in
16 existence and that was closed during the COVID due to
17 lack of employees, things like that.
18     Q.   Was your wife involved in that company?
19     A.   No.
20     MR. TOMCHIN: All right. Come on down,
21 Taylor.
22 BY MR. TOMCHIN:
23     Q.   Another thousand dollars to the Preferred
24 Checking Account, correct, to your wife?
25     A.   Well, it's not to my wife. That account

**41**

1  belonged to both of us.  I probably transferred a
2  thousand dollars, but that was not specifically to her.
3      Q.  To both?
4      A.  Yes.
13:19  5      Q.  And then --
6      A.  A couple of deposits to both of us.
7      Q.  What's the 166.92, what's that for?
8      A.  That's probably paying FPL and probably for me
9  or Iteb because I used to pay bills for him.
13:20  10      Q.  FPL is Florida Power and Light?
11      A.  Yes.  Correct.
12      Q.  And so you had FPL at that time with your
13  home?
14      A.  We had it with my home, my business, and also
13:20  15  I used it for FPL.
16      Q.  Let me ask this.  Do you have any written
17  documents from Iteb where he asked you to pay his FPL
18  account or any other account?
19      A.  Most of our conversation would have been by
13:20  20  What's App or he would have called me.
21      Q.  Do you still have the What's App account?
22      A.  Yeah.  I still have the account.
23      Q.  Do you still have his messages, from Iteb?
24      A.  I might have some.  I don't recall if I have
13:21  25  everything, but I should.

*GEORGIA WINEGEART & ASSOCIATES*

**42**

1      MR. TOMCHIN:  Taylor, write that down too on
2  the list, please.  Okay.  Come down and up a little
3  bit to make sure I have everything.  Right there.
4  BY MR. TOMCHIN:
13:21  5      Q.  The withdrawal of $2,000 made in a branch
6  store, is that a cash withdrawal by you?
7      A.  Yeah.  I did take cash because he asked me to
8  do something for him.  And then I went back to --
9  because he wanted me to pay FPL for the -- not just for
13:21  10  one month, but to make a large deposit to his account.
11  So I had never done that before, but he advised me to go
12  to store and make that payment and -- because I was
13  trying to do it, but I couldn't.  So I had to go to this
14  store to make a large deposit towards the...
13:22  15      Q.  But did you keep the deposit from FPL?
16      A.  I don't -- I don't think I kept the documents,
17  but I did pay the FPL for some time, for a couple of
18  months.  So basically the account was -- so they collect
19  whatever for the month, but it didn't have enough money
13:22  20  in the account for the coming months.
21      Q.  Let me paraphrase and make sure I got it
22  correct.  You went to the bank and got $2,000 cash?
23      A.  Uh-huh.
24      Q.  You then went and paid for potentially the FPL
13:23  25  accounts of Iteb and you have nothing in writing showing

*GEORGIA WINEGEART & ASSOCIATES*

**43**

1  that you paid FPL; is that correct?
2      A.  I didn't say I did not have anything in
3  writing at that time, but I don't recall I have a copy
4  for it now because that was a while back and so I did
13:23  5  not -- I probably -- I'm not promising that I can find
6  it, I can check and check, but it's not easy paying
7  bills and find documents.  And so -- because I believe I
8  told him the account was paid, he went online and said
9  the account was paid 2,000.
13:23  10      Q.  Right.  At this point in time you realized
11  Mr. Muller has sued you, your wife, AAA, Res, all your
12  companies for what Mr. Muller has stated is an improper
13  use of his money he sent to AAA, correct?
14      A.  Well, not that one --
13:24  15      MR. OSBER:  No, no, no, no.  Johnny, Johnny --
16      Cindy, read back the question.
17      MR. TOMCHIN:  Listen to the question.  Sorry.
18  I want you to listen to the question and answer the
19  question.
13:24  20      (The question was read back.)
21      THE WITNESS:  Yes, I am aware of the loss.
22  BY MR. TOMCHIN:
23      Q.  Right.  And you are also aware that I have
24  asked you, your wife, AAA and all of your companies to
13:24  25  give me all documents to show transactions or

*GEORGIA WINEGEART & ASSOCIATES*

**44**

1  communications you had with Iteb and my client -- or my
2  client, correct?
3      A.  Correct.
4      Q.  And at that point in time you have given me
13:24  5  nothing when it comes to the $2,000 or most of these
6  payments so far, correct?
7      A.  Well, I sent --
8      MR. OSBER:  Form.
9      THE WITNESS:  Well, $2,000, and I don't -- I
13:25  10  said I'm not sure if I have receipts for it.
11  BY MR. TOMCHIN:
12      Q.  As you sit here --
13      MR. OSBER:  Both of you can't be talking at
14  the same time; you can't.  Both of you can't be
13:25  15  talking at the same time.
16      Johnny, wait for the question, please, please.
17  Mr. Previlus, please let my client answer.
18      THE WITNESS:  I wasn't finished.
19      MR. OSBER:  I understand.  I just yelled at
13:25  20  him too.
21      MR. TOMCHIN:  It's okay.  It's hard to me.
22  That's why I wanted to do this in person.  It's
23  your fault.  I'm not complaining.  Go ahead and
24  finish your answer, Mr. Previlus.
13:25  25      THE WITNESS:  I said in the wires.  So I have

*GEORGIA WINEGEART & ASSOCIATES*

45

1  all wires transactions.  And they all also attached
2  to the bank statement.  So when we got to the
3  $2,000, I said which one has money?  But that was
4  paid on behalf of FPL that was paid.  So I don't
13:26  5  recall -- I don't know if I have a copy of it, but
6  the account was paid.  That's pretty much -- all
7  the other transactions, internal wires, I have
8  copies of them.
9  BY MR. TOMCHIN:
13:26  10  Q.  Let me go on.  On 12/20 did you pay $452.26 to
11  your Capital One account?
12  A.  Yes.
13  Q.  The next day, did you pay $504.94 to the
14  Walmart at Margate?
13:26  15  A.  Yes.  That was my mine.  Yes.
16  Q.  That's your charge, correct?
17  A.  Yes.
18  Q.  $780.90, another payment the next day to your
19  Capital One mobile account, correct?
13:27  20  A.  Let me see.  Yeah.  The 780, yes.
21  Q.  And then Mr. Muller sent you another
22  277,130 --
23  A.  Not sent to me.
24  MR. OSBER:  Johnny --
13:27  25  BY MR. TOMCHIN:

GEORGIA WINEGEART & ASSOCIATES

46

1  Q.  It was sent to AAA, correct?
2  A.  Yes.  He sent the money on behalf of Iteb
3  because Iteb spoke to him.
4  Q.  Okay.  Fine.  Then there's another FP&L for
13:27  5  322.72, correct?
6  A.  Yes.  Correct.
7  Q.  And is that for your power and light, or do
8  you know?
9  A.  That's probably for my business.
13:27  10  Q.  $300,000, where did that go to?
11  A.  $300,000?
12  Q.  Yes.  Do you see the next one?
13  A.  Oh, 303,000, yes.  That was authorized by
14  Iteb.  And I told him I was moving $300,000 to my
13:28  15  personal account and he was okay with it, but he told me
16  to make sure.  And he has a transaction coming in, and
17  we would use the money to pay back and it was used for
18  him later on.
19  Q.  What did you use the 300,000 for?
13:28  20  A.  The 300,000 was in the account, but very
21  quickly the money was sent back to Wells Fargo, 195.
22  And then also I did pay for the thousand dollars wire
23  instruction.  So basically the money did not go for my
24  use.
13:28  25  Q.  It went to Res Investment, correct?

GEORGIA WINEGEART & ASSOCIATES

47

1  A.  Correct.
2  Q.  Are you telling me that it was never used by
3  Res Investment for anything?
4  A.  I would say the only money that's spent on
13:29  5  that 300,000 is like 50 -- that was like 50-something
6  thousand in the beginning because the 195 I did send
7  back, did send back to...
8  Q.  What did you use any monies of this $300,000
9  in Res Investment for?
13:29  10  A.  Did I use any of the money?
11  Q.  You said 50 or some.  I haven't seen the
12  records on that, even though I requested it.  So do you
13  have --
14  A.  Yeah.  I will provide that.
13:29  15  MR. OSBER:  Johnny.
16  BY MR. TOMCHIN:
17  Q.  Let me ask you this.  Did Res Investment have
18  a Space Coast credit account, correct?
19  A.  Correct.
13:29  20  Q.  You still have those records, correct?
21  A.  Yeah, I should.
22  Q.  And I asked for those, but didn't get them.
23  Were your planning on giving them to me now?
24  A.  Yes, I will discuss that with my lawyer.
13:30  25  Q.  And what do you think you used any of the

GEORGIA WINEGEART & ASSOCIATES

48

1  $300,000 that was sent to Res Investment for?
2  A.  The money was sent back.
3  Q.  You said there was some money that may have
4  not been sent back immediately.  What did you purchase
13:30  5  for Res Investment?
6  A.  Oh, the $57,000, meaning is to be used as part
7  of the purchase of the property in Port St. Lucie.
8  Q.  That was for the property at Port St. Lucie,
9  correct?
13:30  10  A.  Correct.  And that was discussed with Iteb and
11  before I transferred the money.  It's like I did it
12  without Iteb's consent.
13  Q.  Did you sell that property for a gain?
14  A.  I did sell the property, but the goal was not
13:31  15  to sell.  But, yes, I end up selling it.
16  Q.  And I'll ask that question again before Steve
17  yells at me and have that question read again.  Did you
18  sell it for a gain?
19  A.  I did make a profit, but slightly -- slightly
13:31  20  low.
21  Q.  How much?
22  A.  I will have to check on the documents to
23  properly answer that question.
24  Q.  And you have those documents still, do you
13:31  25  not?

GEORGIA WINEGEART & ASSOCIATES

**49**

```
1        A.  Yes, I do.
2        Q.  And I think I asked for those.  You're going
3   to go ahead and get those to your attorney as well,
4   correct?
5        A.  Yes.  Correct.
6             (Brief break)
7             MR. TOMCHIN:  Let's go on.  Taylor, come on
8        down some.  Stop right at the 300,000, if you
9        would.
10  BY MR. TOMCHIN:
11       Q.  Do you see the $300 withdrawal?  I think I
12  might have asked you this already, but that was another
13  withdrawal by you?
14       A.  Yes.  The $300, yes.
15       Q.  What's the 101,728?
16       A.  Yeah.  That was a transaction for him.  And I
17  don't know the full details, but he asked me to do that
18  wire fund.
19       Q.  All right.  But it wasn't for you?
20       A.  No.
21       Q.  Do you think that's jewelry, or do you know?
22            MR. OSBER:  The 101?
23            MR. TOMCHIN:  Yes.
24            THE WITNESS:  I don't know, but I do have the
25       wire record.  So I will be providing that to my
```

*GEORGIA WINEGEART & ASSOCIATES*

**50**

```
1        attorney.
2   BY MR. TOMCHIN:
3        Q.  So you have the wire, but you're not sure what
4   it's for?
5        A.  No.
6        Q.  There's a Macy's purchase of 3,834.
7        A.  That was mine.
8        Q.  What did you buy for that?
9        A.  I believe I -- that was something I purchased
10  from Macy's, and I don't really recall, but I did buy
11  something at Macy's.
12       Q.  It was the day before Christmas.  Was it
13  something for the family?
14       A.  It could be.  I'm not too sure.
15       Q.  357.51 -- well, let me go back.  The
16  636,985.36, for real estate for Iteb?
17       A.  Yeah.  That was -- sorry.  Yes.  That was I
18  did, I believe, one of them is closing.  And, yes, that
19  was for Iteb.
20       Q.  The 357.51, what's that for?
21       A.  That's probably one of the Capital One
22  payments and it used to be direct from that account.
23       Q.  That was for you again?
24       A.  Yes.
25            MR. TOMCHIN:  Come on down, Taylor.
```

*GEORGIA WINEGEART & ASSOCIATES*

**51**

```
1   BY MR. TOMCHIN:
2        Q.  And would it be fair to say -- I think I just
3   looked -- every deposit in that month came from
4   Mr. Muller, did it not?
5        A.  Yes.  And I don't -- yeah, probably that much
6   was mostly...
7        Q.  And we're coming to deposits that you made,
8   and I'll go through at least what I have.  To be fair,
9   I'm going to go over all of the transactions that I have
10  to and to make sure I understand what they are.
11       A.  Yes.
12       Q.  This beginning balance here, $48,215.23, for
13  the next month; is that correct?
14       A.  Yes.  Correct.
15       Q.  And there were deposits of 503,310, correct?
16       A.  Correct.
17       Q.  And withdrawals of 550,913.39.  So only about
18  $600 left in the account?
19       A.  Correct.
20            MR. TOMCHIN:  Come on down, Taylor.
21  BY MR. TOMCHIN:
22       Q.  A thousand dollars Cash App?
23       A.  Yeah.  That was me.
24       Q.  All right.  $10,000 deposit?
25       A.  That was my transaction, received from one of
```

*GEORGIA WINEGEART & ASSOCIATES*

**52**

```
1   my clients, something.
2        Q.  Okay.  But you put money back into this
3   account?
4        A.  That is correct.
5        Q.  And then the next one is a 30,842.95.
6        A.  That was Iteb.
7        Q.  You're not sure what that's for, though, do
8   you?
9        A.  I'm not sure, but it sounds like the same
10  previous transaction.  So that was -- that one was did
11  by him.
12       Q.  278,152.25 came back in from Mr. Muller on --
13       A.  Yes.
14       Q.  And then the Cash App again to you of $226,
15  correct?
16       A.  Yes.
17       Q.  What's the 20,000 --
18       A.  That was Iteb.
19       Q.  What was that for?
20       A.  He directed me to send that wire.  And then I
21  believe that's -- I told him I do not want to send an
22  international wire because that was an international
23  wire.
24       Q.  Repeat your answer to me.  I didn't quite
25  catch that.
```

*GEORGIA WINEGEART & ASSOCIATES*

---

**53**

```
 1      A.   No.  I said --
 2      Q.   Let's start with the question.  It was Iteb.
 3   What's the $20,000 for?
 4      A.   I don't recall what was it, but that was
 5   directed by Iteb.  He sent me the information.
 6      Q.   And then there was a wire fee of 45 bucks for
 7   that one?
 8      A.   Correct.
 9           MR. TOMCHIN:  Come on down, if you would,
10   Taylor.
11   BY MR. TOMCHIN:
12      Q.   $1,500 next was cash to you?
13      A.   Yes.
14      Q.   And then $850, what is that?
15      A.   I don't remember, but probably cash to me.
16   That was my transaction.
17      Q.   And then a $14,000 wire transfer, what is that
18   for?
19      A.   That's Iteb.
20      Q.   Any idea what he was buying there?
21      A.   That was an international.  He told me.  That
22   was probably jewelry, a watch, or I don't recall.  I
23   don't know.
24      Q.   $1,500, the next charge, was Christian
25   Fellowship.  What is that?
```

*GEORGIA WINEGEART & ASSOCIATES*

(timestamps: 13:49, 13:49, 13:49, 13:49, 13:50)

---

**54**

```
 1      A.   That's probably -- that was my transaction.
 2      Q.   All right.  You, personally, or AAA, or Res
 3   Investment?  I want to make sure I'm clear on that.  Can
 4   you tell?
 5      A.   What is it?  Can you answer that for me --
 6      Q.   Well, we have a lot of different entities
 7   here.  We have you, your wife, AAA, Res Investment,
 8   Investment Infinite.  Was that for you personally?
 9      A.   All of them are a part of the offices of Res.
10      Q.   Okay.  What did you give Christian Fellowship
11   $1,500 for?
12      A.   Probably an offering or something like that.
13   It's a church.
14      Q.   It was a return of $19,200 of a wire.  What
15   wire was that?
16      A.   I believe that was a transaction I have done.
17   That was wired, that money.  I don't remember.  And then
18   for whatever reason, the information was incorrect and
19   the wire was returned to me, but that was probably my
20   transaction.
21      Q.   Was it money being returned for an Iteb
22   problem, or what?
23      A.   Something.  I don't recall.  But I know I did
24   that wire for a previous transaction.  That was not part
25   of the Patrick funds.  And then for whatever reason, the
```

*GEORGIA WINEGEART & ASSOCIATES*

(timestamps: 13:50, 13:50, 13:51, 13:51, 13:51)

---

**55**

```
 1   money was returned to the account.
 2      Q.   But at this point in time you can't remember
 3   why?
 4      A.   I cannot remember, unfortunately.  I can
 5   probably dig into it and remember.  Probably I can dig
 6   into it later on.  But for now, I don't remember.
 7      Q.   Then there's $195,000.  What's that?
 8      A.   That was from the $300,000.  So I returned it
 9   back to the account.
10      Q.   195?
11      A.   Yes.
12      Q.   Come on down 158.25, what's that?
13      A.   That's probably my purchase.  The 155, yes, my
14   purchase.
15      Q.   And then there's a Cash App again of $1,150
16   back to you again?
17      A.   No.  That's something -- yeah, that's the Cash
18   App.
19      Q.   For you?
20      A.   Yes.
21      Q.   And then there's a 258.74 Best Buy.  That's
22   another charge by you?
23      A.   Correct.
24      Q.   And then two wire transfer service charges?
25      A.   Yeah.  That's related to Iteb.
```

*GEORGIA WINEGEART & ASSOCIATES*

(timestamps: 13:52, 13:52, 13:52, 13:52, 13:53, 13:53)

---

**56**

```
 1      Q.   And then you bought insurance, your
 2   Progressive Insurance payment of 1,857?
 3      A.   That's correct.
 4           MR. TOMCHIN:  Keep on coming, Taylor.
 5   BY MR. TOMCHIN:
 6      Q.   What's the 466,396.79 for?
 7      A.   That was Iteb, and he says when to pay title
 8   for one of his purchases.
 9      Q.   One of his pieces of property dealing with
10   South Florida?
11      A.   Probably.
12      Q.   Do you have any paperwork on any of that?
13      A.   I may have some paperwork, but I was not
14   basically dealing the transaction.  So I don't have
15   much.  But I do have a wire and probably some
16   communication when they asked me to send it, yes.
17      Q.   Then there's $8,000.  What's that for?
18      A.   That was Iteb.
19      Q.   Any idea what that was?
20      A.   I don't recall, but it should be in
21   communication that he had for me to send the wire.
22      Q.   Do you know where Iteb and his wife are at
23   now?
24      A.   I don't know.  And that's something -- since
25   after -- since the beginning of the lawsuit, that's
```

*GEORGIA WINEGEART & ASSOCIATES*

(timestamps: 13:53, 13:53, 13:53, 13:54, 13:54, 13:54)

---

---

**57**

1  something he never disclosed to me.  The only thing he
2  told me about was the glove.  And then just for the
3  record, the $57,000 that was applied, even though he
4  told me to use it, but that was pretty much what was
13:55  5  going on.  And he did call and ask for that.
6        Q.   He asked for 57,000?
7        A.   Yeah, the money that he made on my account
8  when I was to purchase the house.  So that was literally
9  money that he let me use, but that like a small loan.
13:55  10       Q.   And you did not give that money back to him,
11  did you?
12       A.   No, I never give it back to him since that.
13  And so I was -- even the glove, I had the glove, but I
14  never made the effort to give him the glove,
13:55  15  unfortunately.
16       Q.   The 499.29, what is that?
17       A.   That's my expense.
18       Q.   And then the $900 is your expense too?
19       A.   The 900?
13:56  20       Q.   Yes.
21       A.   Yeah, yes.
22       Q.   And a Cash App of hundred is for you as well?
23       A.   That is correct.
24       Q.   And is the $84.41, is that yours?
13:56  25       A.   Correct.

*GEORGIA WINEGEART & ASSOCIATES*

---

**58**

1        Q.   Yes?
2        A.   Yes.  That was for phone service for the
3  company.
4        Q.   And the $150 Capital One is yours?
13:56  5        A.   Correct.
6             MR. TOMCHIN:  Come on down, Taylor.
7  BY MR. TOMCHIN:
8        Q.   All right.  We're going to go to the next
9  month.  Let me ask you this.  Iteb told you Mr. Muller
13:57  10  was loaning him this $1.8 million cash, or what was he
11  saying?
12       A.   No.  He told me he has a business going on
13  with Mr. Muller.  And before then, he make me believe
14  that Mr. Muller paid for -- is the one that's supporting
13:57  15  him financially at that time.  And then he also pay and
16  then that's when I know Mr. Muller sends wires to his
17  account.  And so because -- and then -- but he never
18  discussed that Mr. Muller loaned him some money.  So he
19  says that was his money.  Mr. Muller trusts him.  So
13:58  20  they did whatever transaction, they did together and
21  things like that.
22       Q.   And this is all what Iteb told you.  You have
23  nothing of that in writing?
24       A.   I should have some of the conversation in
13:58  25  writing.  Some of them was in verbal communication.  But

*GEORGIA WINEGEART & ASSOCIATES*

---

**59**

1  some of them, texts and things like that.  But he make
2  me believe Mr. Muller was very good and his partner and
3  even told me Mr. Muller is like a father to him is what
4  he told me because they supporting him while he was in
13:58  5  jail, supporting his wife.  And then so if he's out of
6  jail, it's because of Mr. Muller paid whatever is the
7  necessary fees.
8        Q.   All right.  This $5,000 deposit, what is that?
9        A.   Oh, that was my money.  That was a client
13:59  10  deposited money.
11       Q.   Which client?
12       A.   At that time I had -- I used to buy cars from
13  auctions.  And then when I was waiting to do this
14  transaction, so I start selling the cars in order to
13:59  15  accumulate the cash that I know to cover my transaction.
16  So a lot of this transaction was the time that I was
17  selling the cars and things like that.
18       Q.   And do you think this was a sale of a car of
19  yours, or not?
13:59  20       A.   That $5,000 was money sent from one of my
21  clients, the $5,000.  And then the other 25,000 was sent
22  because I had money.  And also in my current deal, I do
23  collect money so I can, like a group of people every
24  month, we give some money.  And then when it's my turn,
14:00  25  I receive it.  So that was all my money.

*GEORGIA WINEGEART & ASSOCIATES*

---

**60**

1        Q.   The $77.61, that was a purchase of something
2  on Amazon?
3        A.   Yes.
4        Q.   And that was for you?
14:00  5        A.   That was for me.
6        Q.   And then there was a transfer to AAA of
7  $5,000, correct?
8        A.   That is correct.
9        Q.   And so that went to you as well?
14:00  10       A.   Yeah.  That went to me.  That's my 5,000, yes.
11  I believe that 5,000 and I moved it to another account
12  to do something.
13            MR. TOMCHIN:  Come on down a little bit.
14  BY MR. TOMCHIN:
14:01  15       Q.   There's 25 grand.  What is that?
16       A.   That was money I received for probably sale of
17  the cars or something like that.  That was my money.
18       Q.   And how about the 10?
19       A.   That's pretty much the same.
14:01  20       Q.   Do you think another one of your transactions
21  is where money went into this account by you?
22       A.   That is correct.  That's, from there that was
23  all my transactions because I believe you will probably
24  go into next month and I stop receiving -- that was
14:01  25  during the tax season where I start receiving money and

*GEORGIA WINEGEART & ASSOCIATES*

---

---

**61**

1  I start selling the cars and things like that because
2  let me explain to you I entered into a contract on
3  November 20th to purchase that house, but the seller was
4  not ready to close until February.  So I had money in
14:02  5  two separate accounts, plus I had those cars that I
6  purchased from auctions.  So I have to liquidate them to
7  have the money ready to close because the loan that I
8  was getting was like a hard money, like private
9  financing.  So that was not much requirement to get a
14:02 10  letter.  So I get a letter, but all the money was lined
11  up to cover my transaction.
12  Q.  And the loan you had on your St. Lucie
13  property was about a million dollars?
14  A.  Yeah, it was about a million dollars.  So I
14:02 15  believe I purchased it for 1,330.  And then -- so I put
16  less than 20 percent.  I asked to put 15 percent.  This
17  is when I started the transaction, but I believe the
18  lender changed the -- they change it.  They give me a
19  letter for 15 percent.  Basically I needed less money
14:03 20  after that.  They changed it after the appraisal.
21  But I did -- when I send in documents, you
22  will see all the transactions with my money, which one
23  is like 7 in one account and like 6 in one, plus I sold
24  -- so, therefore, I come up with the money needed for
14:03 25  the transaction.

*GEORGIA WINEGEART & ASSOCIATES*

---

**62**

1  Q.  The $118.07 went to you; is that correct?
2  A.  Yes.  That was my money.
3  Q.  And then it was your charge?  In other
4  words --
14:03  5  A.  That was my charge, yes.
6  Q.  The $19,000, is that money back from you to
7  the business?
8  A.  Yeah.  That was my money, yes.
9  Q.  Any idea where that 19 grand came from?
14:03 10  A.  That come from probably transactions I did
11  probably with the cars or something like that, yes.
12  Q.  The 410.99, what is that?
13  A.  That was a purchase from Boss Resolution.
14  That's probably for service, something like that.
14:04 15  Q.  For you?
16  A.  Yes.
17  Q.  What's the $48,700?
18  A.  That's when I send that money to title company
19  for my closing.
14:04 20  Q.  And that's a payment for your Port St. Lucie
21  property; is that correct?
22  A.  That's correct.
23  Q.  What's the 300,000?
24  A.  So sorry.
14:04 25  Q.  That's all right.  Go ahead.  Finish your

*GEORGIA WINEGEART & ASSOCIATES*

---

**63**

1  answer.  I apologize.
2  A.  No.  As you see all the deposits, that's
3  coming down during that time.  So I was accumulated that
4  amount because at that time the tax money was already
14:05  5  deplenish by Iteb's transactions and so forth.
6  Q.  I appreciate that and I will do all of that
7  math after.  I want to make sure that I was adding and
8  subtracting the right amounts and who put money where
9  and when.  That's what I'm going through today.  That
14:05 10  316.86, your Comcast bill, correct?
11  A.  Yeah.  That was my Comcast bills.
12  MR. TOMCHIN:  Come on down, Taylor.
13  BY MR. TOMCHIN:
14  Q.  $16,000 deposited back by your company to this
14:05 15  account?
16  A.  That is correct.  That was my money.
17  Q.  How about the 398?
18  A.  The 398, I received from TPG Products.  I
19  started the tax fees, money that people pay me to file
14:06 20  taxes.  So I started receiving that, that is correct.
21  Q.  143.75, what is that?
22  A.  That was probably to pay for joining a
23  corporation.  That was pretty much for fees for the same
24  thing.  Like I said, I used this account if somebody
14:06 25  needed to give me anything or things like that and so I

*GEORGIA WINEGEART & ASSOCIATES*

---

**64**

1  do that.
2  Q.  Did you get reimbursed by those people you
3  paid out first and did they pay you back the 143.75?
4  A.  Yeah, they do.  They do pay me because I have
14:07  5  two accounts with Wells Fargo.  One was the receiving
6  one was something like that, but both of them was -- so
7  they pay, if they pay fees.  And the other one, I make
8  transactions out, such as outgoing transactions.
9  Q.  And the same for the second 143.75, correct?
14:07 10  A.  Yes, both the same.
11  Q.  What's the $19,500 for?
12  A.  I believe one of the -- I have to pay for -- I
13  purchased some cars or something like that at that time,
14  if I recall.
14:07 15  Q.  That's for your purchase, though, it's not for
16  Iteb, but for you?
17  A.  That was my purchase.
18  Q.  And the $2,500 is checking for you; is that
19  correct?
14:08 20  A.  That is correct.
21  Q.  Thirty dollars, a wire transfer fee of some
22  nature?
23  A.  Yes.  That was for me.
24  Q.  And the 5,000 --
14:08 25  A.  That was for me too.

*GEORGIA WINEGEART & ASSOCIATES*

---

**65**

1    Q.  The 5,000?

2    A.  No, no.  Wait a second.

3        MR. TOMCHIN:  Come on down.

4        THE WITNESS:  I believe the -- I did the

14:08  5    last -- that was for me because I believe the last

6    transaction I did for Iteb was the $5,000, but

7    that's probably part of the past already.

8  BY MR. TOMCHIN:

9    Q.  Let me just make sure I'm clear.  The $5,000

14:08 10  on February 17th, you?

11    A.  That was my transaction.

12    Q.  Okay.  And then $550 came back in.  That's you

13  as well, correct?

14    A.  Yes.  That's my money.

14:08 15    Q.  And the 42.63, yours?

16    A.  Yes.

17    Q.  And then 84.41, yours?

18    A.  Correct.

19    Q.  And deposit of $505, yours?

14:09 20    A.  Correct.

21    Q.  1,600, yours?

22    A.  Yes.

23    Q.  And $2,700, you and your wife?

24    A.  Correct.

14:09 25    MR. TOMCHIN:  Now let's come down.  So the

*GEORGIA WINEGEART & ASSOCIATES*

**66**

1  closing balance, I think it's going to probably

2  show you at the top of the page, Taylor, what the

3  close was on this.  Keep going, keep going.  I

4  think it shows it, but keep going.  It's going to

14:09  5  be the very first page of this one.

6  BY MR. TOMCHIN:

7    Q.  Ending balance, for some reason maybe -- it

8  doesn't show us here, does it?  They blacked that out,

9  didn't they?

14:10 10    A.  It's blacked out, but you showed total deposit

11  was 61,000 something.

12    MR. TOMCHIN:  Come on down now again, Taylor.

13  BY MR. TOMCHIN:

14    Q.  Let's see.  Totals of 88,000.  Expenditures of

14:10 15  80 -- almost 3,000.  So I just have to do the math on

16  that to see what's left, what we started with.  So

17  there's a few dollars left in there.  Do you know if

18  Mr. Muller put any more money into your account after

19  this February of 2022?

14:10 20    A.  No.  You will see all the deposits.  And then

21  if you need help to know all the transactions was done,

22  I will forward that to my lawyer.  And for Iteb, I will

23  disclose and provide it, the instruction, wire

24  instruction and everything.

14:11 25    Q.  Do you think there's any more payments you

*GEORGIA WINEGEART & ASSOCIATES*

**67**

1  made for Iteb after this February 24th date?

2    A.  I don't recall because I did make a $5,000

3  statement for him.  That was for a dinner with the

4  lawyer in Miami, and I'm trying to look for it, but that

14:11  5  was from the Wells Fargo.  That was for $5,000.  And

6  that was wired.  I'm trying to -- but I will look for

7  it.

8    Q.  That might have been after this?

9    A.  Probably after this or something because I did

14:11 10  the wire.  That was a $5,000 wire.  That was the last

11  transaction I did for him.

12    Q.  At this point in time, without the documents

13  in front of you, you can't tell me how much profit you

14  made on your Port St. Lucie property, correct?

14:12 15    A.  I cannot tell, but that wasn't much of a

16  profit.  There is something after all that come down and

17  it really was probably a huge load on me and she wasn't

18  working.  So we end up not able to pay the property.  So

19  there was a lot of deficit going on.  And because the

14:12 20  license was not active and I was really depressed, so I

21  was not working.  Financially, things were not going

22  well and then the property need some repairs at the

23  time.  So it's a lot of money goes into fees and things

24  like that.  So that was -- I don't remember -- but I

14:12 25  believe the money that we spent, such as the deposit, we

*GEORGIA WINEGEART & ASSOCIATES*

**68**

1  did receive that money.  We did receive that.  And it's

2  literally like 300.  That's pretty much it, as I recall.

3    Q.  Have you done an analysis to establish all of

4  the monies that you -- you see you spent quite a bit of

14:13  5  dollars on different things here, like Macy's and cars

6  and things of that nature, correct?

7    A.  Yeah.  I did spend money, but I did have a lot

8  of money coming into the account, such as -- if you do

9  the math, money that's out and money got in, which is

14:13 10  money that belongs to me, and that would make it

11  different.

12    Q.  And how much -- have you done that analysis?

13    A.  Honestly, I haven't, but I will definitely

14  take a look to see how much was it so we both can come

14:14 15  up with some numbers.

16    Q.  Sure.  And then the issue is, have you spent

17  more money after this for Iteb.  And you said I might

18  have spent $5,000 for a lawyer in South Florida for him

19  out your money, and you're going to look for that.  I

14:14 20  might even have something on that, but I'll look as

21  well.

22    A.  I do have the wire -- oh, so sorry.  I do have

23  the wire instructions.  So I will look for it and then

24  to see if I can match it with any of the transactions.

14:14 25    Q.  Did you have to pay tax on the sale of your

*GEORGIA WINEGEART & ASSOCIATES*

---

**69**

1  property at Port St. Lucie?

2  **A.   Yes, because I believe I did not make a**

3  **profit.  So basically it was not -- it was the money**

4  **that I spent that I was able to secure.  So it wasn't**

14:15 5  **that much taxes.**

6  Q.   Did you do a tax return with the LLC that you

7  purchased it in?

8  **A.   Such as purchasing of the Port St. Lucie**

9  **property?**

14:15 10  Q.   No.  Let me walk through it.  Res Investment

11  owned that property in Port St. Lucie, correct?

12  **A.   Correct.**

13  Q.   It's an LLC?

14  **A.   Yes -- no.  I believe it's a corp or**

14:15 15  **something.**

16  Q.   Do you know if it provided any income to

17  either you or your wife individually?

18  **A.   No, it does not.**

19  Q.   Did it have any money left over after the

14:15 20  sale?

21  **A.   In terms of profit, or in terms of money?**

22  Q.   First, let's say profit.

23  **A.   I don't recall we had any profits.**

24  Q.   You do have a closing statement, though,

14:1? 25  correct, for that?

*GEORGIA WINEGEART & ASSOCIATES*

---

**70**

1  **A.   Yeah, yes.  I will -- I do have that.**

2  Q.   And it will either show money left over; that

3  may not necessarily be profit, but money left over?

4  **A.   That is correct.**

14:16 5  Q.   I think you stated of all the monies that Iteb

6  gave -- well, strike that, strike that question.

7  MR. TOMCHIN:  Let me do this.  It is 2:17.

8  Give me until 2:25 to see if I have any other

9  questions.

14:16 10  MR. OSBER:  Okay.

11  (Brief break)

12  MR. TOMCHIN:  I just have a couple more

13  questions and that's it.

14  MR. OSBER:  All right.  Go ahead.

14:27 15  BY MR. TOMCHIN:

16  Q.   Mr. Previlus, you had mentioned the various

17  things you did for Iteb.  Can you think of anything else

18  you did for him during this timeframe?

19  **A.   The only thing that I did was this.  And**

14:28 20  **after --**

21  (Garbled audio)

22  BY MR. TOMCHIN:

23  Q.   Let me start over.

24  **Q.   Can you hear me?**

14:28 25  Q.   Now I can.  That's a little bit.  I asked you

*GEORGIA WINEGEART & ASSOCIATES*

---

**71**

1  the question.  You had outlined what you had done for

2  Iteb during this period.  Can you think of anything

3  else?  And then you started to answer.  Go ahead.

4  **A.   No.  During this period, the only thing -- the**

14:28 5  **only services that I did was basically to receive the**

6  **money and then do the wires.  I did not do anything**

7  **except for the wire.  And beside that, I disconnected**

8  **me, such as internet services.  No other services with**

9  **it at all.**

14:29 10  MR. TOMCHIN:  Great.  I have no further

11  questions.

12  MR. OSBER:  No questions.

13  MR. REINER:  No questions.

14  COURT REPORTER:  Read or waive?

14:29 15  MR. OSBER:  We'll read.

16  (The deposition was concluded at 2:30 p.m.)

17  * * * * *

18

19

20

21

22

23

24

25

*GEORGIA WINEGEART & ASSOCIATES*

---

**72**

1  CERTIFICATE OF OATH

2  (VIDEOCONFERENCE PROCEEDINGS)

3

4  THE STATE OF FLORIDA )

5  COUNTY OF DUVAL    )

6

7  I, the undersigned authority, certify that

8  JOHNNY PREVILUS, appeared before me and was duly sworn

9  on the 29th of March, 2024.

10

11

12  Signed this 13th day of April, 2024.

13

14

15  _____

CYNTHIA G. SILVERBERG, Court Reporter

16  Notary Public - State of Florida

17

18

19

20

21

22

23

24

25

*GEORGIA WINEGEART & ASSOCIATES*

73

```
1                    CERTIFICATE OF REPORTER
2
3     THE STATE OF FLORIDA )
4     COUNTY OF DUVAL     )
5
6          I, CYNTHIA G. SILVERBERG, Court Reporter and Notary
7     Public, certify that I was authorized to and did
8     stenographically report the videoconference deposition
9     of JOHNNY PREVILUS, Pages 1 through 71; that a review of
10    the transcript was requested; and that the transcript is
11    a true and complete record of my stenographic notes.
12         I further certify that I am not a relative,
13    employee, attorney, or counsel of any of the parties,
14    nor am I a relative or employee of any of the parties'
15    attorney or counsel connected with the action, nor am I
16    financially interested in the action.
17
18         DATED this 13th day of April, 2024.
19
20
21         _____
           CYNTHIA G. SILVERBERG
22         Court Reporter and Notary Public
23
24
25
      GEORGIA WINEGEART & ASSOCIATES
```

74

```
1                         ERRATA SHEET
              DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
2     IN RE: PATRICK MULLER & MOUNA BOUZID v. ITEB ZAIBET, et al.
             CASE NO: 23-cv-22276-BLOOM/Otazo-Reyes
3            WITNESS: JOHNNY PREVILUS
                 TAKEN: 03/29/2024
4
      Page   Line      Change           Reason For Change
5
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22         Under penalties of perjury, I declare that I have
      read the foregoing document and that the facts stated in
23    it are true.
24    _____    _____
      DATE                JOHNNY PREVILUS
25

              GEORGIA WINEGEART & ASSOCIATES
```