IN UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:  23-cv-22276-BLOOM/Otazo-Reyes

PATRICK MULLER, an individual,
and MOUNA BOUZI, an individual,

    Plaintiffs,

vs.

ITEB ZAIBET a/k/a
"Swagg Man", an individual,
LOLITA C. REBULARD, an
individual; LUXURY PROPERTIES, INC.,
a Delaware corporation;
BEACH PROPERTIES RENTAL, INC., a Delaware
corporation; LUXURY PROPERTIES
TRUST u/a/d March 2, 2018;
AAA PLUS FINANCIAL GROUP, INC.,
a Florida corporation;
YVETTE TENORD, an individual;
JOHNNY PREVILUS, an individual;
RES INVESTMENT INTER, INC., a
Florida corporation; INFINITE
RES INVESTMENT, LLC, a Nevada
limited liability company,
NEW MIAMI REALTY, CORP., a
Florida corporation; and
GUZMAN305 TRUST, a Florida trust,

    Defendants.
_____/

VIDEOCONFERENCE DEPOSITION OF
YVETTE TENORD

Friday, March 29, 2004
10:00 AM - 11:40 AM

Georgia Winegeart & Associates
(904) 355-1500
www.georgiawinegeart.com

Stenographically Reported By:
Cynthia Silverberg, Court Reporter

*GEORGIA WINEGEART & ASSOCIATES*

---

## Page 2

1    APPEARANCES:

3  On behalf of Plaintiffs:
    TAYLOR, DAY, GRIMM & BOYD
4    50 North Laura Street, Suite 3500
    Jacksonville, FL 32202
5    (904) 356-3224
    BY: KENNETH A. TOMCHIN, ESQUIRE  (via Zoom)
6    AND: TAYLOR MCMAHON, ESQUIRE  (via Zoom)
    ktomchin@taylordaylaw.com
7    jdo@taylordaylaw.com
    tmcmahon@taylordaylaw.com
8    amelton@taylordaylaw.com
    lad@taylordaylaw.com
9    hmaxwell@taylordaylaw.com

12  On behalf of Defendants Johnny Previlus, Yvette Tenord,
    AAA Plus Financial Group, Inc., Res Investment Inter,
13  Inc., Infinite Res Investment, LLC
    CONRAD & SHERER, LLP
14    633 South Federal Highway, Suite 800
    Fort Lauderdale, Florida 33316
15    (954) 462-5500
    BY: STEVEN H. OSBER, ESQUIRE (via Zoom)
16    And: JASON ADAMSKY, ESQUIRE (via Zoom)
    sosber@conradsherer.com
17    jadamsky@conradsherer.com
    athomas@conradsherer.com

20    *  *  *  *  *

*GEORGIA WINEGEART & ASSOCIATES*

---

## Page 3

1    I N D E X
             Page
2
    TESTIMONY OF: **YVETTE TENORD**
3
      Direct Examination by Mr. Tomchin    4
4
    CERTIFICATE OF OATH    60
5
    CERTIFICATE OF REPORTER    61
6
    ERRATA SHEET    62
7
8        *  *  *  *  *
9  *
10      E X H I B I T S
11  Plaintiffs' Exhibit 1 - Request and Response    41
12  Plaintiffs' Exhibit 2 - Checking Account Records  41
13  Plaintiffs' Exhibit 3 - Residential Contract    55
19
    * Plaintiffs' Exhibit 3 not received.

21        *  *  *  *  *

*GEORGIA WINEGEART & ASSOCIATES*

---

## Page 4

1        **YVETTE TENORD,**

2  having been produced on behalf of the Plaintiffs herein,

3  was examined and testified as follows:

4      **DIRECT EXAMINATION**

10:03 5  BY MR. TOMCHIN:

6    Q.  Good morning.  My name is Ken Tomchin.  Would

7  you state your name for the record, please?

8    A.  **My name is Yvette Tenord.**

9    Q.  And it's T-e-n-o-r-d?

10:03 10    A.  **Correct.**

11    Q.  And Ms. Tenord, I represent the Plaintiffs,

12  Mr. Muller and Ms. Bouzid.  Have you ever had your

13  deposition taken before?

14    A.  **No.**

10:03 15    Q.  So this is the first for you?

16    A.  **Yes.**

17    Q.  I'm going to ask you some questions today.  If

18  you would, wait till I finish to make sure you

19  understand my question and I get it fully out.  If you

10:03 20  don't understand my question, please ask me to rephrase

21  and I'll try my best.

22    A.  **Okay.**

23    Q.  And I'm going to presume, though, that you

24  understood my question if you answer it.  Is that a fair

10:04 25  presumption in your mind?

*GEORGIA WINEGEART & ASSOCIATES*

---

5

1      A.   Okay.

2      Q.   So I say that to my witnesses just to make

3   sure, if I ask you a question you don't understand,

4   please ask me to rephrase, or you can even tell me why

10:04 5   my question doesn't make sense to you and we'll have a

6   nice conversation going back and forth here today.

7      A.   Okay.

8      Q.   What did you do to prepare for your deposition

9   today?

10:04 10         MR. OSBER:   Other than any conversation you

11      spoke with your attorney about and anything that I

12      ever showed you, you can answer that question.

13      Everything else would be considered attorney/client

14      privilege and work product privilege.  He's

10:04 15      speaking if you did other things other than meet

16      with me and talk with me and review documents with

17      me.

18         THE WITNESS:   Yes.

19   BY MR. TOMCHIN:

10:04 20      Q.   Did you do anything else other than talk to

21   your attorney and look at documents that he showed to

22   you?

23      A.   No.

24      Q.   Have you met with your husband about this

10:05 25   deposition?  And that's a yes or no answer.

*GEORGIA WINEGEART & ASSOCIATES*

---

6

1      A.   Have I met with my husband?

2      Q.   About this deposition.  Let me ask it a

3   different way.  Did you discuss this deposition with

4   your husband?  That's a yes or no as well.

10:05 5      A.   No.

6      Q.   Did you talk to anyone else about any of the

7   items that you might think I'm going over in your

8   deposition today?

9      A.   No.

10:05 10      Q.   Did you look independently at any documents

11   that you thought might be relevant today outside the

12   presence of your lawyer?

13      A.   No.

14      Q.   Tell me where you currently live.

10:05 15      A.   I'm in Texas.

16      Q.   What's your address there?

17      A.   It's 27208 Starry Oaks Drive, Magnolia, Texas

18   77354.

19      Q.   How long have you lived there?

10:06 20      A.   About -- going to be two years, maybe.

21      Q.   Where did you live before Texas?

22      A.   I was in Port St. Lucie, Florida.

23      Q.   And what was your address -- go ahead.

24      A.   2181 Southwest Newport Isles Boulevard 34953.

10:06 25      Q.   And how about before Port St. Lucie?

*GEORGIA WINEGEART & ASSOCIATES*

---

7

1      A.   7198 Southwest 22nd Street, Davie, Florida

2   33317.

3      Q.   Great.  What's your current occupation?

4      A.   I'm active, but in Florida.

10:07 5      Q.   Say that one more time.  I didn't quite hear

6   you on that.

7      A.   I am currently -- I'm a home -- I stay home

8   with my children.

9      Q.   Oh, okay.  What was the last job that you

10:07 10   held?

11      A.   I was a real estate -- active real estate

12   agent in Florida.

13      Q.   And with what company?

14      A.   With Real Estate Solutions Today.

10:07 15      Q.   How long had you worked there for?

16      A.   It was going to be a year after -- yeah, it

17   was going to be a year.

18      Q.   Let me do this.  I'm going to stop there and

19   go backwards.  Where were you born and raised?

10:07 20      A.   I was born in Haiti in a province called

21   Port-de-Paix.

22      Q.   Spell that for me, would you, please?

23      A.   P-o-r-t, space d-e, space P-a-i-x.

24      Q.   How long did you live there for?

10:08 25      A.   From birth until 1994.  It was about 20 years.

*GEORGIA WINEGEART & ASSOCIATES*

---

8

1      Q.   Did you go to school in Haiti?

2      A.   Yes, I did.

3      Q.   And what was your educational -- highest

4   educational level you reached?

10:08 5      A.   I would say high school.

6      Q.   Any college courses?

7      A.   In Haiti, no.

8      Q.   How about in the United States?

9      A.   I did high school here and, of course, the

10:09 10   license for that real estate license.

11      Q.   So did you get a high school degree both from

12   Haiti and the United States?

13      A.   Yes.  I went to an adult education center when

14   I came here.

10:09 15      Q.   Where was that at?

16      A.   It was in North Miami.

17      Q.   And that was what year?  Refresh my memory,

18   what you just said.  When did you come to the U.S.?

19      A.   I came to the U.S. in 1994.

10:09 20      Q.   Are you a U.S. citizen?

21      A.   Yes, I am.

22      Q.   And when did you become a U.S. citizen?

23      A.   I'm thinking.  I don't remember the exact

24   date, probably 2003 or '4.  I really don't remember the

10:10 25   exact dates unless I go get my certificate.

*GEORGIA WINEGEART & ASSOCIATES*

---

9

```
 1       Q.   That's okay.  It's been about maybe 19 --
 2   almost 20 years ago then?
 3       A.   Yes.
 4       Q.   Great.  After you got your high school degree
10:10  5   here in the United States, approximately how many jobs
 6   have you held since then?
 7       A.   After I got my high school?
 8       Q.   Yes.
 9       A.   I don't remember how many jobs because I've
10:10 10   been -- I've done a couple of jobs.
11       Q.   Why don't you walk me through 1994 to the
12   present, as best you can, when it came to your work
13   history?
14       A.   In 19 -- let's see.  Okay.  I'm just trying to
10:10 15   recall the first one.  I worked for McDonald's, let's
16   say 19 -- I don't remember the exact year, but closer to
17   1996, 1997.
18       Q.   Okay.
19       A.   I -- also at the time I was working for
10:11 20   Payless as well, pretty much the same location.  And I
21   believe I also worked for -- I believe it was KFC.  Then
22   I worked as security for Burns Security.  And I also,
23   during the same time I was working for Burns Security, I
24   also was working for Allied Security.  And from Allied
10:11 25   Security, I worked for the DHL Express.
```

GEORGIA WINEGEART & ASSOCIATES

11

```
 1   have you worked for?
 2       A.   I would say three.  So when I started, I
 3   started with Extreme International Reality.
 4       Q.   Okay.
10:14  5       A.   And when I left Extreme, I was with Charles --
 6   is it Charles Wolner-something.
 7       Q.   Spell that for me, if you could.
 8       A.   I would have to Google it because I don't
 9   think I -- yeah.  My transition from Extreme to Charles
10:14 10   didn't last long with Charles because it's right during
11   the -- the serving and DPR -- you know, there was a
12   situation, and that's why we are here today.  And I
13   think that -- --
14       Q.   The DPR investigation, is that the DPNR
10:14 15   investigation?
16       A.   That's correct, yeah.  And Charles fired me.
17   And after some time -- I don't recall how long -- I was
18   sitting home before I got with Real Estate Solutions
19   Today.
10:15 20       Q.   Real Estate Solutions.  When you were with
21   Extreme, approximately how many properties were you
22   involved with that actually went to sale?
23       A.   I don't recall.  A few.
24       Q.   I ask that question sometimes and folks say 3
10:15 25   or 3,000.  Can you give me an estimate of approximately
```

GEORGIA WINEGEART & ASSOCIATES

10

```
 1       Q.   What did you do for DHL?
 2       A.   My position was, you know, handling packages,
 3   processing, and I was a lead there.  I was a team lead.
 4       Q.   Excellent.  Was that down in the Miami area as
10:12  5   well?
 6       A.   Correct.
 7       Q.   Great.  After DHL, where did you go to?
 8       A.   After DHL -- during DHL, I was still active.
 9   I was still -- I had my real estate license.  And in
10:12 10   2018, during the time I was working for DHL, I was
11   active.
12       Q.   Let me make sure I understand your answer.
13   Did you get your real estate license in 2018?
14       A.   That's correct.
10:13 15       Q.   Okay.  And you still have a current real
16   estate license today?
17       A.   Active in Florida, yes.
18       Q.   When was the last time you worked for DHL, if
19   you can recall approximately when?
10:13 20       A.   Until 2019 -- 2019.  If I can recall, probably
21   2019 and 2020.  I don't remember.
22       Q.   And after leaving DHL, did you go full-time as
23   a real estate agent, or what did you do?
24       A.   I was going full-time.  I was working at home.
10:13 25       Q.   And how many different real estate companies
```

GEORGIA WINEGEART & ASSOCIATES

12

```
 1   how many properties you may have been involved with that
 2   actually closed at Extreme?  And, again, I know it's not
 3   a memory test, but I'm just trying to get a feeling if
 4   you did 50 or a hundred.  What would you think you did
10:15  5   with Extreme?
 6       A.   I would say maybe ten, you know.  I don't have
 7   an exact number.  It could be 10.  It could be less.  I
 8   don't remember.
 9           MR. OSBER:  Yvette, if you're not sure, it's
10:16 10   okay to say that.  Don't speculate.  If you know,
11       you know.  If you're not sure, feel free to say
12       that.
13           THE WITNESS:  No, I'm not sure.
14   BY MR. TOMCHIN:
10:16 15       Q.   Okay.  But I'm just trying to get a rough
16   estimate.  It could be as little as 5, but more like 15
17   or 20, somewhere in that timeframe.  It's not like a
18   hundred, though?
19           MR. OSBER:  Form.
10:16 20           THE WITNESS:  No, not a hundred.
21   BY MR. TOMCHIN:
22       Q.   And your best estimate at this point in time
23   it's somewhere in the ten range?
24           MR. OSBER:  Form.
10:16 25           THE WITNESS:  I don't remember; I don't
```

GEORGIA WINEGEART & ASSOCIATES

**13**

1    remember.
2    BY MR. TOMCHIN:
3        Q.   Okay.  And at this point in time, you can't
4    estimate how much -- how many you might have closed?
10:16 5        A.   Let's say -- I don't have a number.  I don't
6    remember.
7        Q.   Okay.  How many pieces of real estate have you
8    owned in your lifetime?
9        A.   One.
10:17 10        Q.   And what property is that?
11        A.   7198 Southwest 22nd Street.
12        Q.   And where is that at?
13        A.   Yeah.  It's in Fort Lauderdale.
14        Q.   Did you ever purchase any property in Port St.
10:18 15    Lucie?  And let me rephrase my question.  It might have
16    been a poor question.  When I talked about you, either
17    you or a company you were involved with that may have
18    purchased real estate.
19        A.   Yes.
10:18 20        Q.   So let me ask it again this way.  Either you
21    or any company you had an interest in, how many pieces
22    of real estate have you purchased in your lifetime?  Do
23    you understand my question?
24        MR. OSBER:  Do you mean ownership interest?
10:18 25        MR. TOMCHIN:  My question was --

**14**

1        MR. OSBER:  You said interest.
2    BY MR. TOMCHIN:
3        Q.   A -- or a company that you had any interest
4    in; in other words, a member, stock, shareholder,
10:18 5    managing member, member, anything of that nature,
6    anything that you had affiliated with a company that
7    owned real estate?
8        A.   Let's say two.
9        Q.   Okay.  What were those two, the one you just
10:19 10    described to me?  Just give me those two pieces of
11    property, the addresses.
12        A.   The 7198 Southwest 22nd Street, the Davie.
13    And the 8356 Calumet Court, that was under the company.
14        Q.   And was the company Res Investment Inter,
10:19 15    Inc.?
16        A.   Yes.
17        Q.   And the address I have is 8356 C-a-l-u-m-e-t
18    Court?
19        A.   Correct.
10:19 20        Q.   How did you get interested in that piece of
21    property?
22        A.   I'm sorry.
23        Q.   I said how did have you an interest -- how did
24    you come to find out about this piece of property over
10:20 25    in Port St. Lucie?

**15**

1        A.   I'm a real estate agent and that piece of
2    property is not the first piece of property I either
3    closed on or submit offers for.  That piece of property,
4    I have -- the company is created was for investment.
10:20 5    After I sold my home in Davie, I opened that -- that
6    corporation to invest my money in.  So I have tried to,
7    you know, buy and I rent and for sale.  So that's what
8    the company was for.
9        Q.   And how many did the Res Investment have, just
10:20 10    this one?
11        A.   It's just this one.  But I did, prior to that
12    -- I don't recall when -- I won an auction on a home.  I
13    went through the whole process until the last minute was
14    to close and find out there were some liens what was on
10:21 15    the property.  There were many liens.  So I wasn't going
16    on with the transaction -- that was in Fort Lauderdale
17    -- and the deal was dead.
18        Q.   Was there anyone else involved with Res
19    Investment?
10:21 20        A.   Yes.  Johnny.
21        Q.   And that's your husband?
22        A.   Yes.
23        Q.   Does Res Investment have any real estate
24    holdings at this point in time?
10:21 25        A.   No.

**16**

1        Q.   It's still active, though?
2        A.   Yes.
3        Q.   Do you remember the purchase price of the
4    house at 8356?
10:22 5        A.   Yes.
6        Q.   And what was that?
7        A.   1.33 --
8        Q.   Say that again.  You broke up.  Let me make
9    sure I heard that right.
10:22 10        A.   1.330.
11        Q.   And have you sold that property?
12        A.   Yes.
13        Q.   And what was the sale price?
14        A.   It was for 1. -- it was for 1.6, I believe.
10:22 15        Q.   Approximately how much money did Res clear on
16    that sale, if you know?
17        A.   I don't remember.
18        Q.   You did make a profit?
19        A.   There was a slight profit, yes, but I don't
10:22 20    remember how much it was.
21        Q.   Why not?
22        A.   I don't remember the number.
23        Q.   Do you have documents that disclose the
24    numbers?
10:23 25        A.   I don't have the document handy right now.

17

1    Q.   I asked for those documents in my document
2  production.  I did not receive any documents.  Do you
3  still have documents concerning the purchase and sale of
4  that house in your possession?
10:23  5    A.   **I may look for them.  I can look for them.**
6    Q.   I didn't ask if you may look for them.  Do you
7  think you still may have them in your possession?  That
8  was my question.
9    A.   **Yes --**
10:23 10        MR. OSBER:  Hold on just a second, Yvette.
11  Mr. Tomchin, I would appreciate it if you would
12  just let her finish her answer.  I know you may not
13  like the answer and you might not agree with it.
14  But with you talking at the same time Yvette is,
10:23 15  it's going to make Cindy's job a lot more
16  difficult.  So I would ask if you would give her
17  the courtesy of letting her finish her answer,
18  okay?
19        MR. TOMCHIN:  I sure will.  No problem.
20        MR. OSBER:  Thank you very much.
21  BY MR. TOMCHIN:
22    Q.   Let me ask that question again to you.  Do you
23  believe you still have those documents in your
24  possession or can get them?
10:23 25        MR. OSBER:  Form.

18

1        THE WITNESS:  I can --
2        COURT REPORTER:  I'm sorry.  I did not hear
3  the answer.
4        MR. OSBER:  Yvette, we're having an issue.  I
10:24  5  don't know if it's your Wi-Fi connection.  I don't
6  know if it shows that your connection is weak or
7  something like that, but every once in a while the
8  audio on your Zoom gets garbled.
9        THE WITNESS:  Okay.  I'm going to try my best.
10:24 10        MR. OSBER:  I just wanted to let you know what
11  was happening.  You're not doing anything wrong.
12  I'm just going to ask for clarification.
13  BY MR. TOMCHIN:
14    Q.   But I think your answer was yes; you have
10:24 15  possession of those documents, or can get them.
16        MR. OSBER:  Object to the form.  You can
17  answer.  Go ahead.
18        THE WITNESS:  I might have tried to get them.
19  BY MR. TOMCHIN:
10:24 20    Q.   Where are they?
21    A.   **I can reach out to Title and see if they have**
22  **them.**
23    Q.   Did you not keep a copy of your closing
24  documents, either when you bought it or sold it?
10:25 25    A.   **Yes.**

19

1    Q.   And so where are those at?
2    A.   **The closing documents?**
3    Q.   Yes.
4    A.   **I would have to look for them.  I don't think**
10:25  5  **I have -- I mean, I don't have them right now because**
6  **the property was sold.  So I would have to look.**
7    Q.   Do you keep documents at your house that
8  you're currently living in?
9    A.   **I'm not sure because I'm not sure if I still**
10:25 10  **have that closing package.  So I would have to check.  I**
11  **would have to look, sir.**
12    Q.   Is Extreme still in existence.
13    A.   **Yes, it is.**
14    Q.   Do you agree you had at one time the closing
10:25 15  documents in your possession, though?
16    A.   **To which property?**
17    Q.   For the one at Port St. Lucie.
18    A.   **Yes.**
19    Q.   You remember the purchase price and the sale
10:26 20  price, but you can't remember how much of the difference
21  was profit; is that what you're saying?
22    A.   **That is correct.  I don't remember.  I**
23  **remember the buying.  I don't remember the specifics of**
24  **the sale because -- I just don't remember.**
10:26 25    Q.   Did you pay income tax on the sale of that

20

1  property?
2    A.   **I don't remember.**
3    Q.   It would be on your tax return?
4    A.   **I do not remember.**
10:26  5    Q.   If you made -- you don't remember if you
6  declared any value -- strike that.  You don't remember
7  if you declared any profit on your tax return; is that
8  what you don't remember?
9    A.   **I do not remember.**
10:26 10    Q.   Who does your taxes?
11    A.   **I don't --**
12        MR. OSBER:  At what point in time,
13  Mr. Tomchin?
14  BY MR. TOMCHIN:
10:26 15    Q.   Doesn't your husband have a tax service?
16    A.   **Yes.**
17    Q.   Has he ever done your taxes, either for your
18  individual tax return, or for Res Investment, or do you
19  know?
10:27 20    A.   **Yes.**
21        MR. OSBER:  Form.
22        THE WITNESS:  Yes.  I'm sorry.
23  BY MR. TOMCHIN:
24    Q.   He does both?
10:27 25    A.   **I believe he does.**

### 25

1   or any of their agents, companies, trusts concerning the
2   matters raised in the complaint in this matter.  Can you
3   read that?  Did I read that fairly?
4       A.   Can you read it again for me?
10:32 5     Q.   Copies of all documents received or sent to
6   Iteb Zaibet -- and do you know Iteb is Swagg Man; is
7   that correct --
8       A.   Yes.
9       Q.   -- Lolita Rebulard, do you remember that as
10:33 10   his potential wife --
11      A.   Yes.
12      Q.   -- Luxury Properties, Inc., Luxury Properties
13  Trust, whenever established, Guzman305 Trust, or any of
14  their agents, companies, or trusts concerning the
10:33 15   matters raised in the complaint in this matter.  Are you
16  clear now on that question?
17      A.   Yes.
18      Q.   Did you ever look for documents from Swagg
19  Man, his wife, or his companies listed there?
10:33 20    A.   No.  I know Iteb and Lolita, but I don't know
21  anything about dates of any personal business.
22      Q.   Did you ever receive any documents from them?
23      A.   No.  Again, I know them.  I saw -- I mean, I
24  saw Iteb and Lolita one time.  They came into the
10:34 25   office.  That was a couple of years ago.  And after

GEORGIA WINEGEART & ASSOCIATES

### 26

1   that, I have never -- I don't have any communications
2   with them.  I don't talk with them.  I've never sent or
3   received anything from them.  So I don't know anything
4   about their personal business.
10:34 5     Q.   Okay.  So at this point in time, you don't
6   know of any documents you personally may have received
7   from them?
8       A.   No.  I've never received documents from them.
9       Q.   Now did you have an affiliation with AAA?
10:34 10    A.   Yes.
11      Q.   What was your affiliation with that company?
12      A.   I was part of the corporation.
13      Q.   And what did that corporation do?
14      A.   Taxes and --
10:35 15    Q.   Go ahead.
16      A.   And we do like taxes and other services.
17      Q.   Were you an officer at one time?
18      A.   Yes.
19      Q.   And did you take an active participation in
10:35 20   the business?
21      A.   Well, I was the officer of the company, but
22  all the handling was handled by Johnny, like all of the
23  business was done by Johnny.
24      Q.   And did you do anything at that business?
10:35 25    A.   No.  I was -- I was home -- I was taking care

GEORGIA WINEGEART & ASSOCIATES

### 27

1   of the children.  So everything managing was -- the
2   business was managed by Johnny.
3       Q.   Did you all discuss business at any times
4   while you were an officer of that company?
10:36 5     A.   Yes.
6       Q.   Do you remember discussing Swagg Man or his
7   wife?
8       A.   Discussing Swagg Man and his wife?  Yes.
9       Q.   And what do you remember discussing with your
10:36 10   husband about Swagg Man and/or any business dealings
11  with your company, AAA?
12      A.   I know Johnny used to do his tax and provide
13  other services to him.
14      Q.   What other services?
10:36 15    A.   I don't recall because when -- Johnny had the
16  point of contact with Iteb.  So a lot of that -- certain
17  services or certain things done, whatever he provide to
18  Iteb, some of them had to be, even though I'm the wife,
19  had to be, you know, work with Johnny at the time.  But,
10:37 20   yes.
21      Q.   Tell me more that your husband and you
22  discussed concerning Iteb, everything you can recall.
23      A.   Besides him providing service to Iteb?
24      Q.   Yes.  The only service you told me is some
10:37 25   sort of tax services.  You couldn't remember anything

GEORGIA WINEGEART & ASSOCIATES

### 28

1   else on your previous answer.  Do you remember anything
2   else provided to Iteb by your husband from AAA?
3       A.   I don't recall.
4       Q.   So how many conversations did you have with
10:38 5     your husband concerning Iteb, would you say?
6       A.   I don't remember.
7       Q.   Did you have more than one?
8       A.   I do not remember, sir.
9       Q.   What do you mean, you don't remember?  When
10:38 10   you got sued, you don't remember talking to your husband
11  about getting sued and talking about Iteb?
12      A.   Well, yeah.  When they come and served us, I
13  was the one that received the package.
14      Q.   And what did you talk to your husband about?
10:38 15    A.   I asked him what was going on when I received
16  the -- when I received the package, the serving package,
17  because I never had any sort of communications with
18  either Iteb or his wife.  And I asked Johnny what -- I
19  received a package saying whatever was going on.  So
10:39 20   what's going on?  So either one of us was not aware of
21  really what was going on.
22          And at this point I asked Johnny to provide me
23  -- that was the first time because I asked Johnny to
24  give me the guy's phone number, Iteb's phone number, to
10:39 25   talk to him to find out why am I being involved in that,

GEORGIA WINEGEART & ASSOCIATES

1   what is going on so, because basically I've never talked
2   to Iteb. Yes, Johnny provided services. Me,
3   personally, we've never had any communication.
4        So, yes, that was the only time I reach out to
10:39  5   him and find out -- I mean, it surprise me. What is
6   this, what is going on, because I never know about
7   anything.
8      Q.   Did you get ahold of Iteb?
9      A.   I just now remember, yes. When I received the
10:40  10   package, the serving package, it surprised me. I didn't
11   know what was going on. Yes, I did text Iteb. It was
12   the first time I said -- I said, Good afternoon. This
13   is Johnny's wife. I'm not sure what is going on. I
14   received some documents because his name was in there.
10:40  15   So it was something that I didn't know what was --
16   something that was going on. I wanted to know what was
17   going on.
18      Q.   What did he tell you?
19      A.   I don't remember what he said. I really don't
10:40  20   remember it said, but...
21      Q.   Do you remember, how long was the
22   conversation, would you say?
23      A.   It was not long.
24      Q.   Five minutes, thirty minutes?
10:41  25      A.   It was a text.

1      Q.   A text. Do you still have that text?
2      A.   No, I don't because I went to Arizona. They
3   sold my phone there.
4      Q.   And you don't remember anything that was in
10:41  5   the text?
6      A.   I was just addressing why I received the
7   package -- when I received the serving package. And
8   then it surprised me my name was involved in it. So,
9   yes, I wanted to make sure -- I mean, I wanted to find
10:41  10   out what it was, what is it about.
11        First of all, sir, when I received that
12   package that said I was involved, and Mr. Patrick stated
13   that I was the one doing real estate transactions with
14   them. Untruth, unclear. That's the reason why I was
10:42  15   doing the investigation and was searching for
16   everything, evidence. Patrick --
17      MR. OSBER: Yvette, I'm going to interrupt you
18   for just a second.
19      Cindy, can you read back the question, please?
10:42  20      (The question was read back.)
21      THE WITNESS: I really don't remember. I
22   mean, look, it was a shock to me because I didn't
23   even know. I've haven't done anything and I didn't
24   see --
10:42  25      MR. OSBER: Let me do this one more time.

1   Cindy, can you read back the question again?
2      (The question was read back.)
3      MR. OSBER: Do you need to hear it another
4   time, Yvette?
10:43  5      THE WITNESS: I think I told them I received
6   the serving package and what does it really say,
7   the home and this and that. So I don't -- and then
8   I don't remember anything else.
9   BY MR. TOMCHIN:
10:43  10      Q.   Let me ask you this. Did you ask your husband
11   whether or not AAA sent to your company, Res Investment,
12   any money of Mr. Muller's?
13      A.   No. I would say -- can you repeat the
14   question for me?
10:43  15      Q.   Yeah. Have you ever talked to your husband,
16   outside the presence of your attorney -- Mr. Muller has
17   stated he sent money to AAA. Do you understand that?
18      A.   No. I kept -- sent money to AAA, sir, because
19   Mr. Muller -- either me or Johnny never have ahold of
10:44  20   Mr. Muller. We never talked to Mr. Muller. We never
21   heard -- the money was passed -- was Iteb; it wasn't
22   Mr. Muller because Mr. Muller, we never have a
23   conversation with Mr. Muller. We never talked with
24   Mr. Muller. He said that Mr. Muller would tell Iteb he
10:44  25   was going to send money to AAA. I said this, not

1   Mr. Muller. At this point the money belonged to
2   Mr. Iteb.
3      Q.   Did you ever look at your AAA bank records at
4   Wells Fargo to see who actually sent the money to AAA?
10:44  5      MR. OSBER: Form.
6      THE WITNESS: Iteb.
7   BY MR. TOMCHIN:
8      Q.   Let me ask you this question again. Have you
9   ever looked at AAA's Wells Fargo banking account to see
10:45  10   how the money came in to AAA?
11      A.   Yes.
12      Q.   Did you -- are you stating now that after
13   looking over those records, those banking records, that
14   the monies came in by Iteb and not Mr. Muller?
10:45  15      MR. OSBER: Form.
16      THE WITNESS: The reason why I said the money
17   was not Iteb's, because of communication was -- it
18   was sent by Mr. Muller but for Iteb. So that's the
19   reason why I say that.
10:46  20   BY MR. TOMCHIN:
21      Q.   So let me make sure we're clear. When you --
22   first of all, did you ever send me copies of those bank
23   records?
24      A.   Did I send you a copy of those?
10:46  25      Q.   Of the Wells Fargo Bank records, did you ever

**33**

1  send me copies of those Wells Fargo Bank records?

2  A. Yes, I may have them.

3  Q. I never received them in the documents I got

4  from your attorney. Let me ask you this. Did you send

10:46 5  your attorney the Wells Fargo banking records you had

6  with AAA?

7  MR. OSBER: Mr. Tompkin --

8  MR. TOMCHIN: Mr. Tomchin; it's not Tompkin.

9  MR. OSBER: Mr. Tomchin, that would be a

10:46 10  communication between a client and an attorney,

11  wouldn't it?

12  MR. TOMCHIN: I don't think it is.

13  MR. OSBER: I think it is. So I'll instruct

14  her not to answer then.

10:46 15  MR. TOMCHIN: That's fine.

16  BY MR. TOMCHIN:

17  Q. You have reviewed AAA Wells Fargo Bank

18  records; is that correct, anytime in your life?

19  A. Yes.

10:47 20  Q. And did you look specifically to see where

21  monies came from dealing with this lawsuit?

22  A. Yeah --

23  Q. And did you --

24  COURT REPORTER: I didn't hear that answer.

10:47 25  MR. OSBER: It's because Mr. Tomchin keeps

*GEORGIA WINEGEART & ASSOCIATES*

**34**

1  talking over the answers.

2  MR. TOMCHIN: Thank you, Steve. I appreciate

3  that.

4  BY MR. TOMCHIN:

10:47 5  Q. Go ahead, Ms. Tenord. Say that answer again.

6  A. Can you repeat the question for me again,

7  please?

8  Q. Yeah. I said, Did you review those banking

9  records?

10:47 10  A. Yes.

11  Q. Could you tell where the monies came from

12  involved in this lawsuit?

13  A. Well, the arguing if the money came from

14  Mr. Patrick, I mean, I don't remember what I've seen in

10:47 15  those documents because I saw it some time ago. I

16  didn't go over it, but it was sent to me. But, yes, the

17  communications with the money came from Mr. Patrick for

18  Mr. Iteb.

19  Q. Does it -- well, I'll get into those records

10:48 20  in a few minutes, but you do admit it looked like on

21  those records, the bank records, that the money came

22  from Mr. Patrick Muller?

23  MR. OSBER: Form.

24  THE WITNESS: Yes. For Iteb, yes.

10:48 25  BY MR. TOMCHIN:

*GEORGIA WINEGEART & ASSOCIATES*

**35**

1  Q. You keep saying Iteb. How do you know they

2  were for Iteb?

3  A. That was the communication.

4  Q. I thought you said you only talked to Mr. Iteb

10:48 5  once by text?

6  A. That was the communication with Iteb and

7  Johnny.

8  Q. Yes. So you didn't hear anyone tell you what

9  the money was for, did you, other than what your husband

10:49 10  told you?

11  A. Can you repeat that question for me?

12  Q. Yeah. Swagg Man never told you what that

13  money was for, you, personally, correct?

14  A. No.

10:49 15  Q. And Johnny was the only one who told you why

16  Mr. Muller sent the money to the AAA account, correct?

17  A. Correct.

18  Q. Now what did your husband tell you that money

19  was for?

10:49 20  MR. OSBER: That's a spousal privilege. Don't

21  answer the question.

22  MR. TOMCHIN: Great. That's fine.

23  Taylor, let's scroll on down a little bit.

24  Let's see Number 3.

25  BY MR. TOMCHIN:

*GEORGIA WINEGEART & ASSOCIATES*

**36**

1  Q. Let me ask you this question. Were you ever a

2  real estate agent for Iteb?

3  A. No, sir --

4  Q. Okay.

10:50 5  A. Either one, neither Patrick or Iteb.

6  MR. OSBER: Answer the question that's being

7  asked of you and just answer that question.

8  THE WITNESS: Okay.

9  MR. TOMCHIN: Come on down again, Taylor, come

10:50 10  on down even further.

11  BY MR. TOMCHIN:

12  Q. Did Mr. Muller ever give you any instructions

13  with any money that was at AAA?

14  A. No.

10:50 15  Q. And you never talked to Mr. Muller; is that

16  correct?

17  A. That is correct.

18  MR. TOMCHIN: Come on down some more, Taylor.

19  Keep coming. That's fine.

10:51 20  BY MR. TOMCHIN:

21  Q. Number 13 reads: Copies of any documents

22  dealing with the purchase or sale of the property

23  located at 8356 Calumet Court, Port St. Lucie. We've

24  talked a little bit about that. What documents, if you

10:51 25  have them, would you have concerning that property?

*GEORGIA WINEGEART & ASSOCIATES*

---

57

```
 1    A.   We had -- I know we had the Res Investment.
 2   We had some money in it.  So that's what I know.
 3    Q.   And those are in banking records that you're
 4   going to look for?
11:37 5    A.   Yes.
 6    Q.   Did you actually get a loan -- did Res
 7   Investment get a loan for the almost million dollars?
 8    A.   Yes, it was a loan.
 9    Q.   And you filled out information for that?
11:37 10   A.   Did I fill out the information for it?
 11   Q.   Did you or Johnny fill out -- that was a poor
 12  question.  I appreciate that.  Do you know if you filled
 13  out any information for that loan for Res Investment?
 14   A.   Johnny would have the answer to this.
11:37 15   Q.   Did you have to guarantee that loan
 16  individually, yourself?
 17   A.   No.
 18   Q.   Do you know if -- I'll ask Johnny.  The loan
 19  has been paid off; is that correct?
11:38 20   A.   Yes.
 21   Q.   And do you remember who you sold this property
 22  to?
 23   A.   With the documents you will receive was -- I
 24  don't remember the name of the couple who purchased it.
11:38 25   Q.   Okay.  Had you ever known them before?
```

GEORGIA WINEGEART & ASSOCIATES

---

58

```
 1    A.   No.
 2    Q.   Were you the real estate agent on that
 3   transaction?
 4    A.   No.
11:38 5    Q.   Okay.
 6    A.   Which -- on this one?
 7    Q.   Yes.
 8    A.   The buying, yes.
 9    Q.   How about when this sold, were you the real
11:38 10  estate agent when you sold this property?
 11   A.   I was co-agent.
 12   Q.   Who else was the agent on it?
 13   A.   I think her name was Patricia.
 14   Q.   How about the last name?
11:38 15   A.   I don't remember her last name.
 16   Q.   And what company -- was that the company you
 17  were working for at the time?
 18   A.   Yes.
 19   Q.   And refresh my memory, what that company's
11:39 20  name is.
 21   A.   Real Estate Solutions Today.
 22   Q.   Your husband, who does he work for or with
 23  now?
 24   A.   He's self-employed.
11:39 25   Q.   And under what companies?
```

GEORGIA WINEGEART & ASSOCIATES

---

59

```
 1    A.   Faith, Faith Lending.
 2    Q.   Faith Lending; is that correct, Faith Lending?
 3    A.   Something.
 4    Q.   Do you have any involvement in that company?
11:39 5    A.   No.
 6    Q.   All right.  Do you know if you or your husband
 7   or your company ever paid AAA back for any monies it
 8   might have received from Mr. Muller?
 9    A.   No.
11:40 10        MR. TOMCHIN:  I have no further questions.
 11        MR. OSBER:  I have no questions.
 12        COURT REPORTER:  Read or waive?
 13        MR. OSBER:  We'll read.
 14        MR. TOMCHIN:  Steve, why don't we take, like
11:40 15  you said, a half an hour?  How about 15 after 12?
 16        MR. OSBER:  Yeah, that's fine, 12:15.  We'll
 17  have lunch now and we'll resume back at 12:15.  And
 18  Johnny will be in the hot seat there.
 19        (The deposition was concluded at 11:40 a.m.)
 20             *  *  *  *  *
 21
 22
 23
 24
 25
```

GEORGIA WINEGEART & ASSOCIATES

---

60

```
 1             CERTIFICATE OF OATH
 2          (VIDEOCONFERENCE PROCEEDINGS)
 3
 4   THE STATE OF FLORIDA )
 5   COUNTY OF DUVAL      )
 6
 7   I, the undersigned authority, certify that
 8   YVETTE TENORD, appeared before me and was duly sworn on
 9   the 29th of March, 2024.
 10
 11
 12  Signed this 13th day of April, 2024.
 13
 14
 15  _____
     CYNTHIA G. SILVERBERG, Court Reporter
 16  Notary Public - State of Florida
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

GEORGIA WINEGEART & ASSOCIATES

61

```
 1              CERTIFICATE OF REPORTER
 2
 3    THE STATE OF FLORIDA )
 4    COUNTY OF DUVAL     )
 5
 6        I, CYNTHIA G. SILVERBERG, Court Reporter and Notary
 7    Public, certify that I was authorized to and did
 8    stenographically report the videoconference deposition
 9    of YVETTE TENORD, Pages 1 through 59; that a review of
10    the transcript was requested; and that the transcript is
11    a true and complete record of my stenographic notes.
12        I further certify that I am not a relative,
13    employee, attorney, or counsel of any of the parties,
14    nor am I a relative or employee of any of the parties'
15    attorney or counsel connected with the action, nor am I
16    financially interested in the action.
17
18        DATED this 13th day of April, 2024.
19
20
21        _____
          CYNTHIA G. SILVERBERG
22        Court Reporter and Notary Public
23
24
25
```

**GEORGIA WINEGEART & ASSOCIATES**

62

```
 1                        ERRATA SHEET
                DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 2    IN RE: PATRICK MULLER & MOUNA ROUZID v. ITEB SAIBET, et al.
              CASE NO: 23-cv-22276-BLOOM/Otazo-Reyes
 3                  WITNESS: YVETTE TENORD
                    TAKEN:  03/29/2024
 4
      Page    Line      Change          Reason For Change
 5
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22        Under penalties of perjury, I declare that I have
      read the foregoing document and that the facts stated in
23    it are true.
24    _____        _____
      DATE                    YVETTE TENORD
25
```

**GEORGIA WINEGEART & ASSOCIATES**