UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**CASE NO. 2023-cv-22276-JB**

PATRICK MULLER, an individual, and MOUNA
BOUZID, an individual,

    Plaintiffs,

vs.

ITEB ZAIBET a/k/a "Swagg Man", an individual,
LOLITA C. REBULARD, an individual, LUXURY
PROPERTIES INC., a Delaware corporation,
BEACH PROPERTIES RENTAL, INC., a Delaware
corporation, LUXURY PROPERTIES TRUST u/a/d
March 2, 2018, AAA PLUS FINANCIAL GROUP
INC., a Florida corporation, YVETTE TENORD, an
individual, JOHNNY PREVILUS, an individual,
RES INVESTMENT INTER, INC., a Florida
corporation, INFINITE RES INVESTMENT, LLC,
a Nevada limited liability company, NEW MIAMI
REALTY, CORP., a Florida corporation, and
GUZMAN305 TRUST, a Florida trust,

    Defendants.
_____/

**PREVILUS DEFENDANTS' PROPOSED FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND FINAL JUDGMENT**

Defendants, Johnny Previlus ("Previlus") Yvette Tenord ("Tenord"), AAA Plus Financial Group Inc. ("AAA"), Res Investment Inter, Inc. ("Res Investment"), and Infinite Res Investment, LLC ("Infinite Res") (collectively "Previlus Defendants"), hereby file this, their Proposed Findings of Fact, Conclusions of Law, and Final Judgment in the form of a written closing brief as directed by this Court on January 14, 2025, as follows:

## GENERAL BACKGROUND

This action, as the third in a series of three lawsuits, arises from Plaintiffs' attempts to invest money with Iteb Zaibet and Lolita Rebulard. The "investment opportunities" were in fact all part of a ulterior motive orchestrated, organized, and coordinated between Plaintiffs and Iteb Zaibet and Lolita Rebulard, and, while presented as surrounding an investment in south Florida real estate, were in fact primarily an attempt by Plaintiffs to invest in a cryptocurrency known as "Bitcoin." The sale, transfer, purchase, and holding of which is illegal in the Mullers' country of residence, Tunisia.

It is uncontroverted that neither Patrick Muller ("Muller"), nor Mouna Bouzid ("Bouzid") (collectively, "Plaintiffs" or "the Mullers"), had any direct interaction with the Previlus Defendants at any time whatsoever prior to the Mullers initiating legal action founded on the claims brought in this lawsuit. Rather, as a result of representations made, and directions given to, Plaintiffs, solely by Iteb Zaibet ("Zaibet") and/or Lolita Rebulard ("Rebulard"), Plaintiffs wired approximately €1,525,000.00 to AAA, which acted as the agent for the funds – a legitimate business service. Despite Plaintiffs' contention throughout this lawsuit and its two predecessor suits that the €1,525,000.00 thus wired on the direction of Iteb Zaibet was done so for the purpose of an investment in a residential property at 5421 Bayview Drive, Fort Lauderdale, Florida 33308, only one single document exists that refers to that property: "wiring instructions" that, even according to the Plaintiffs themselves, are not authentic, and were received only *after* the money was wired. In reality, and despite Plaintiffs' contentions, the overwhelming weight of the evidence shows that Plaintiffs intended their €1,525,000.00 to be used for the purchase of Bitcoin, as facilitated by Zaibet. The purchase, sale, holding, and transfer is illegal in Plaintiffs' home country of Tunisia by way of application of anti-money laundering and counter-financing of terrorism laws.

**FINDINGS OF FACT**

I. **Plaintiffs and Their Dealings with Iteb Zaibet**

Patrick Muller has been a resident of the country of Tunisia for more than twenty years, and by his own admission, is subject to the laws of that country. He is married to Mouna Bouzid - also a resident of Tunisia - and together the two own and operate a textile manufacturing company called "Nimetex Group." According to their own version of events, Plaintiffs are well-known in Tunisia as successful business owners.

Plaintiffs first became acquainted with Iteb Zaibet - also known by his pseudonyms "Swagg Man" and "Rayan Sanchez" - in July of 2019, through mutual friends who reached out to Plaintiffs on Zaibet's behalf in order to discuss potential business ventures in the field of textile manufacturing. At that time, Zaibet was incarcerated in prison in Tunisia for twenty counts of fraud. Zaibet, through his attorneys and representatives, ultimately solicited a loan from Plaintiffs due to the financial difficulties he was having, and Plaintiffs willingly provided financial assistance, which included paying the costs of having Zaibet released from prison.

II. **The Subject "Real Estate Transaction"**

Plaintiffs claim that the €1,525,000.00 they wired to AAA's operating account – on the directions of Zaibet and/or Rebulard – was for the purchase of a residential property located at 5421 Bayview Drive, Fort Lauderdale, Florida 33308. The record, however, reveals a lack of *any* documentary evidence substantiating such a significant purchase of real estate. There are no real estate listings, MLS listings, escrow statements, sale postings, contract documents, proposal documents, or any other such materials that have been presented to show that the property was ever offered for sale, or discussed as an investment, that would have been relied upon by Plaintiffs in sending €1,525,000.00 overseas. Muller and Bouzid both acknowledged under oath that they had never

seen the property in person, or made any attempts to do so. Further, Plaintiffs have been unable to give *any details whatsoever*, via documentary evidence or testimony, that would describe the nature and/or scope of their "investment" into that property – e.g. whether the money was for a wholesale purchase of the property or whether it was for a share of ownership, how proceeds were to be divided upon the sale or rental of the property (and whether the property was to be rented or sold), any division of expenses that would needed to be put forth with regard to possible rehabilitation, upkeep, or holding costs, etc. In fact, the **only** piece of "evidence" that even makes **reference** to that property is a set of "wiring" instructions, which, *as testified to by both Plaintiffs*, is falsified, and, *as testified to by both Plaintiffs*, was only received by the Plaintiffs from Zaibet *after* they had wired the money to AAA's accounts. (Ex. P-1). Both Plaintiffs conceded that the "investment" in the 5421 property was essentially their first such investment in real estate.

Further casting doubt as to the legitimacy of the "real estate" transactions is the fact that both Plaintiffs, by their own admission and without explanation, wired the "investment" money through a series of four payments, with no corroborating evidence as to why the payments were structured in that manner; and contrary to the "wire instructions" which contemplate one single lump-sum payment. It simply defies explanation as to why the subject "wiring instructions" were created, or would have been provided, *after the money had already been sent*, if that was indeed its intended purpose.

    **III.**    **Prior Lawsuits and Actions Taken by Plaintiffs Against the Previlus Defendants**

On February 15, 2022, Plaintiff Patrick Muller filed his first lawsuit (the "first lawsuit") arising out of the alleged real estate scheme that is the subject of the instant action. (Ex. D-82). Thus first lawsuit was against Previlus, Tenord, and AAA in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida. The **verified** Complaint in that matter sought a

temporary restraining order, as well as a preliminary injunction and permanent injunction with regard to the funds purportedly wired to AAA by the Mullers for the purposes of investing in 5421 Bayview Drive.  When Mr. Muller later sought leave to amend this verified Complaint on March 24, 2022, the Amended Complaint contained *numerous* allegations describing the Mullers' intention to invest in Bitcoin with Zaibet and Rebulard through the "Kraken" and "Metamask" applications (Ex. D-83 at PREVILUS-00586, 00592-00595), and included numerous exhibits outlining Bouzid's contact with Zaibet related to her use of the Kraken application for such Bitcoin investments (*Id.* at PREVILUS 00698 – 00745). Both Johnny Previlus and Yvette Tenord incurred significant attorneys' fees in defending against that lawsuit.

On June 27, 2022, Muller filed his second lawsuit (the "second lawsuit") – this time joined by his wife as a Plaintiff - based on the alleged real estate scheme and other transactions with Zaibet as a part of those investments.  This second lawsuit was filed in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, against Zaibet, Rebulard, and several business entities owned and/or controlled by Zaibet (the "second lawsuit" or "Miami lawsuit") (Ex. D-84, D-84T).  Plaintiffs alleged in that lawsuit that they engaged in a number of investment opportunities with Zaibet and Rebulard that turned out to be fraudulent, including the real estate investment that is the subject of the instant action, as well as an investment in Bitcoin. (*Id.* at PREVILUS -00747 -00752). Plaintiffs in that action pled that they intended to invest with Zaibet in a number of projects – including "an industrial project in the field of textiles, a real estate investment consisting of the acquisition of a property in Florida," and "the purchase of BITCOINS with high return potential through the KRAKEN application." *Id.* The Miami-Dade lawsuit was later amended and supplemented by interlineation to include a verification page.  (Ex. D-86 and D-88).  Much like the Broward lawsuit, the Miami-Dade lawsuit was accompanied by exhibits

5

(many of them being the same as those attached to the Broward Lawsuit) demonstrating and outlining the specifics of Plaintiffs' investments into Bitcoin; including the dates of transfers of funds into the "Kraken" platform, and confirmations that Bitcoin had been purchased. (Ex. D-84 and D-84T, generally). These exhibits – again, filed by Plaintiffs themselves – further included Muller's own bank ledger – forwarded from his personal email address to his "Nimetex" business email address – *confirming that he had purchased Bitcoin, and showing the exact amounts and dates of transfers.* Further, these exhibits included correspondence between Mouna Bouzid and "Kraken" support, including photographs of Bouzid holding her passport and a written acknowledgment of a disclaimer statement, sent in her efforts to regain access to her locked Kraken account. (Ex. D-84 at PREVILUS 00846, 00848, 00854, 00860, 00886, Ex. D-84T at PREVILUS 00850T-00852T, 00856T, 00858T, 00862T, 00864T, 00866T, 00868T, 00870T, 00872T, 00874T, 00876T, 00878T, 00880T, 00882T, 00884T, 00888T, 00890T, 00892T, 00900T).

In connection with their efforts to recover funds "invested" with Zaibet and Rebulard, Plaintiffs engaged attorney Steven G. Ganim of the Ganim law group to send correspondence in the form of a demand letter to Johnny Previlus through AAA Plus. (Ex. P-60). In that letter, the Mullers, by and through their attorney, *demanded* that Johnny Previlus/AAA Plus send €1,500,000.00 as a "return of the funds" within ten (10) days of receipt of that letter, and if this transfer was not made, the Ganim Law Group would "…initiat[e] civil **and criminal actions."** against Previlus. *Id.* Plaintiffs additionally filed complaints with the Department of Business and Professional Regulation ("DBPR") against both Previlus and Tenord, who again had to retain and pay an attorney significant expenses in dealing with these complaints, which were both dismissed for lack of any finding of wrongdoing. Tenord was nevertheless fired from her job as a result of

the Complaint, and her real estate license was even put on hold while the investigation was ongoing, causing further financial harm.

### IV. Plaintiffs' Illegal Bitcoin Transactions as The Centerpiece of Their "Investments" With Iteb Zaibet

The Mullers are residents of Tunisia and therefore subject to Tunisian Law. The trading, holding, purchase, sale, transfer, and mining of Bitcoin is **illegal** in Tunisia, by application of "Anti-Money Laundering" and "Counter-Financing of Terrorism" rules. (Ex. D-81 - 73 CAIL Annual Institute on Energy Law § 11.03, Ex. D Ex. 92 - Law Library of Congress, Regulation of Cryptocurrency Around the World: November 2021 Update (Nov. 2021)[1] .

The record in this case contains *significant* documentary evidence showing Muller and Bouzid's self-described intentions to invest in Bitcoin with Zaibet and/or Rebulard as part of the series of transactions that also included their purported "investments" in 5421 Bayview Drive. On the face of those facts alone, it is abundantly clear that the investment schemes were related. However, a closer review of the exhibits attached to the Complaint in the Miami-Dade and Broward lawsuits reveals that the entire "real-estate" investment scheme described in this lawsuit was a careful artifice designed to retroactively disguise a series of illegal investments in Bitcoin.

Plaintiffs contend that they made a total of seven transfers to or through Iteb Zaibet as part of their "investment" into 5421 Bayview Drive:

| Date | To/From | Amount |
|---|---|---|
| November 10, 2021 | Muller to Zaibet | 200,000 dinars (62,172 euros) |
| November 12, 2021 | Muller to Zaibet | 100,000 dinars (31,086 euros) |
| November 18, 2021 | Muller to Zaibet | 30,000 dinars (9,325 euros) |
| December 3, 2021 | Muller to AAA Plus Financial Group | 500,000 euros |
| December 8, 2021 | Muller to AAA Plus Financial Group | 500,000 euros |
| December 23, 2021 | Muller to AAA Plus Financial Group | 250,000 euros |

---

[1] See Defendants' Request for Judicial Notice [D.E. 179] -in determining foreign law, the Court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.

| January 7, 2022 | Muller to AAA Plus Financial Group | 250,000 euros |

(Plaintiff's Complaint D.E. 1, at ¶ 30.) Plaintiffs have not offered any explanation, however, as to why three transfers were made to Zaibet directly, before they switched to making transfers to AAA's accounts.

A review of Mouna Bouzid's Kraken Ledger (Ex. D-84T at PREVILUS 00900T) shows that Bitcoin transfers were made on November 15, 17, and 18 of 2021; which approximately coincide with the dates of the first three transfers made to Zaibet toward the "purchase of the house." (Ex. D-84T at 900T). These dates likewise correspond with Patrick Muller's bank account statements, which show transfers "to Kraken Payward" on November 12 and November 16, 2021. *Id.* at 870T. Further, correspondence between Bouzid and Zaibet in late November 2021 clearly shows that Bouzid and Zaibet were having issues with the Kraken cryptocurrency exchange, which had been suspended account access for both Zaibet and Bouzid. (D-84T at PREVILUS 00850T, 00852T, 00856T, 00858T, 00866T, 00868T, 00876T, 00878T, 00882T, 00884T, 00888T, 00890T, 00892T, D-84 at PREVILUS 00846, 00848, 00854, 00860, 00886, Ex. D-115).

Perhaps most telling are the WhatsApp messages between Bouzid and Zaibet that follow, on December 18, 2021, where Bouzid proposes to Zaibet that the "200 thousand from Metamask" be combined with "300 from Patrick to have the exact amount." (D.E 84T at 00866T). Notably, the "exact amount" of these two transfers is the "exact amount" of the two combined subsequent transfers on December 3, 2021 and January 7, 2022, that flowed into the accounts of AAA. It is clear that Mouna Bouzid and Patrick Muller were investing in Bitcoin all along; and ran into trouble along the way with their accounts being flagged by the Kraken application, and needed to find an alternative method of transferring money for the purchase of Bitcoin. It was at this point that the Mullers and Zaibet chose to involve the Previlus Defendants, as the Previlus Defendants

8

operated a financial services company that Plaintiffs could use to send and hold money for the purchase of Bitcoin. By disguising these transfers with fabricated wire transfer instructions as being for the purpose of investing in real estate, Plaintiffs were able to avoid scrutiny from the Central Bank of Tunisia, which is responsible for regulating the banking sector as well as conducting monetary policy and supervising banks and financial institutions. Most telling, when asked repeatedly about Bitcoin investments in light of the allegations in the verified complaints, both Plaintiffs answers were evasive.

### V.     Involvement of the Previlus Defendants

During the time period of the subject transactions, Johnny Previlus owned and operated AAA Plus Financial Group, a financial services provider that, for a fee, performs financial services for clients such as tax return preparation, wire transfer and payment services, bookkeeping, and corporate establishment. AAA Plus Financial does not buy or sell real estate, or provide mortgage or title escrow services. Previlus originally became acquainted with Zaibet in connection with this business, where Zaibet sought out Previlus's services for the management of funds received from Zaibet from the sale of a house in the Florida Keys. Throughout their course of dealings in the next several years, Previlus/AAA regularly performed services for Zaibet that included setting up companies, making wire transfers, and preparing tax returns. Zaibet went to prison for fraud from 2019-2021, but upon his release, the two resumed their business relationship. In late 2021, Zaibet, communicating with Previlus through phone calls and WhatsApp messages, informed Previlus that his business partner, "Patrick," would be making a series of wires to AAA's accounts that Iteb and his business partner – later revealed to be Patrick Muller – were using for a series of investments. As the money was deposited into AAA's accounts, Zaibet – in line with his prior business dealings with Johnny – would direct that it be disbursed for various purposes, including purchasing property

and paying off bills. In connection with the services performed for Zaibet, Previlus would keep a running ledger of disbursements as well as monies owed by Zaibet for services rendered. Yvette Tenord was not involved in any way with the transactions that are at the heart of this case. While she is listed as an officer of AAA Plus, Res Investment Inter, and Infinite Res, she has no managerial or operational responsibilities as to those companies. At no time were the Previlus Defendants aware of the full extent of Plaintiffs' alleged claim to the monies.

## CONCLUSIONS OF LAW

### I. WITNESS CREDIBILITY

#### a. Patrick Muller

Patrick Muller's testimony contained numerous inconsistencies, unsupported denials, and omissions. As a sophisticated businessman who operates a large-scale textile manufacturing company, Muller's testimony regarding his apparent lack of due diligence in investing €1,525,000.00 – described by him as essentially his "life savings" – with an individual known to him to have been accused of, and imprisoned for, more than twenty counts of fraud, is simply not credible or reliable. Mr. Muller could not provide any rational explanation for the *unusual* nature of his purported "investments" into a property that he had never laid eyes on and in fact had essentially no substantive information about. Likewise, Mr. Muller's suggestion that he had never previously made any such investments in real estate casts significant doubt on his version of events.

Muller was remarkably evasive on the topic of investments in Bitcoin in particular. Despite documentary evidence belying his version of events – *his own bank statements showing purchases of Bitcoin and correspondence from his wife relating to her consultations with him on her own purchases of Bitcoin* – Muller asserted that it was not him, but rather his wife, who was involved in Bitcoin transactions. Mr. Muller was able to recall a conversation that he had with Zaibet via

10

WhatsApp that took place after relationship between those two individuals soured. During that conversation, Zaibet repeatedly reminded Mr. Muller of the purpose of the wire transfers to AAA's accounts – for investment into Bitcoin. However, Mr. Muller did not at any point during that conversation "correct the record" or otherwise deny Iteb's statements. Instead, he only stated that Iteb's statements were "exaggerated."

Mr. Muller's explicit acknowledgement that he is subject to the laws of Tunisia, coupled with authority showing that Bitcoin and cryptocurrency trading is illegal in Tunisia, shows an obvious motive to avoid any acknowledgement of his involvement in such transactions, to avoid legal consequences in his home country, as well as adverse results in this lawsuit. In sum, in attempting to create a narrative that was contrary to documentary evidence provided to the Court, Mr. Muller's various statements as to his lack of involvement in Bitcoin were not credible, and the Court cannot give credence to the substance of his testimony on his own behalf or on behalf of his wife and co-Plaintiff, Mouna Bouzid.

### b. Mouna Bouzid

Ms. Bouzid testified remotely from her home Country of Tunisia through the use of contemporaneous transmission technology. Ms. Bouzid's testimony, like that of her husband, was inconsistent and not credible. Bouzid initially vehemently denied having ever invested in Bitcoin; instead stating that she only transferred funds to the Kraken cryptocurrency platform but did not actually purchase any Bitcoin. Ms. Bouzid later tacitly admitted that she had invested in Bitcoin; even despite having testified in her deposition that she had never done so. Like her husband, Bouzid is a resident of Tunisia, and subject to the laws of Tunisia, and would therefore have an interest in distancing herself as much as possible from any transactions related to Bitcoin. Ms.

Bouzid's testimony as to her involvement in Bitcoin transactions as the subject of her investments with Iteb Zaibet was therefore likely perjurious, or otherwise not credible or reliable.

Just days before the first trial setting in this matter of August of 2024, Bouzid notified the Court that she would be unable to attend trial in-person due to her inability to travel. (D.E. 161). She later requested to testify remotely, stating that she was "not authorized to enter the United States" due to her "ESTA" Visa application being denied a number of times. (D.E. 169). Bouzid was unable to provide any explanation as to why her travel Visa was denied, or why she was essentially blocked from leaving her home country of Tunisia. Bouzid's lack of knowledge on this subject is simply baffling, and is more easily explained as a lack of candor in testifying about those issues.

### c. Johnny Previlus

Johnny Previlus testified in a straightforward, non-evasive manner, and was credible. Most notably, Mr. Previlus's testimony was consistent with WhatsApp messages and other documentary evidence submitted by the Plaintiffs themselves, as to the following issues:

a) he never communicated directly with either Plaintiff,

b) Plaintiffs wired the €1,525,000.00 euro to AAA's accounts solely on the directions of Zaibet, with AAA simply acting as an agent for the funds,

c) Johnny had no knowledge of the specifics of the dealings between Plaintiffs and Iteb Zaibet and was simply told that the funds belonged to Zaibet and were sent by his "business partner" Patrick Muller,

d) All funds disbursed by AAA Plus were done so under the express and proper authority of Zaibet consistent with a prior course of dealings,

e) the Previlus Defendants did not learn of Plaintiffs' claims for the funds until after most of the funds had been disbursed,

f) the Previlus Defendants ultimately suffered harm as a result of Plaintiffs' various attempts to recover their "investments" for which Zaibet was responsible

As to the damages claimed by the Plaintiffs, Mr. Previlus capably testified that none of Plaintiffs funds were used toward the purchase of the Port St. Lucie property; as these funds came from other personal and business accounts of the Previlus Defendants, including funds from Res Investment Inter's accounts. This testimony was uncontradicted. Likewise, Mr. Previlus testified that he earned approximately $20,000 in fees for services rendered to Zaibet in the ordinary course of his business.

### d. Yvette Tenord

Yvette Tenord's testimony, while brief, was competent, credible, and straightforward. Although Ms. Tenord's name is nominally associated with the corporate Previlus Defendants as an officer of those corporations, she was not involved in any of the transactions upon which this case is founded, and did not speak to the Mullers before the Mullers initiated their first lawsuit. While Ms. Tenord did earn a commission from the sale of the Port St. Lucie property, she did so in her normal capacity as a realtor on a standard sale of a property. She was not unjustly enriched.

## II. PLAINTIFFS' CLAIMS ARE BARRED BY THE DOCTRINE OF UNCLEAN HANDS

Plaintiffs have unclean hands because they engaged in illegal transactions and attempted to conceal their wrongful conduct. Specifically, Plaintiffs engaged in transactions for the purpose of investing in Bitcoin, which is they are prohibited from doing under the laws of their own country, and eventually sought to conceal the nature of their "investments" by using falsified wiring instructions to avoid scrutiny from banking and financial institutions once they ran into trouble

while using the Kraken platform. Likewise, in the course of a series of lawsuits spanning two counties and three court systems, Plaintiffs similarly wish to again changed their position. The instant lawsuit shows a conspicuous absence of allegations regarding Bitcoin, despite voluminous allegations to the contrary in prior sworn lawsuits, and despite the fact that Plaintiffs originally sued Zaibet and his companies in this lawsuit. *Both Plaintiffs* have engaged in further wrongful conduct by making misrepresentations under oath throughout the course of the proceedings in this case regarding their prior investments in Bitcoin[2]. Defendants have been harmed by Plaintiffs' illegal and wrongful actions by virtue of the fact that they have incurred massive attorneys' fees in defending several lawsuits and unfounded DBPR complaints, and Yvette Tenord in particular was even fired from her job due to those complaints.

### III. DAMAGES

While it is Defendants' position that Plaintiffs' claims are barred by the doctrine of "unclean hands," the Court requested a discussion about Plaintiffs' potential damages. The evidence shows that with regard to any claimed damages, at most, a *de minimis* amount of the Mullers' total funds were used by the Previlus Defendants for their own purposes, and were done so with the express permission of Zaibet as either compensation for services rendered. Plaintiffs' claims for damages fall into two categories – 1) funds withdrawn or otherwise disbursed from AAA's Wells Fargo

---

[2] The unclean hands doctrine exists principally to protect the integrity of the Court. *See e.g. Padideh v. Moradi,* 305 Cal. Rptr. 3d 906, 910 (Ct. App. 2023) ("This consideration outside the merits of a plaintiff's claim reflects that one beneficiary of the unclean-hands doctrine is the courts, as its application 'protects judicial integrity and promotes justice. It protects judicial integrity because allowing a plaintiff with unclean hands to recover in an action creates doubts as to justice provided by the judicial system. Thus, precluding recovery to the unclean plaintiff protects the court's, rather than the opposing party's, interests.'"), *Mona v. Mona Elec. Grp., Inc.*, 934 A.2d 450, 474 (Md. Ct. Spec. App. 2007) ("the clean hands doctrine 'is intended to protect the courts from having to endorse or reward inequitable conduct.'" (quoting *Adams v. Manown*, 615 A.2d 611, 616 (Md. 1992)).

accounts by the Previlus Defendants for their "own purposes," and 2) $163,598.23 as disgorgement of profits from the Previlus Defendants' purchase and sale of 8356 Calumet Court in Port St. Lucie, Florida.

As to the first category, Plaintiffs' damage claim erroneously relies upon a rudimentary addition of all AAA Wells Fargo funds used by the Previlus Defendants during the relevant time period of December 2021 to February 2022. However, a quick review of the Wells Fargo statements also reveals that during this time period, the Previlus Defendants were also regularly making deposits of their own money into that account. Plaintiff's damages as described by the extent to which the Previlus Defendants were "unjustly enriched" by their funds are not the aggregate of all funds used from the Wells Fargo account, because a *significant* portion of that money - approximately 75% - was the Previlus Defendants' own money flowing into and out of that account, which oftentimes never interacted with the principal deposit by the Mullers. Likewise, any money disbursed for the benefit of Zaibet would not count toward any alleged unjust enrichment of the Previlus Defendants.

| Month | Beginning Balance | Deposited by Mullers | Funds Disbursed for Zaibet's Purposes | Withdrawal or Disbursement of Funds by Previlus Defendants | Money Deposited into AAA Accounts by Previlus Defendants | Monthly Total |
|---|---|---|---|---|---|---|
| December 2021 | $2,020.54 (prior to first Muller Deposit) | $1,389,110.50 | $1,018,742.97 | $325,276.52 | $1,103.68 | $324,172.84 more used than deposited by Previlus Defendants |
| January 2022 | $48,215.23 | $278,152.25 | $539,404.74 | $11,508.65 | $225,157.75 | $213,649.10 more deposited than used by Previlus Defendants |

15

| February 2022 | $611.84 | $0.00 | $0.00 | $82,974.12 | $88,053.00 | $5,078.88 more deposited than used by Previlus Defendants |
| --- | --- | --- | --- | --- | --- | --- |
| **TOTAL:** | Ending acct. balance $5,078.88 | $1,667,262.75 | $1,558,147.71 | $419,759.29 | $314,314.43 | **$108,503.92 ultimately retained** |

For reasons stated above, Plaintiffs' damages from this first category *cannot exceed* $108,503.92. In fact, a closer review of the evidence reveals that Plaintiffs' damages are limited even further. On December 23, 2021, Johnny Previlus withdrew $300,000 from the Wells Fargo account as a loan authorized by Zaibet (Ex. P-38). The Wells Fargo account statements (Ex. P-61) show that of that $300,000, $195,000 was returned to AAA's Wells Fargo account *twenty-one days later*. Further, Johnny Previlus testified that, operating under Zaibet's representations that the $300,000 portion was Zaibet's to disburse and transfer, repaid an additional portion of that $300,000 *to Zaibet* by wiring $48,000 *of Previlus's own funds* toward the purchase of a property in Los Angeles, California, for Zaibet's benefit, on January 10, 2022. This transaction is shown on Plaintiffs' Exhibit 6, and is described in Plaintiff's Exhibit 32. It cannot be said that the Previlus Defendants were in any way unjustly enriched as to that amount. Further, Previlus testified that in accordance with the tax preparation, corporate establishment, and wire transfer services provided to Zaibet, Previlus was owed approximately $20,000 in fees. It cannot be said that Previlus was *unjustly enriched* by those amounts either, as those were fees that were earned and retained. Plaintiffs' damages, as to the first "category," if any, are thus limited as follows:

| Total Amount "Retained" by Previlus Defendants | Amounts Not Used for the Benefit of Previlus Defendants | Fees Earned and Retained by Previlus | Total "Damages," if Any |
|---|---|---|---|
| $108,503.92 | $48,000 toward Iteb Zaibet's purchase of Los Angeles property | Approx. $20,000 | **$40,503.92** |

Plaintiff's second category of claimed damages pertains to alleged profits from the Previlus Defendants' purchase and sale of a residential property in Port St. Lucie, Florida, for which they contend approximately $300,000 their funds were used. The evidence in this case, however, shows that none of the $300,000 – or any of Plaintiffs' money whatsoever – was used toward the purchase of that property. Much of the $300,000 was returned to the Wells Fargo accounts, or otherwise disbursed for the benefit of Iteb Zaibet as noted above. As testified to by Johnny Previlus, not one dollar of the funds put forth by the Previlus Defendants toward the Port St. Lucie property were those belonging to the Mullers, as they came from entirely different accounts. Thus, disgorgement of profits from the sale of the Port. St. Lucie property are not recoverable.

## CONCLUSION

The Previlus Defendants find themselves in an unfortunate quandry where, through no fault of their own, they were caught in a scheme where Plaintiffs and Zaibet conspired to make illegal investments in Bitcoin, and later sought to conceal the nature of these transactions while in the same breath seeking to recover their funds from the Previlus defendants. "One maxim of equity is that a litigant going into equity must go with clean hands, and another is that he who seeks equity must do equity." *Davis v. Verandah at Lake Grady Homeowners Association, Inc.*, 48 Fla.L.Weekly D142a (Fla. 2d DCA 2022) quoting *Engebretsen v. Engebretsen*, 11 So.2d 322, 329 (Fla. 1942).

**WHEREFORE,** Johnny Previlus, Yvette Tenord, AAA Plus Financial Group, Res Investment Inter, and Infinite Res Investment respectfully request this Honorable Court deny any and all relief sought whatsoever by Patrick Muller and/or Mouna Bouzid, and enter judgment in favor of Johnny Previlus, Yvette Tenord, AAA Plus Financial Group, Res Investment Inter, and Infinite Res Investment, and grant any such other relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of February, 2025 a true and correct copy of the foregoing has been furnished by electronic filing with the Clerk of the court via CM/ECF, which will send notice of electronic filing to all counsel of record.

Respectfully submitted,

**CONRAD & SCHERER, LLP**
614 S. Federal Hwy., Suite 800
Fort Lauderdale, Florida 33316
Telephone: (954) 462-5500
Facsimile: (954) 463-9244
Email: SOsber@conradscherer.com
         CPengel@conracdscherer.com

By: */s/ Steven H. Osber*
       Steven H. Osber
       Florida Bar No. 86088